Nos. 25-3347, 25-3348, 25-3349, 25-3350, 25-3363,
25-3453 to 25-3494, 25-3563 & 25-3564

————————————

# UNITED STATES COURT OF APPEALS FOR THE THIRD CIRCUIT

————————————

CRYSTALLEX INTERNATIONAL CORPORATION

v.

BOLIVARIAN REPUBLIC OF VENEZUELA

Bolivarian Republic of Venezuela, Appellant in Nos. 25-3347, et al.
PDV Holding, Inc., Appellant in No. 25-3348
CITGO Petroleum Corporation, Appellant in No. 25-3349
Petróleos de Venezuela, S.A., Appellant in Nos. 25-3350, et al.
Gold Reserve Ltd., Appellant in No. 25-3363

————————————

On Appeals of an Order of the
United States District Court for the District of Delaware
Nos. 17-mc-151-LPS, et al. (Hon. Leonard P. Stark)

————————————

## BRIEF OF APPELLANT GOLD RESERVE LTD.

————————————

MATTHEW H. KIRTLAND
NORTON ROSE FULBRIGHT US LLP
799 Ninth Street NW, Suite 1000
Washington, DC 20001
(202) 662-0200

AARON M. PANNER
DANIEL S. SEVERSON
COLLIN R. WHITE
DENNIS D. HOWE
KELLOGG, HANSEN, TODD,
  FIGEL & FREDERICK, P.L.L.C.
1615 M Street, N.W., Suite 400
Washington, D.C. 20036
(202) 326-7921

*Counsel for Appellant Gold Reserve Ltd.*

January 8, 2026

*(Additional Counsel Listed Inside)*

KEVIN J. MANGAN
MATTHEW P. WARD
STEPHANIE SMIERTKA RILEY
WOMBLE BOND DICKINSON (US) LLP
1313 North Market Street, Suite 1200
Wilmington, Delaware 19801
(302) 252-4320

MICHAEL BOWE
TYLER PURINTON
BRITHEM LLP
565 Fifth Avenue
New York, NY 10017
(646) 653-9173

*Counsel for Appellant*
*Gold Reserve Ltd.*

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Rule 26.1(a) of the Federal Rules of Appellate Procedure, Gold Reserve Ltd. states that it does not have a parent corporation and that no publicly held corporation owns 10 percent or more of its stock.

**TABLE OF CONTENTS**

**Page**

CORPORATE DISCLOSURE STATEMENT.......................................................i

TABLE OF AUTHORITIES...........................................................................v

INTRODUCTION ........................................................................................1

JURISDICTION.............................................................................................5

ISSUES PRESENTED....................................................................................6

RELATED CASES .........................................................................................6

STATEMENT ...............................................................................................6

A.   The Court Appoints the Special Master, Who Engages Weil and
Evercore as Advisors, To Oversee the Sale of PDVH Shares ........................6

B.   Parallel Litigation by the 2020 Bondholders and "Alter Ego"
Claimants Complicates Efforts To Market the Shares ..................................9

C.   The Parties Unanimously Reject the Advisors' Initial,
Unsuccessful Attempt To Sell the PDVH Shares to Elliott ..........................11

D.   The District Court Re-Boots the Sale Process..............................................12

E.   The Special Master Recommends Red Tree as the Stalking
Horse Bid and Gold Reserve as the Final Recommended Bid.....................15

F.   Discussions with the Advisors Encourage Elliott To Make a
Post-Topping Period Offer; the Special Master Recommends
Elliott's Lower-Priced Bid..........................................................................18

G.   Post-Recommendation Discovery Reveals Weil and Evercore
Have Significant Relationships with Elliott and the
2020 Bondholders, but the District Court Denies Motions
for Disqualification ....................................................................................21

H.   The Court Approves the Sale to Elliott .......................................................25

STANDARD OF REVIEW............................................................................26

SUMMARY OF ARGUMENT ....................................................................27

ARGUMENT ........................................................................................28

I.  THE DISTRICT COURT'S SALE ORDER VIOLATES THE
    REQUIREMENT THAT ATTACHED SHARES BE SOLD
    TO "THE HIGHEST BIDDER".............................................................28

    A.  The Sale Order Violates Section 324's Requirement That
        the PDVH Shares Be Sold to the Highest Bidder ..............................28

        1.  The "highest bidder" requirement is an objective
            analysis.................................................................................28

        2.  Gold Reserve was the "highest bidder" under
            Delaware law........................................................................32

        3.  Gold Reserve was a qualified bidder with a
            conforming bid......................................................................33

    B.  Deviation from the "Highest Bidder" Requirement Also
        Violated the Court-Ordered Sale Procedures....................................35

        1.  The Evaluation Criteria Did Not Permit Selection
            of a Lower-Priced Bid over a Higher-Priced
            Unconditional Bid.................................................................35

        2.  The Requirement of an "Overbid" Made Clear
            That a Lower Bid Could Not Displace a Higher
            Recommended Bid.................................................................37

II. DISQUALIFICATION OF THE DISTRICT COURT,
    THE SPECIAL MASTER, AND ADVISORS WEIL AND
    EVERCORE IS REQUIRED UNDER 28 U.S.C. § 455..............................40

    A.  Weil's and Evercore's Conflicts of Interest Create the
        Appearance of Bias Under Section 455 .............................................41

    B.  The Discretionary Judgments Favoring Elliott Contribute
        to the Appearance of Bias ................................................................48

C.      Weil's and Evercore's Conflicts of Interest Are Imputed
        to the Special Master and the District Court Under
        *Kensington* .................................................................................51

D.      Gold Reserve's Disqualification Motion Was Procedurally
        Proper ........................................................................................54

CONCLUSION ........................................................................................57

STATUTORY ADDENDUM

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF FILING AND SERVICE

CERTIFICATE OF BAR MEMBERSHIP

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Alexander v. Primerica Holdings, Inc.*, 10 F.3d 155 (3d Cir. 1993) ...........40, 41, 42

*Amgen, Inc. v. Smith*, 357 F.3d 103 (D.C. Cir. 2004) ................................39

*Bakalis*, *In re*, 220 B.R. 525 (Bankr. E.D.N.Y. 1998) ................................30

*Biden v. Nebraska*, 600 U.S. 477 (2023) ................................................39

*Carauna v. Saligman*, 1990 WL 212304 (Del. Ch. Dec. 21, 1990) ........................29

*Commonwealth Coatings Corp. v. Continental Cas. Co.*, 393 U.S. 145
(1968) ................................................................................40

*Crystallex Int'l Corp. v. Bolivarian Republic of Venezuela*:

932 F.3d 126 (3d Cir. 2019) ..................................................1, 6, 7

24 F.4th 242 (3d Cir. 2022) ........................................................8

*Family Christian, LLC*, *In re*, 533 B.R. 600 (Bankr. W.D. Mich. 2015) ................31

*G&A Strategic Invs. I LLC v. PDV Holding, Inc.*, No. 4:24-cv-2774,
Dkt. 63 (S.D. Tex. Mar. 19, 2025) ................................................11

*G&A Strategic Invs. I LLC v. Petróleos de Venezuela, S.A.*,
788 F. Supp. 3d 616 (S.D.N.Y. 2025), *appeal pending*,
No. 25-1789 (2d Cir. July 23, 2025) ..............................................11

*Genuine Parts Co. v. Essendant Inc.*, 2019 WL 4257160 (Del. Ch.
Sept. 9, 2019) ....................................................................45

*Glenn Def. Marine (ASIA), PTE Ltd. v. United States*, 720 F.3d 901
(Fed. Cir. 2013) ..................................................................31

*Jenkins v. Sterlacci*, 849 F.2d 627 (D.C. Cir. 1988) ................................47

*Johnson v. Craddock*, 365 P.2d 89 (Or. 1961) ........................................30

*Keith v. Johnson*, 59 S.W. 487 (Ky. 1900) ...........................................30

*Kensington International Ltd.*, *In re*, 368 F.3d 289 (3d Cir. 2004)..............5, 26, 41,
42, 43, 47,
51, 52, 53, 55, 56

*Lawsky v. Condor Cap. Corp.*, 2015 WL 4470332 (S.D.N.Y. July 21,
2015) ...............................................................................................31

*Leatherbury v. Greenspun*, 939 A.2d 1284 (Del. 2007).............................. 28-29, 30

*LeBoon v. Lancaster Jewish Cmty. Ctr. Ass'n*, 503 F.3d 217
(3d Cir. 2007).................................................................................56

*Liljeberg v. Health Servs. Acq. Corp.*, 486 U.S. 847 (1988) ....................................41

*MCI Telecomms. Corp. v. AT&T Co.*, 512 U.S. 218 (1994)....................................39

*NACCO Indus., Inc. v. Applica Inc.*, 997 A.2d 1 (Del. Ch. 2009)...........................45

*Petróleos de Venezuela, S.A. v. MUFG Union Bank, N.A.*, 2025
WL 2675871 (S.D.N.Y. Sept. 18, 2025), *appeal pending*,
No. 25-2652 (2d Cir. Oct. 21, 2025) ................................................9

*Pitchfork Ranch Co. v. Bar TL*, 615 P.2d 541 (Wyo. 1980)....................................30

*Portfolio FB-Idaho, LLC v. FDIC*, 2011 WL 573793
(D. Idaho Feb. 13, 2011)................................................................34

*Roche v. Evaporated Milk Ass'n*, 319 U.S. 21 (1943)..............................................52

*Salzberg v. Sciabacucchi*, 227 A.3d 102 (Del. 2020)..............................................30

*School Asbestos Litig.*, *In re*, 977 F.2d 764 (3d Cir. 1992)................................41, 52

*State v. City of Lincoln*, 94 N.W. 719 (Neb. 1903)..................................................30

*Travelers Cas. & Sur. Co. v. Insurance Co. of N. Am.*, 609 F.3d 143
(3d Cir. 2010)................................................................................26

*Tumey v. Ohio*, 273 U.S. 510 (1927) ......................................................................46

*United States v. Chemical Found.*, 5 F.2d 191 (3d Cir. 1925),
*aff'd as modified*, 272 U.S. 1 (1926)..............................................31

vi

*Vornado PS, L.L.C. v. Primestone Inv. Partners, L.P.*, 821 A.2d 296
(Del. Ch. 2002), *aff'd*, 2003 WL 1904666 (Del. Apr. 16, 2003)..................33

*Young Broad. Inc.*, *In re*, 430 B.R. 99 (Bankr. S.D.N.Y. 2010).............................34

## STATUTES AND RULES

28 U.S.C. § 455 ..................................................................................6, 24, 40, 41

28 U.S.C. § 455(a)...........................................................................40, 41, 52, 53

28 U.S.C. § 1291 ...........................................................................................5

28 U.S.C. § 1330 ...........................................................................................5

28 U.S.C. § 1605(a)(6) ..................................................................................5

Del. Code:

    tit. 8:

        § 324 ........................................................ 19, 28, 29, 30, 31, 32, 33

        § 324(a).............................................................................1, 4, 6, 28

    tit. 9:

        § 4535 ............................................................................................29

        § 8753 ............................................................................................29

    tit. 22, § 504(a)..................................................................................29

    tit. 25, § 6309 ...................................................................................29

Fed. R. Civ. P. 69(a)(1)...................................................................................1

**ADMINISTRATIVE MATERIALS**

Off. of Foreign Assets Control, U.S. Dep't of Treasury:

    FAQ (Jan. 20, 2022; updated Dec. 19, 2025),
    https://ofac.treasury.gov/faqs/595 ...............................................................49

    General License No. 5T (Dec. 19, 2025),
    https://ofac.treasury.gov/media/934866/download?inline ...........................10

**INTRODUCTION**

Section 324(a) of title 8 of the Delaware Code authorizes the attachment and sale of corporate shares to satisfy a debt.  The district court attached stock of Petróleos de Venezuela Holding, Inc. ("PDVH"), a wholly owned subsidiary of Petróleos de Venezuela, S.A. ("PDVSA") and indirect owner of CITGO Petroleum Corp., to satisfy debts owed by the Bolivarian Republic of Venezuela; this Court affirmed the attachment.  *See Crystallex Int'l Corp. v. Bolivarian Republic of Venezuela*, 932 F.3d 126 (3d Cir. 2019).

Under Delaware law, a sale of attached shares must be "public" and "*to the highest bidder*."  Del. Code tit. 8, § 324(a) (emphasis added); *see also* Fed. R. Civ. P. 69(a)(1) ("The procedure on execution . . . must accord with the procedure of the state where the court is located[.]").  The district court created elaborate sale procedures carried out by a court-appointed Special Master and "Advisors" that the Special Master hired:  a law firm, Weil, Gotshal & Manges LLP ("Weil"), and an investment bank, Evercore, Inc. ("Evercore"; together with Weil "Advisors")

A crucial aspect of the sale procedures was the use of a "Stalking Horse" bid to create a baseline against which any successful bid would compete in a subsequent "Topping Period."  The Stalking Horse round was designed not to generate the highest possible bid but instead to give bidders a target.  The bid selected after the Topping Period, on the other hand, was intended to be final:

court-approved bidding protections provided the bidder selected after the Topping Period safeguards against subsequent offers, including a non-solicitation provision, barring the Special Master from seeking additional bids, and a "minimum overbid" provision, requiring any subsequent bid to exceed the recommended bid by at least $50 million. The Special Master was given "discretion to lower or raise the overbid minimum," A5639, but not to eliminate it.

After the Topping Period, the Special Master determined that only two bids were "Qualified Bids" – including the bid of Dalinar Energy, a subsidiary of appellant Gold Reserve.[1] After "conduct[ing] rigorous assessments of the strengths and weaknesses of each Topping Bid," A318 (¶ 200), the Special Master recommended the Gold Reserve bid – which offered nearly $7.5 billion for the PDVH shares, significantly more than the other Qualified Bid. The Special Master and Gold Reserve entered into a Stock Purchase Agreement ("SPA") that included court-approved bid protections, including the overbid minimum. A6054. The Special Master's "Final Recommendation" recommended acceptance of the Gold Reserve bid.

After the Special Master made his recommendation, however, another bidder – Amber Energy, a subsidiary of Elliott Investment Management L.P. ("Elliott")[2] –

---

[1] This brief will refer to the bidding entity as "Gold Reserve."

[2] This brief will refer to the bidding entity as "Elliott."

submitted its own "unsolicited" offer.  At $5.9 billion – $1.5 billion *less* than Gold Reserve's offer of $7.4 billion – Elliott's bid did not satisfy the overbid minimum. But rather than reject the lower bid (as Delaware law and the SPA required), the Special Master recommended it over Gold Reserve's offer – even after Gold Reserve had further increased its bid to $7.9 billion.

Nor was the bid truly "unsolicited."  Rather, as subsequent discovery revealed, Elliott's discussions with the Special Master's Advisors at Weil encouraged Elliott to make that offer.  Furthermore, Elliott's lawyer *at Weil* pushed the Advisors at Weil to hold those discussions – emphasizing the importance of Elliott as a Weil client.  (Indeed, last-minute discovery revealed that both Weil and Evercore have extensive but previously undisclosed relationships with the beneficiaries of the Special Master's ultimate recommendation – leading Gold Reserve to move to disqualify the district court, the Special Master, and those Advisors.)

The Special Master justified accepting a $2 billion *lower* bid based on the supposedly greater "certainty of close" for the Elliott bid.  He cited the risk that a different set of creditors – owners of bonds issued by PDVSA (known as "2020 Bondholders" or "the 2020s" because of the bonds' maturity date) – would seek to block any transaction involving the merger of CITGO Petroleum.  Elliott had entered into a Transaction Support Agreement ("TSA") with owners of more than

3

two-thirds of the 2020 bonds; the agreement provided for a payment of more than $2 billion to the 2020 Bondholders in exchange for their agreement not to attempt to block Elliott's deal.  By contrast, Gold Reserve maintained that its bid remained the highest qualified bid because the risk that the 2020 Bondholders would attempt to block its transaction was contingent on pending litigation, and the district court already had determined that settlement with the 2020s was not required to make a qualified bid.

Gold Reserve's bid was higher than Elliott's – by $2 billion.  The district court nevertheless accepted the Special Master's recommendation and ordered the sale of the PDVH shares to Elliott.  That decision was unlawful and should be reversed for two basic reasons.

*First*, under Delaware law and the court-ordered sale procedures, the district court could not accept a lower bid in preference to a higher qualified bid.  The Delaware statute is unambiguous:  attached shares *must* be sold at public sale "*to the highest bidder*."  Del. Code tit. 8, § 324(a) (emphasis added).  That highest-bidder requirement was reflected in the express terms of court-ordered bidder protections and embodied in Gold Reserve's SPA:  those protections bar consideration of any competing offer *unless* the offer satisfies a "minimum overbid," which the Special Master may *reduce*, but not eliminate.  The court repeatedly ruled that settlement with the 2020 Bondholders was not a requirement

for a qualified bid, and the Special Master had recommended the Gold Reserve bid over a different bid that included such a settlement. By giving Elliott's TSA dispositive weight, the court allowed for diversion of $2 billion from attachment creditors to the non-party 2020 Bondholders, undermining the core purpose of the "highest bidder" requirement.

*Second*, the district court's decision cannot stand because the court lacked authority given the appearance of bias that infected the proceeding. The beneficiaries of the court's decision – Elliott and the 2020 Bondholders – are clients of Weil and Evercore, having paid $170 million in fees to the two Advisors in other matters. An objective observer would conclude that the Advisors had an incentive to favor the interests of their clients – a suspicion reinforced by evidence that other Weil attorneys facilitated conversations between the Advisors and Elliott leading Elliott to pursue its "unsolicited offer" strategy. The apparent conflict of the Advisors is attributed to the Special Master and the district court and requires vacatur of the judgment and reassignment of the case on remand. *See In re Kensington Int'l Ltd.*, 368 F.3d 289 (3d Cir. 2004).

### JURISDICTION

The district court had jurisdiction under 28 U.S.C. § 1330 and § 1605(a)(6). *See Crystallex*, 932 F.3d at 132-52. This Court has jurisdiction under 28 U.S.C. § 1291 to review the district court's November 29, 2025 final order, A429-839,

and prior interlocutory orders that merge with the judgment. On December 1, 2025, Gold Reserve timely appealed. A10.

## ISSUES PRESENTED

1.     Whether the district court violated Delaware law's requirement that attached shares be sold "to the highest bidder," Del. Code tit. 8, § 324(a), and the procedures governing the sale of PDVH shares by accepting Elliott's lower bid over Gold Reserve's higher qualified bid.

2.     Whether Weil's and Evercore's undisclosed representations of Elliott and the 2020 Bondholders required recusal of the district court, the Special Master, and his Advisors based on apparent conflicts of interest under 28 U.S.C. § 455.

## RELATED CASES

This appeal is one of 49 appeals from the same decision below that this Court has consolidated for expedited briefing and argument. *See* No. 25-3347, Dkts. 111, 146.

## STATEMENT

**A.     The Court Appoints the Special Master, Who Engages Weil and Evercore As Advisors, To Oversee the Sale of PDVH Shares**

Plaintiff Crystallex International Corporation ("Crystallex") holds a $1.2 billion judgment against Venezuela based on Venezuela's expropriation of the company's gold mining rights. A1456-57. Crystallex sought to collect on its judgment under Delaware law by executing on property nominally owned by

Venezuela's state-owned oil company, PDVSA – namely, PDVSA's shares of PDVH, which indirectly owns, through CITGO Holding, Inc., CITGO Petroleum Corp. ("CITGO").  In August 2018, the district court found that PDVSA was an alter ego of Venezuela and that PDVSA's shares in PDVH were subject to attachment by Venezuela's judgment creditors.  A1734-35; A10751-826.  This Court affirmed.  *See Crystallex*, 932 F.3d at 133.

More judgment creditors, including Gold Reserve, registered their judgments with the district court in order to share in the proceeds of the PDVH shares.  A285 (¶ 71).  Gold Reserve was involved with a mining project in Venezuela, which the Venezuelan government terminated without compensation. After an arbitration panel awarded Gold Reserve $740 million, Gold Reserve secured confirmation of that judgment and registered it.  *See Gold Reserve Inc. v. Bolivarian Republic of Venezuela*, No. 22-mc-453, Dkt. 1 (D. Del. Oct. 5, 2022). The district court valued Gold Reserve's claim (as of an estimated closing date of June 30, 2026) at approximately $1.25 billion.  A288.

The district court ultimately ranked the attachment creditors, A288, and made clear that it would not "improperly allow[ ] . . . [c]laimants to leapfrog" the "priority order with respect to judgment creditors' claims," A5503 10n.6.

The district court issued an opinion and order setting forth some of the procedures it would follow in conducting the sale, recognizing that Delaware law

"*commands*" "*selling the shares at a public sale to the highest bidder*." A112-13; A117. The court also appointed a special master (Mr. Robert Pincus) to oversee the design and implementation of more detailed sale procedures and the sale of PDVH shares. A112-13; A117; *see generally Crystallex Int'l Corp. v. Bolivarian Republic of Venezuela*, 24 F.4th 242, 249 (3d Cir. 2022) (dismissing appeal). The Special Master retained Weil as transaction counsel and Evercore as financial advisor; both were granted judicial immunity to serve the Special Master "as an arm of the Court." A2442-45 (¶¶ 13, 20-21); *see* A3572-74.

The sale process has been run almost exclusively by Weil and Evercore. Weil's billing records show that, since the sale process began in earnest in late 2023, Weil has billed for tens of thousands of hours of attorney time, whereas the Special Master has spent relatively little time on the matter. *See*, *e.g.*, D.I.2606 (Weil billing nearly 7,000 hours for September to November 2025 alone, compared to 144 hours for Special Master himself);[3] A10441. The Advisors have amassed millions of dollars in billings. *E.g.*, A4856; A4889; A5111; A5791; A5884; A5890; A7070; A8998.

---

[3] "D.I." references the district court's docket entries.

**B.      Parallel Litigation by the 2020 Bondholders and "Alter Ego" Claimants Complicates Efforts To Market the Shares**

Efforts to market the PDVH shares were complicated by parallel litigation involving other claims on PDVH and CITGO.

*First*, in 2019, PDVSA filed an action in the Southern District of New York challenging the validity of certain bonds PDVSA had issued; security for those bonds (which matured in 2020) was a pledge of 50.1% of the equity in CITGO Holding, Inc., the direct owner of CITGO Petroleum.  Because PDVSA defaulted on the bonds, if the bonds ultimately are deemed valid, the 2020 Bondholders may have the ability prevent the merger of CITGO Petroleum with an acquisition vehicle, which could prevent the closing of any transaction that depends for its financing on security provided by CITGO Petroleum's assets.  After the Second Circuit reversed an initial ruling on the validity of the bonds under New York law, the Southern District of New York recently ruled that the bonds are valid under Venezuelan law; that decision is subject to another, expedited appeal.  *See Petróleos de Venezuela, S.A. v. MUFG Union Bank, N.A.*, 2025 WL 2675871 (S.D.N.Y. Sept. 18, 2025), *appeal pending*, No. 25-2652 (2d Cir. Oct. 21, 2025).

The significance of the threat posed by the 2020 Bondholders remains disputed.  For one thing, sanctions against Venezuela currently prevent the 2020 Bondholders from exercising their rights under the pledge; for the past six years, the U.S. Office of Foreign Assets Control ("OFAC") repeatedly has suspended the

9

license that otherwise would allow transactions and financing in the purported pledge of CITGO Holding equity to the 2020 Bondholders. A291 (¶ 87); A8511; A8521-22; *see also* A5878-79.[4] For another thing, although Elliott entered into an agreement with certain 2020 Bondholders under which they would release the pledge encumbering the CITGO Holding equity, the bond indenture requires the written consent of the issuer for that release; PDVSA has not provided that written consent. A5393-94 (¶ 9.02(b)). In any event, even if the 2020 Bondholders could obstruct the purchase of PDVH shares, they have an incentive to reach agreement with whoever ultimately is the winning bidder.[5]

*Second*, a group of creditors of Venezuela and PDVSA filed litigation in the Southern District of New York and Texas state court seeking to establish that PDVH is the alter ego of Venezuela and/or PDVSA. A293-94 (¶¶ 96-100). That "Alter Ego" litigation created a risk that PDVH – and thus any future owner of the shares – would be found liable for the debts of Venezuela and/or PDVSA. The

---

[4] Most recently, OFAC issued General License No. 5T, suspending the license's effectiveness until February 3, 2026. *See* https://ofac.treasury.gov/media/934866/download?inline.

[5] The Special Master "sought to create a level playing field among bidders" by negotiating a settlement with the 2020 Bondholders that would be available to any winning bidder. A292 (¶ 92). An agreement in principle was opposed by Crystallex, the Venezuela Parties, and ConocoPhillips (the three "Sales Process Parties" that the court had designated to provide input into sale procedures, *see* A277 (¶ 39)), and the Special Master abandoned efforts to finalize the agreement. A292-93 (¶¶ 93-95).

district court below denied the Special Master's motion to enjoin the Alter Ego

litigation.  A5492-518.  The Southern District of New York granted summary

judgment denying the Alter Ego claims in May 2025; an appeal is pending at the

Second Circuit, with briefing to conclude in March 2026.  *See G&A Strategic Invs.*

*I LLC v. Petróleos de Venezuela, S.A.*, 788 F. Supp. 3d 616 (S.D.N.Y. 2025),

*appeal pending*, No. 25-1789 (2d Cir. July 23, 2025).[6]

**C.**     **The Parties Unanimously Reject the Advisors' Initial, Unsuccessful
          Attempt To Sell the PDVH Shares to Elliott**

After a marketing period and submission of initial non-binding bids in

January 2024, final bids were required to be submitted in June 2024, in advance

of a July 18, 2024 Sale Hearing.  A5904 (¶ 30); *see also* A6532 (Hiltz Decl. ¶ 13).

Gold Reserve submitted the highest bid, but the Advisors did not select it as the

winning bidder because, for reasons not then explained, the Advisors obtained

extensions of these deadlines to conduct unsanctioned exclusive discussions with

another bidder – Elliott.  A4875; A5904 (¶ 32); *see also* A6532 (Hiltz Decl. ¶ 14).

On September 27, 2024, the Advisors filed a recommendation that the district court

approve the sale of the PDVH shares to Elliott.  A4554.  The terms of the deal

were so lopsided in favor of Elliott and so adverse to the interests of the attached

---

[6] The action filed in Texas state court was removed and subsequently
dismissed for lack of jurisdiction.  *See* Order, *G&A Strategic Invs. I LLC v.
PDV Holding, Inc.*, No. 4:24-cv-2774, Dkt. 63 (S.D. Tex. Mar. 19, 2025).

judgment creditors, however, that, once the terms were made public, they generated near-universal opposition. *See*, *e.g.*, D.I.1337; D.I.1373-2; D.I.1373-4; A4871; A4877; D.I.1373-7; D.I.1417; D.I.1418; A5102.

Under this bid, Elliott was to take possession of the PDVH shares, and thus control of CITGO, without paying a penny to any attached judgment creditor. A4555; A4692-93; A4871. Instead, Elliott proposed – and the Advisors agreed – that all of Elliott's stated purchase price would be escrowed indefinitely, until final, non-appealable orders were entered in the 2020 litigation and the Alter Ego litigation. *Id.* In the interim, Elliott would own and operate CITGO, taking control of its substantial existing and future cash reserves. Moreover, if either of the two litigations did not end in a manner acceptable to Elliott, it could refuse to pay for the PDVH shares, return them to the court, and walk away. A4696-97. The parties' opposition to this proposal was summed up at an October 6, 2024, hearing by lead judgment creditor Crystallex, who described the terms as "evil." A4732 (29:19-30:2), A4739 (36:21-24).

## D.     The District Court Re-Boots the Sale Process

1.     Over the course of the next three months, the parties engaged in extensive litigation to scotch the proposed Elliott deal and to re-start the Sale Process with new procedural rules designed to prevent another failed process. *E.g.*, D.I.1433 at 1; A5480; A5523 (each summarizing extensive briefing).

12

The culmination of these efforts was a full-day hearing on December 13, 2024 and subsequent order. D.I.1507; A5519-30. The district court indicated that it would adopt, in advance, bid evaluation criteria, bidding procedures, and a model SPA; the court also adopted protections to prohibit the Special Master and his Advisors from entering into exclusive negotiations with any bidder without court approval. A5482-86; A5519-30.

2.     In an effort to generate greater "competitive tension" among bidders, A5638, the court adopted a two-round sale process that featured an initial "Stalking Horse" round followed by a second "Topping Period" designed to produce the final, highest bid. A5523-30.

The Stalking Horse period aimed to generate a credible baseline that other bidders would attempt to exceed; in exchange, the successful Stalking Horse bidder would gain certain bidder protections (including payment if its bid were replaced), enter into a SPA, and purchase the PDVH shares unless the bid was topped. But a Stalking Horse bid would gain no exclusivity; on the contrary, the express purpose of the Stalking Horse bid was to assist the Special Master in generating additional, higher bids.

The acceptance of any Stalking Horse bid would be followed by a Topping Period, during which the Special Master would solicit and evaluate Topping Bids, designate "Qualified Bids," and negotiate with bidders. A5526 (¶ 15). At the

conclusion of the Topping Period, the Special Master would "make a Final Recommendation" to the court.  A5527 (¶ 16).  Any successful Topping Bid also would gain bidder protections:  in particular, a successful Topping Bid would be protected by an "overbid minimum" equal to $50 million, provided that the Special Master would have discretion to "lower or raise" the overbid minimum.  A5639.  And, unlike in the case of a successful Stalking Horse bid, the Special Master was prohibited from soliciting a competing proposal.  A5617-18.

      **3.**     In its order clarifying procedures, the district court also approved certain guidelines and evaluation criteria for bids.  Most relevant here, the court adopted the Special Master's recommendation that any bidder could *not* employ a "trust/escrow construct[ ]" or any other provision "impacting certainty of funds payable [to judgment creditors] relating to the 2020 bonds"; nor could a bidder include any "closing conditions relating to the 2020 bonds."  A5557; A5648.  As the Special Master noted, while "[b]idders are welcome to address the 2020s separately, . . . this should not impact closing certainty or clarity around proceeds to creditors."  A5557.

      The court also adopted two basic "[e]valuation [c]riteria" for all bids:  price and "[c]ertainty of [c]losing."  A5559-60.  The "[p]rice paid for the PDVH Shares will be evaluated based on the amount of Attached Judgments expected to be satisfied by the purchase price."  A5559.  Certainty of closing would consider

(among other factors) "[c]onditionality related to pending or future litigation (including with respect to the 2020 Bonds[)]." *Id.*; *see* A5626-52 (adopting evaluation criteria with modifications). However, the court made clear that the evaluation criteria "shall NOT include any requirement or condition with respect to the 2020 Bond Entities other than that bidders acknowledge that the 2020 Bond Entities purport to have a pledge of 50.1% of the equity of CITGO Holding, Inc., which is disputed by the Venezuela Parties and is subject to active litigation." A5529-30 (¶ 28).

**E. The Special Master Recommends Red Tree as the Stalking Horse Bid and Gold Reserve as the Final Recommended Bid**

Following further marketing efforts by Evercore, the Special Master recommended a bid by Red Tree over Gold Reserve's higher-priced bid to serve as the Stalking Horse. Red Tree's bid was supported by a TSA with the 2020 Bondholders; the Special Master found that, as a result, "Red Tree had a much higher degree of certainty of closing" than Gold Reserve. A308 (¶ 162). The district court accepted that recommendation over the objections of Gold Reserve and other creditors (who argued for the highest bid), emphasizing that a Stalking Horse bid is "where the competition to purchase the PDVH Shares ***begins*** but does ***not end***." A5873. "The Special Master will, appropriately, remain open during the Topping Period to placing greater emphasis on price and lesser emphasis on certainty as he determines what bid to recommend as a Final Bid." *Id.* The court

15

agreed that the Red Tree bid "is most likely to lead to a robust topping period."

A5874 (cleaned up).  And the court rejected the argument that Delaware law's

requirement that attached shares be "**sold** 'to the highest bidder'[ ] requires the

Court to **start** the bidding process with the highest 'headline' price received so

far."  A5875-76.

The Topping Period opened April 28, 2025; after one extension, the Topping

Period closed June 18, 2025.  The Special Master continued negotiations with Gold

Reserve, Red Tree, and Elliott, all of whom had submitted bids during the Topping

Period; Gold Reserve and Red Tree eventually submitted revised proposals.[7]

Before making his final recommendation, the Special Master and his

Advisors conferred with the district court *ex parte* and sought guidance on how to

balance consideration of price and closing certainty – in particular, the risk that the

2020 Bondholders might block a transaction.  A6600-16 (46:22-62:15).  The court

emphasized that it had *not* " 'set up a process that is in any way intended to benefit

the 2020 bondholders' "; accordingly, " 'it is certainly a *detriment* to any deal if it's

one that allows for the scenario whereby the 2020s walk away with a lot of money

that they may not even be entitled to.' "  A316 (¶ 193) (quoting A6602-04 (48:25-

---

[7] As discussed below, the Special Master's Advisors at Weil apparently
advised Elliott that it could avoid certain commitment fees by submitting an
"unsolicited" bid after the Final Recommendation instead of attempting a
competitive Topping Bid.

49:4, 49:14-50:4)) (emphasis added).  The court stated that the risk from the 2020 Bondholders is one that "'I should be very comfortable taking unless the gap between a deal that takes that risk off the table and one that means we have to live with that risk *is pretty small*.'"  A317 (¶ 195) (quoting A6611 (57:12-18)) (emphasis added).  The court stated "offhand" it would be better to accept a bid worth $1 billion more over a bid that included a settlement with the 2020 Bondholders.  *Id.* (quoting A6614 (60:14-18)).

Consistent with that guidance, the Special Master recommended Gold Reserve's $7.382 billion bid – improved by $300 million over its bid during the Stalking Horse round – over the Red Tree bid, which offered the same (lower) price and features as its Stalking Horse bid.[8]  The Special Master executed the SPA with Gold Reserve consistent with the court-ordered terms – including required bidder protections.  In his Final Recommendation, the Special Master expressed "confidence with respect to [Gold Reserve's] financial wherewithal and certainty of financing," secured from "highly reputable global financial institutions." A5926.  He acknowledged "risks associated with the PDVSA 2020 Bondholders," but recognized that "an appellate court may reject a bid that places substantial value on a settlement with the PDVSA 2020 Bondholders considering that

---

[8] The Special Master also rejected several bids that were non-conforming, including Elliot's Topping Bid.  A319 (¶¶ 203-205).

subsequent events could occur invalidating or inhibiting any rights of the PDVSA 2020 Bondholders." A5926-27. The Special Master acknowledged that Red Tree was attempting to reach agreement with a creditor to accept an additional $1.5 billion in non-cash consideration, but stated that, even if that were agreed, he was "skeptical" that "any value attributable to the Revised Stalking Horse Bid on account of closing certainty . . . would be sufficient to make up for the over $2.076 billion purchase price difference." A5924. Ultimately, the Special Master "conclude[d] that [Gold Reserve's] Proposed Sale Transaction is the highest bid that he reasonably believes to be capable of being timely consummated." A5899.

### F. Discussions with the Advisors Encourage Elliott To Make a Post-Topping Period Offer; the Special Master Recommends Elliott's Lower-Priced Bid

Elliott's decision not to submit a conforming bid during the Topping Period followed discussions it had with the Special Master's Advisors at Weil. On June 24, 2025, a partner at Weil, Jeffrey Saferstein, reached out on behalf of Elliott to the Advisors (specifically Chase Bentley, a more junior colleague), explaining that Elliott was "frustrated" because "we're imposing new conditions and timing on them and it's impossible for them to meet them." A9998. Saferstein urged Bentley to speak with Elliott because "I['d] hate for them to not want to work with us." *Id.*

18

After further discussion between the Advisors at Weil and Elliott later that day, Bentley supplied a read-out to Saferstein, stating that the call was "fine" and that Elliott realized that the Advisors "were saving them some money in commitment fees"; Bentley inferred that, as a result of the discussion, Elliott would "submit something not fully committed in the morning" and "then wait to see what our recommendation is on July 2 *and try to beat that with an unsolicited offer*." A10098 (emphasis added).

Following those discussions, Elliott submitted a purportedly unsolicited bid that was approximately $1.5 billion lower than Gold Reserve's final recommended bid but that included a settlement with the 2020 Bondholders. A7427-31 (¶¶ 4, 7, 9). Specifically, Elliott had executed a TSA – like the one that had supported the earlier Red Tree Stalking Horse bid – that guaranteed $2.1 billion to the 2020 Bondholders.

Based on Section 324, the court-ordered terms of the SPA with Gold Reserve, and the district court's guidance, the Special Master should have rejected – indeed, was required to reject – the Elliott bid. To start, the court already had determined that "[t]he SPA and Evaluation Criteria shall NOT include any requirement or condition with respect to the 2020 Bond Entities"; a settlement with the 2020 Bondholders was *not* a required component of a bid to be recommended. A5529-30 (¶ 28).

Consideration of the bid also violated the court-ordered terms of the SPA, which barred consideration of any unsolicited competing proposal that failed to "satisfy an overbid minimum." A6054. Although the definition of "Superior Proposal" in the SPA includes a competing proposal that "would constitute a higher *or better* bid for the Shares based upon the Evaluation Criteria," *id.* (emphasis added), that definition *depends on* the proposal first qualifying as a "Competing Proposal" – which is where the overbid minimum is established. A proposal that does not satisfy the "overbid minimum" is not a "Competing Proposal" and, by definition, cannot qualify as a "Superior Proposal" under the SPA.

Furthermore, the Special Master's decision to pivot to the Elliott bid contradicted the guidance that the district court had provided earlier. As noted, at the end of the Topping Period, the court stated that a bid not supported by a settlement with the 2020 Bondholders but offering judgment creditors $1 billion more "'sounds like it might be better'" than a lower bid with such a settlement. A317 (¶ 195) (quoting A6614 (60:14-18)). The Special Master ignored the court's guidance and instead designated Elliott's bid a Superior Proposal – even though the court had previously recognized that, if the appeal in the Second Circuit results in a ruling that "the 2020 Bondholders have no rights to CIT[G]O Holding,"

"it would be a fundamental injustice" to execute on a lower-priced bid "when bids with a much greater purchase price were rejected."  A5878-79.

Under the terms of the SPA, Gold Reserve had just three days to improve its own proposal.  A7396.  With enormous effort, Gold Reserve submitted a new bid priced at $7.902 billion, which was more than $2 billion higher than Elliott's bid and would have satisfied more judgments than any conforming bid.  A7428, A7433-35 (¶¶ 5, 13-15).

To no avail:  even though the Special Master himself had stated that a settlement with the 2020 Bondholders would not justify a $2 billion dollar price difference, *see supra* p.18, the Special Master's Updated Final Recommendation asked the district court to approve the sale of PDVH shares to Elliott.  The only feature the Special Master cited as favoring the Elliott bid was its agreement to pay off the 2020 Bondholders for their still-contingent claims, which supposedly "virtually eliminates any closing risks associated with" the 2020 Bondholders litigation.  A7435 (¶ 16).

**G.    Post-Recommendation Discovery Reveals Weil and Evercore Have Significant Relationships with Elliott and the 2020 Bondholders, but the District Court Denies Motions for Disqualification**

1.    At the time of the Advisors' appointment and for most of the sale process, Gold Reserve and other judgment creditors had no reason to suspect that Weil's and Evercore's relationships with Elliott and the 2020 Bondholders were

21

more than de minimis.  On the contrary, the Special Master, Weil, and Evercore withheld ongoing relationships in prior disclosures.  For instance, in response to a discovery request that the Special Master produce "[d]ocuments sufficient to identify any professional engagements in which You or Your advisors performed work for any bidder participating in the sale process," A5842, Weil disclosed one, purportedly concluded, 27-day engagement with Elliott from July 17, 2024 to August 13, 2024, A12683, which supposedly had ended before the Special Master recommended Elliott's (ultimately abandoned) offer in September 2024.  Evercore did not disclose any engagements with Elliott.  A12684.

At the September 9, 2025, deposition of Elliott's assistant general counsel, Michael Turkel, however, Gold Reserve learned for the first time that Weil has served and continues to serve as Elliott's outside counsel in various matters, including in connection with trading, credit, and restructuring issues.  A12672-73 (242:12-243:24).

Gold Reserve raised these conflicts with the court on September 10, 2025, which ordered a response from the Special Master and his Advisors.  A12689-97. Their subsequent disclosures revealed that Weil collected more than $4.6 million in fees from Elliott and its affiliates from 2023-2025, spanning 16 matters. A10195; A12686-87.  Weil also has multiple recent matters (some active) for Elliott where Weil has yet to be paid and on which additional unspecified fees are

22

forthcoming. A12692-93; A12699. These disclosures also revealed that, since the Special Master retained Weil in 2021, Weil has earned more than $62 million in fees from the 2020 Bondholders. A10217. Weil also has earned $12.8 million more from ad hoc groups including one or more Bondholders. *Id.* & n.1.

Evercore too has earned substantial fees from ad hoc groups involving Elliott and will obtain more for collaborations with Elliott on other matters. A12679-81 (261:2-263:2); A12696 n.2; A12917-18. In mid-July 2025, Evercore pitched another ad hoc group of creditors, among whom Elliott was "the largest at about 20-25%." A12705. Evercore personnel acknowledged internally that their ongoing relationship with Elliott posed a "huge issue" – *i.e.*, a conflict of interest – for securing work from the ad hoc groups. A12703; *see also* A12706. Evercore nevertheless ignored the same conflict in continuing to advise the Special Master to recommend Elliott's underbid just weeks later. A7426-42. During its time as Advisor to the Special Master, moreover, Evercore earned more than $80 million directly or through ad hoc groups involving the 2020 Bondholders. A12917-18.

All told, Weil and Evercore have received a combined $170 million in fees from engagements of Elliott and the 2020 Bondholders during just the last four years of these sale proceedings.

2.    Based on this newly discovered information, Gold Reserve moved to disqualify the Advisors, the Special Master, and the court under 28 U.S.C. § 455; the Venezuela Parties also moved for disqualification.[9]  A12644-67; A12719-45.[10]

On November 13, 2025, the district court denied the disqualification motions.  A10412-65.  The court first held that Gold Reserve's request for recusal was untimely and waived.  A10419-30.  The court then held that no disqualification was required because:  (1) notwithstanding the payments that Weil and Evercore received from Elliott and the 2020 Bondholders during the pendency of the sale proceedings and the record evidence of Weil's interventions on behalf of Elliott, a reasonable observer would not perceive an appearance of bias; and (2) the history of the sale process – including the recommendation of (a) an Elliott bid in 2024 that every creditor opposed and (b) an Elliott bid that effectively diverted $2 billion from judgment creditors to the 2020 Bondholders – did not demonstrate any favoritism or bias toward Elliott or the 2020 Bondholders.

---

[9] The Venezuela Parties previously moved to disqualify the Special Master and his Advisors on unrelated grounds.  A2737-46; A3314-29; A4419-32.  The court denied those motions.  A3011-60; A3541-49; A4526-39.

[10] Gold Reserve also sought a stay of further proceedings until final resolution of the conflict issue and filed a petition for a writ of mandamus in this Court seeking similar relief.  On November 18, 2025, this Court denied the petition. *See* Order, *In re Gold Reserve Ltd.*, No. 25-3091, Dkt. 46.

**H.    The Court Approves the Sale to Elliott**

Meanwhile, the district court proceeded with the sale hearing on September 15-18 and October 21, 2025.  The court heard witness testimony, including from Gold Reserve's CEO Paul Rivett.  No witness representing the 2020 Bondholders testified.  No witness testified that the 2020 Bondholders would seek to interfere with closing the Gold Reserve bid.  No witness testified regarding any analysis of the 2020 Bondholders risk; the Special Master's recommendation did not contain any such analysis.  *See* D.I.2183-4 (¶¶ 5-9); D.I.1660 at 4.

On November 25, the district court adopted the Special Master's Updated Final Recommendation, A258-425; A426-28; on November 29, it issued the order approving the sale to Elliott, A429-839.  The court concluded that the Elliott bid was "better" despite the price, $5.892 billion, being "$2 billion less than the headline price of the [Gold Reserve] Bid, $7.899 billion."  A343 (¶ 311).  Although the court previously concluded that a settlement with the 2020 Bondholders was not required, the court determined that Elliott's bid "removes the risk of the 2020s attempting to block the sale."  A346 (¶ 322).  The court injected a new "expected value" analysis and discounted Gold Reserve's higher-priced bid based on the intervening Southern District of New York decision deeming the 2020 bonds valid.  A350 (¶ 342).  The court stated "Gold Reserve and [Elliott] took opposite sides of a bet that could only pay off for one of them.  In the end, [Elliott's] number came

up and Gold Reserve's did not." A416. The court also determined that, by "authorizing termination of the [Gold Reserve] SPA," which caused dislocation of Gold Reserve's financing, "the [Gold Reserve] Bid is no longer a Qualified Bid." A407, A409.

Gold Reserve timely appealed. A10.

## STANDARD OF REVIEW

This Court reviews "the District Court's findings of fact for clear error and its conclusions of law *de novo*." *Travelers Cas. & Sur. Co. v. Insurance Co. of N. Am.*, 609 F.3d 143, 156 (3d Cir. 2010) (cleaned up). "When confronted with mixed questions of fact and law, [the Court] appl[ies] the clearly erroneous standard except that the District Court's choice and interpretation of legal precepts remain subject to plenary review." *Id.* This Court reviews a district court's order denying recusal for abuse of discretion. *See Kensington*, 368 F.3d at 301. "To the extent judges continue to retain any discretion under . . . § 455, it is only to determine if the facts asserted as comprising bias, a forbidden financial interest, kinship, or the appearance of partiality bring the trial court judge within the disqualifying definition. If the answer to that inquiry is 'yes,' disqualification must follow." *Id.* at 301 n.12 (citation omitted).

**SUMMARY OF ARGUMENT**

I.      The district court's order approving the sale of PDVH shares violated the Delaware law requirement that attached shares be sold to "the highest bidder." Gold Reserve submitted the highest qualified bid, but the court impermissibly deprived Venezuela's judgment creditors of $2 billion for the benefit of non-judgment creditor bondholders.  Further, the Special Master's recommendation of Elliott's bid violated multiple procedural orders the court established to protect the integrity of the bidding process and to implement the Delaware law requirement. In particular, the court failed to enforce the "overbid minimum" that required any competitive offer to exceed a recommended bid, instead approving a bid priced $2 billion lower.

II.      The district court failed to grant the motions for disqualification despite an appearance of non-neutrality that tainted the proceeding.  The beneficiaries of the court's errors are clients of the law firm and the investment bank that advised the Special Master and the court – to the tune of some $170 million in fees across other matters – while engaging in behind-the-scenes discussions that encouraged Elliott to submit a competitive bid (which was accepted even though a comparable bid was earlier found inferior) rather than a compliant bid during the Topping Period.  The appearance of bias requires vacating the judgment and reassigning the case on remand.

27

# ARGUMENT

## I.    THE DISTRICT COURT'S SALE ORDER VIOLATES THE REQUIREMENT THAT ATTACHED SHARES BE SOLD TO "THE HIGHEST BIDDER"

By approving the sale to Elliott for a price $2 billion lower than Gold Reserve's bid, the district court disregarded the unambiguous requirement of Delaware law that the PDVH shares be sold to the highest bidder.  It also ignored court-ordered sale procedures barring acceptance of Elliott's lower bid in preference to Gold Reserve's higher bid.  Whatever risk the court perceived that the 2020 Bondholders would block Gold Reserve's transaction, it provided no justification for displacing Gold Reserve's higher conforming bid.

### A.    The Sale Order Violates Section 324's Requirement That the PDVH Shares Be Sold to the Highest Bidder

Delaware law requires that, once attached, corporate shares must be sold "at public sale to the highest bidder."  Del. Code tit. 8, § 324(a).  Given that Elliott's bid is $2 billion lower in purchase price than Gold Reserve's bid, *see* A13173 (587:11-588:3) (W. Hiltz), the district court's order directing the sale of the PDVH shares to Elliott violates Delaware law.

#### 1.    The "highest bidder" requirement is an objective analysis

The "highest bidder" requirement under Delaware law is unambiguous and unqualified.  Where statutory text is clear, "the court's role is limited to an application of the literal meaning of those words."  *Leatherbury v. Greenspun*,

28

939 A.2d 1284, 1288 (Del. 2007).  Here, the "highest bidder" requirement imposes a straightforward, objective standard that requires selection of whichever conforming bid is "highest" in price.

The "highest bidder" requirement serves the important purpose of ensuring that the public sale of shares will retire the greatest possible amount of outstanding debt, to the benefit of judgment creditors and debtor.  That purpose was reflected in the district court's statement that the "[p]rice paid for the PDVH Shares will be evaluated based on the amount of Attached Judgments expected to be satisfied." A5559; *see* A5651.  Particularly in a situation like this one, where the amount of attached judgments far exceeds the value of PDVH shares and order of priority depends on date of filing a motion for a writ of attachment, A286-87 (¶ 75), accepting a lower bid in preference to a higher one creates substantial unfairness. *See* A287-88 (¶ 77).

The district court claimed that Elliott's bid was "better," but the Delaware General Assembly prohibits courts from choosing a buyer based on whether one bid is "better" than another.  Section 324 uses the words "highest bidder."  It does not use the words "highest and best" bidder, even though other statutory provisions include those words.  *See*, *e.g.*, *Carauna v. Saligman*, 1990 WL 212304, at *5 (Del. Ch. Dec. 21, 1990) (distinguishing between "highest bid" and "best bid"); *see also*, *e.g.*, Del. Code tit. 9, §§ 4535, 8753; *id.*, tit. 22, § 504(a); *id.*, tit. 25, § 6309.  That

29

the General Assembly "expressly included" the words "and best" "in one statute but omitted [them] from another" shows "that the General Assembly intended to make those omissions" in Section 324. *Leatherbury*, 939 A.2d at 1291; *see also Salzberg v. Sciabacucchi*, 227 A.3d 102, 117-18 & n.69 (Del. 2020) (noting statutes are read "to avoid surplusage").

Other state high courts agree. The Wyoming Supreme Court has reasoned that an auctioneer "bound by contract" to sell to those "who will pay the highest prices obtainable" lacked "discretion" to sell to the second-highest bidder. *Pitchfork Ranch Co. v. Bar TL*, 615 P.2d 541, 553 (Wyo. 1980). And courts distinguish "highest and best bidder" from "highest bidder." *Johnson v. Craddock*, 365 P.2d 89, 95 (Or. 1961) (en banc) ("'Highest,' alone, would normally imply ministerial action . . . . But the addition of the words 'and best' imports a degree of selection which rests within the discretion of the county court."); *Keith v. Johnson*, 59 S.W. 487, 488 (Ky. 1900) (explaining "force is to be given to both the controlling words 'highest' and 'best'"); *State v. City of Lincoln*, 94 N.W. 719, 720 (Neb. 1903) (same).

Likewise, federal bankruptcy law permits non-price considerations in selecting a bid under a "highest and best" standard. *See In re Bakalis*, 220 B.R. 525, 533 (Bankr. E.D.N.Y. 1998) (noting that "best" in "highest and best" standard is "not mere surplusage" and authorizes selecting a lower bid based on non-price

factors); *cf. Glenn Def. Marine (ASIA), PTE Ltd. v. United States*, 720 F.3d 901, 908 (Fed. Cir. 2013) (noting "discretion" for determining "best value" in government contracts).  Delaware's Section 324 asks which bid is "highest" – not "highest and best."

None of the authorities cited below supports the proposition that a "highest bidder" standard allows selection of a lower bid based on its purported superiority in other respects.  Most significantly, *United States v. Chemical Foundation*, 5 F.2d 191 (3d Cir. 1925), *aff'd as modified*, 272 U.S. 1 (1926), involved a statute with a similar "highest bidder" standard – but that also included an express carveout for selecting a lower bid in the public interest.  There, the Court cited this carveout as the basis for "departing from the statute's general rule of public sale" to "contemplate[] something more than money."  *Id.* at 206.  Section 324 has no such carveout.  Indeed, that the *Chemical Foundation* Court relied on a carveout – which is missing here – to expand the "highest bidder" standard shows that the "highest bidder" standard without such a carveout is limited to the simple, quantitative question of which bid is higher.[11]

---

[11] Other cases cited below do not involve a "highest bidder" standard at all. *See Lawsky v. Condor Cap. Corp.*, 2015 WL 4470332, at *6 (S.D.N.Y. July 21, 2015) (receiver could choose whatever bid he "deems to be advisable or necessary"); *In re Family Christian, LLC*, 533 B.R. 600, 624 (Bankr. W.D. Mich. 2015) (applying the "highest and best" standard).

Neither the district court, nor the Special Master, nor any party has cited a case where, in a Section 324 sale or under any other statute requiring sale to the highest bidder, corporate shares (or anything else) have been sold to any person other than the highest qualified bidder.

### 2. Gold Reserve was the "highest bidder" under Delaware law

Gold Reserve was the "highest bidder" for the PDVH shares by more than $2 billion. Gold Reserve's Improved Bid was $7.9 billion, while the recommended Elliott bid was only $5.892 billion. That is the beginning and end of the analysis under Delaware law.

Elliott argued below that its bid has a "total value" of $9.5 billion, augmenting the $5.9 billion in writ extinguishment with (i) a settlement with the 2020 Bondholders it valued at approximately $2.86 billion; (ii) additional consideration of $75 million offered to extinguish $500 million of Gold Reserve's writ; and (iii) $205 million in break fees and court fees. But that is not the standard for evaluating the "highest bidder." As the Special Master recognized, the Elliott bid's "purchase price [is] approximately $5.892 billion," because the bid "satisfies $5.892 billion of Attached Judgments." A7426, A7433; *see also* A5559. The district court repeatedly recognized that the price of any bid would be based on satisfaction of attached judgments. *Supra* p.14.

Taking into consideration the value of debt other than that of the attached creditors in evaluating the bid price would undermine both the statute and the purpose of the proceeding below, which was to compensate the attached creditors in order of priority. As the district court recognized, it would be improper to allow non-party creditors to "jump the queue" by collecting consideration paid for the PDVH shares ahead of attached creditors. *See* A5503 (noting that the court would not "allow [creditors] to obtain through the 'back door' a higher-priority claim to the PDVH Shares than they obtained through the 'front door' of this Court's Sale Process"). Yet that is the effect of the court's order: by favoring Elliott's bid over Gold Reserve's, the court allowed the 2020 Bondholders to jump in front of the attached creditors who will receive no payment from the sale of PDVH shares.

**3.    Gold Reserve was a qualified bidder with a conforming bid**

Section 324's "highest bidder" requirement does not mean that the district court cannot set criteria for defining what bidders are "qualified" and what bids are "conforming." The court may set reasonable parameters in conducting the sale. *See Vornado PS, L.L.C. v. Primestone Inv. Partners, L.P.*, 821 A.2d 296, 309-10, 316 (Del. Ch. 2002) (concluding under New York law that objecting competing bidder had been "properly disqualified from bidding" because its purported financing did not exist), *aff'd*, 2003 WL 1904666 (Del. Apr. 16, 2003) (judgment

33

noted at 822 A.2d 397 (table)).[12] The Special Master applied that principle to disregard multiple, non-actionable bids. *E.g.*, A5914-16. Through such mechanisms, the district court can lawfully refuse to consider bids that purport to have a higher purchase price but in fact are non-actionable.

This principle has no application to Gold Reserve's bid, however. The record evidence confirms both that Gold Reserve is a qualified bidder and that its bid was conforming and actionable. A5917 (¶ 67). Indeed, the Special Master selected Gold Reserve's bid as the "final recommended" bid and confirmed it was "the highest bid for the PDVH Shares that meets the Bid Requirements," A5923 (¶ 78), before later deviating to Elliott's eleventh-hour submission.

In attempting to square its decision with Delaware law, the district court asserted that Gold Reserve's bid was "no longer" qualified based on a footnoted comment in Gold Reserve's post-hearing briefing that " 'the Court's decision to grant the Special Master's request to terminate the [Gold Reserve] SPA . . . has caused dislocation with [Gold Reserve's] lending consortium.' " A407, A409 (quoting A9625 n.8) (alterations by court). But that is circular: the termination of

---

[12] *See also In re Young Broad. Inc.*, 430 B.R. 99, 108 n.7 (Bankr. S.D.N.Y. 2010) (finding potential purchaser "did not qualify to participate in the auction because the bid was not accompanied by a deposit and it was subject to additional due diligence"); *Portfolio FB-Idaho, LLC v. FDIC*, 2011 WL 573793, at *6 (D. Idaho Feb. 13, 2011) (noting bidder properly disqualified because it "violated [the bidder's] certifications in the Bid Package").

Gold Reserve's SPA (which the court had said was "ministerial" and would not pre-judge the merits, *see* A409), caused the "dislocation"; the court's decision cannot be defended on the basis that the Special Master's unlawful actions undermined Gold Reserve's bid. And, in any event, Gold Reserve made clear at the hearing that it remains capable of following through on its bid; the court cited no contrary evidence. *See* A13308, A13313-17 (1085:24-1086:9, 1086:13-22, 1108:15-1110:1, 1111:24-25, 1115:5-8, 1115:19-1116:14, 1118:11-15, 1122:22-1123:12 (P. Rivett)).

## B.    Deviation from the "Highest Bidder" Requirement Also Violated the Court-Ordered Sale Procedures

Nothing in the court-ordered sale procedures permitted deviation from the statutory highest-bidder requirement based on consideration of potential litigation risk from the 2020 Bondholders; on the contrary, the district court had rejected the very requirement of settlement that the Special Master and the court ultimately imposed. And by including a "minimum overbid" requirement among the bidder protections, the court precluded the Special Master from accepting a lower bid in preference to a higher qualified bid – the very action the court ultimately approved.

### 1.    The Evaluation Criteria Did Not Permit Selection of a Lower-Priced Bid over a Higher-Priced Unconditional Bid

Nothing in the court-approved Evaluation Criteria indicated that the Special Master would have discretion to reject a higher bid over a lower bid based on

35

closing risk associated with the 2020s.  The district court recognized two basic evaluation criteria:  price and "Certainty of Closing."  A5559.  In adopting those criteria, the court never indicated that a qualified bid could be rejected in favor of a lower-priced one, and the court specifically ordered that "Evaluation Criteria" shall "NOT include any requirement or condition with respect to the 2020 Bond Entities other than that bidders acknowledge that the 2020 Bond Entities purport to have a pledge of 50.1% of the equity of CITGO Holding, Inc., which is disputed." A5529-30 (¶ 28).

The court-adopted procedures instead address potential risk associated with the 2020 Bondholders by clarifying that bids could not be made conditional on the resolution of that litigation.  *First*, the procedures prohibited bidders from using an escrow arrangement or otherwise making resolution of the 2020 Bondholders' claims a condition of closing.  A5557.  The Special Master clarified that, while bidders were "welcome to address the 2020s separately," this "should not impact closing certainty or clarity around proceeds to creditors."  *Id.  Second*, the Evaluation Criteria indicate that if, for example, a bidder's financing contains "*[c]onditionality* related to pending or future litigation," that conditionality could be considered in evaluating certainty of closing (for example, if two bids were otherwise priced similarly).  A5559 (emphasis added).  Even if a lower bid with higher closing certainty could permissibly be selected over a higher qualified bid

with less closing certainty because of conditionality in financing, that possibility does not apply here; the financing supporting Gold Reserve's bid contained no conditionality related to resolution of the 2020 Bondholders' litigation.

Gold Reserve's bid delivered $2 billion more to attached creditors than Elliott's; the sole supposed advantage of Elliott's bid was the settlement with the 2020 Bondholders, which diverts sale proceeds away from attached creditors. Contrary to the district court, that risk did not reflect a "bet" by Gold Reserve that the 2020 Bondholders would be unsuccessful in their litigation. Gold Reserve is fully committed to closing and has recognized the possibility that this may ultimately require an arrangement with the 2020 Bondholders. *Supra* p.35. By approving the Elliott bid over Gold Reserve's far higher bid, however, the Special Master and the court functionally threw out the approved procedures for addressing the risk posed by the 2020 Bondholders – in particular the explicit rejection of settling with the 2020 Bondholders as a condition of a qualified bid.

### 2. The Requirement of an "Overbid" Made Clear That a Lower Bid Could Not Displace a Higher Recommended Bid

The Special Master's recommendation and the district court's approval of Elliott's lower bid also violated the requirement that, once the Special Master accepted a bid and entered into a SPA with a recommended bidder, no competing offer would be considered unless it exceeded the price of the recommended bid.

37

Throughout the sale process, the requirement of an overbid minimum was included in every version of the Sale Procedures Order – from the first iteration the Special Master proposed in August 2021 (*see* A10827-907; A10911-1008) through the sixth and final version the district court entered in October 2022 (A3295-96 (¶ 21)).  The operative bidder protections adopted in January 2025 were specifically litigated by the parties, precisely to ensure that no recommended bid could be displaced except by a higher bid.  Those protections provided that "[a]ny subsequent bidding increments (including bidding increments at any auction) will need to satisfy an overbid minimum equal to or in excess of $50 million" subject to "the Special Master . . . hav[ing] the ability to exercise his discretion to lower the overbid minimum."  A5618; *see* A5639.

Gold Reserve relied on these protections in compiling and submitting a qualified bid, which required it to incur tens of millions of dollars in fees to secure committed financing and millions more to comply with regulatory filing requirements.  A7424-25 (¶ 9) (Rivett Decl.).  Its SPA with the Special Master contained the provision that the district court expressly ordered.  A6054.  Yet the Special Master ignored the overbid requirement in recommending a competing proposal from Elliott that was more than *$1.5 billion lower* than Gold Reserve's final recommended bid.  Indeed, the Special Master's Notice of Superior Proposal did not even reference the Subsequent Overbid Minimum requirement.  A7395-96.

38

Neither the Special Master nor the district court provided any valid justification for nullifying the overbid minimum. While the operative Bidding Procedures provide the Special Master with "the ability to exercise his discretion to lower the overbid minimum amount for subsequent bids or any auction," A5618; *see* A5639, they do not allow the Special Master to eliminate the overbid minimum entirely. *Cf. Biden v. Nebraska*, 600 U.S. 477, 494 (2023) ("permission to 'modify' does not authorize 'basic and fundamental changes'") (quoting *MCI Telecomms. Corp. v. AT&T Co.*, 512 U.S. 218, 225 (1994)); *Amgen, Inc. v. Smith*, 357 F.3d 103, 117 (D.C. Cir. 2004) (authority to make "adjustments" does not extend to "total elimination" of a statutory requirement). Nor did the Special Master seek or obtain any authority to dispense with the overbid minimum.

The requirement for an overbid once a bid has been accepted is the only way to comply with Delaware's statutory requirement that the shares be sold to the highest bidder. *Cf.* A5875-76 (statutory requirement that shares be *sold* "to the highest bidder" does not require that the district court "*start* the bidding process with the highest 'headline' price received so far"). The Special Master's Final Recommendation recognized that Gold Reserve's bid "represents the highest bid for the PDVH Shares that meets the Bid Requirements and that the Special Master believes to be capable of being timely consummated." A5923 (¶ 78). Given that determination, neither the Delaware statute, nor the court-adopted procedures, nor

39

the terms of the SPA permitted the Special Master to accept a lower bid for the PDVH shares.

## II. DISQUALIFICATION OF THE DISTRICT COURT, THE SPECIAL MASTER, AND ADVISORS WEIL AND EVERCORE IS REQUIRED UNDER 28 U.S.C. § 455

The district court should have recused itself and the Special Master in light of evidence of significant conflicts of interest among Weil, Evercore, Elliott, and the 2020 Bondholders. Under 28 U.S.C. § 455(a), disqualification is required whenever a judge's "impartiality might reasonably be questioned." Here, not only were there significant undisclosed client relationships between the Advisors and the beneficiaries of the Special Master's recommendation, but also a Weil attorney actively intervened on behalf of Elliott during the bidding process, warning a junior colleague of the risk that Elliott might be lost as a firm client. And other discretionary judgments the Special Master made in favor of Elliott and the 2020 Bondholders only reinforce concerns of non-neutrality.

"[A]ny tribunal permitted by law to try cases and controversies not only must be unbiased but also must avoid even the appearance of bias." *Commonwealth Coatings Corp. v. Continental Cas. Co.*, 393 U.S. 145, 150 (1968). Disqualification "concerns not only fairness to individual litigants, but, equally important, it concerns 'the public's confidence in the judiciary, which may be irreparably harmed if a case is allowed to proceed before a judge who appears to be tainted.'" *Alexander v.*

*Primerica Holdings, Inc.*, 10 F.3d 155, 162 (3d Cir. 1993) (quoting *In re School Asbestos Litig.*, 977 F.2d 764, 776 (3d Cir. 1992)).  The appearance of bias alone is sufficient to require disqualification under Section 455(a) even absent evidence of actual bias.  *See id.*; *Kensington*, 368 F.3d at 317-18.  Whenever circumstances create an appearance of bias under this standard, disqualification is mandatory; the court has "no statutory power to hear" the case.  *School Asbestos*, 977 F.2d at 778; *see also* 28 U.S.C. § 455(a); *Liljeberg v. Health Servs. Acq. Corp.*, 486 U.S. 847, 859-61 (1988).

Disqualification of the district court, the Special Master, and Advisors Weil and Evercore is required under these standards.  *First*, Weil's and Evercore's relationships with Elliott and the 2020 Bondholders and the active intervention of Elliott's lawyer at Weil in the bidding process satisfy Section 455(a)'s standard for an appearance of bias.  *Second*, the discretionary judgments the Special Master made in favor of Elliott reinforce the apparent conflict.  *Third*, those conflicts of interest are imputed to the Special Master and the district court under this Court's analysis in *Kensington*.  *Fourth*, contrary to the district court, Gold Reserve's motion was timely, preserved, and procedurally proper.

A.    **Weil's and Evercore's Conflicts of Interest Create the Appearance of Bias Under Section 455**

Circumstances give rise to an appearance of bias that requires disqualification under Section 455 when an average layperson, fully informed of the facts, would

41

find the adjudicator's objectivity to be reasonably questionable. *See Kensington*, 368 F.3d at 301-03. That is the case here. Weil's attorney-client relationship with Elliott and the 2020 Bondholders, and Evercore's commercial relationship with Elliott and the 2020 Bondholders, give the Advisors strong incentives to favor those parties' interests – incentives that would cause a reasonable observer to question whether the Advisors are independent and unbiased.

*First*, a reasonable observer would question whether an attorney or banker would ignore the potential benefit to an existing client from the outcome of a separate case – the very consideration that led to disqualification in *Kensington*. There, this Court held that the district judge's attorney advisors in one asbestos case were conflicted because they also represented plaintiffs in an "unrelated asbestos-driven bankruptcy" and "espoused views therein on the same disputed issues." *Id.* at 302. This Court held that those circumstances "require[d] disqualification," *id.* at 318 – notwithstanding the district court's 102-page decision finding the motion untimely and without merit, *see id.* at 300. "By their very position as representatives of the future asbestos claimants" in the unrelated bankruptcy*,* the advisors "signaled to all that they could not be non-partisan, benign, or neutral" in the proceedings before the district court. *Id.* at 304. Here, both Weil and Evercore have extensive and continuing relationships with both Elliott and several of the 2020 Bondholders. *Supra* pp.21-23. Just as the advisors

42

in *Kensington* had an incentive to tilt their advice to the district court to benefit clients in an unrelated proceeding, so too Weil and Evercore have an incentive to prefer an outcome favorable to parties that are, as in *Kensington*, clients in unrelated proceedings.

The district court sought to distinguish *Kensington* on the ground that the two asbestos cases "involved overlapping legal issues," while there is "no overlapping issue between this case and the unrelated matters in which Weil and Evercore have represented Elliott, the 2020s, and/or their respective affiliates." A10453.  But *Kensington* turned on the fact that the advisors held mutually incompatible "dual roles" that gave rise to a conflict of interest (*see* 368 F.3d at 304) – not on the legal (rather than business) nature of that conflict.  *Kensington* "emphasize[d] that it is the *conflict of interest* and not the particular specialty of the neutral expert or advisor that concerns us."  *Id.* at 305.  That Weil's and Evercore's apparent conflicts arise from their business relationships with parties in interest, rather than overlap in legal issues, is no basis to disregard *Kensington*.

*Second*, a reasonable observer would naturally question the effect of the recommendation on the Advisors' own economic *self*-interest.  The proponent (Elliott) and beneficiaries (the 2020 Bondholders) of the bid the Special Master and his Advisors have recommended have paid the Advisors more than $170 million in other matters.  Those fees have risen over the course of the Advisors'

work advising the Special Master.  A10195.  A reasonable observer would ask whether, by favoring the interests of those clients, Weil and Evercore hope to encourage those clients to view them favorably – and steer more business their way.

The appearance problems here are further reinforced by the intervention of Elliott's lawyer at Weil in the sale process on Elliott's behalf.  At a critical moment, a Weil partner, at Elliott's urging, intervened with Weil attorneys advising the Special Master to urge the Advisors to speak further with Elliott about the content and timing of a potential Topping Bid.  *Supra* pp.18-19.  In urging his more junior colleague to accommodate Elliott, the Weil partner specifically invoked the risk that Weil could lose future business from Elliott.  A10444.

The district court dismissed the significance of this communication on the basis that the subsequent discussions that the Weil Advisors had with Elliott did not provide Elliott any information "other than what Elliott could discern for itself."  A10445.  The evidence suggests otherwise:  the email that the Weil attorney advising the Special Master sent to Elliott's attorney at Weil indicated that the discussion had satisfied Elliott that it could save itself "commitment fees" (that

44

is, payments for committed financing) by pursuing a later "unsolicited" bid instead, something Elliott apparently had not understood.[13]

More important, the appearance of non-neutrality does not depend on proving that the Special Master improperly conveyed information to Elliott. The incident shows that Elliott had, and took advantage of, an existing client relationship with Weil to ensure that the Advisors at Weil were responsive. Weil could not, consistent with its obligation to be neutral, intervene on behalf of a bidder, yet that is precisely what it did. Again, a reasonable observer would see this as evidence that the Advisors had an incentive to favor the interests of their client in the bid process.

The district court also accepted the Special Master and Advisors' argument that the $170 million in fees the Advisors received from clients bidding in and benefitting from the process the Advisors were running are not disqualifying

---

[13] To the extent the Advisors encouraged Weil to submit a later "unsolicited" bid instead of a Topping Bid, that itself violated the sale procedures. The district court ordered that bid protections for any recommended bid following the Topping Period would include a non-solicitation provision prohibiting the Special Master from "solicit[ing], initiat[ing], knowingly encourag[ing] *or* knowingly facilitat[ing]," whether "directly *or indirectly*," "*any* proposal or offer" that might "reasonably be expected to lead to" a "competing proposal." A5551 (¶ 4) (emphases added). Advice to Elliott to forgo a Topping Period bid to save "money in commitment fees" would constitute solicitation of a post-Topping Period "competing proposal." *See Genuine Parts Co. v. Essendant Inc.*, 2019 WL 4257160, at *2 (Del. Ch. Sept. 9, 2019); *NACCO Indus., Inc. v. Applica Inc.*, 997 A.2d 1, 16 (Del. Ch. 2009).

because the fees were "a miniscule fraction" of the Advisors' total revenue. A13010; *see also* A10452 (noting that the fees Weil received from Elliott and the 2020 Bondholders were "immaterial compared to Weil's $4.5 billion revenue during that same period" and that the fees received by Evercore were "dwarfed by Evercore's annual revenue, which in 2024 was $2.97 billion").

But an ordinary observer would not discount these amounts as "immaterial." Millions – to say nothing of $170 million – in revenue is a material amount to any law firm or investment bank. A financial interest need not be large to undermine the appearance of impartiality required of judicial proceedings. *See Tumey v. Ohio*, 273 U.S. 510, 525 (1927) ("There was at the common law the greatest sensitiveness over the existence of any pecuniary interest however small or infinitesimal in the justices of the peace."). And the financial interests here were *substantial*. The district court cited nothing to support the notion that such sums can be discounted because they are only a fraction of a firm's overall revenues.

*Third*, the district court suggested that such conflicts of interest are unavoidable, asserting that "[f]irms qualified to provide the Special Master competent advice typically have regular interactions with the types of entities who may be interested in buying an asset like the PDVH Shares." A10441.

The district court cited nothing to support the notion that the appearance of partiality can be overlooked on the ground that it is difficult to find advisors without apparent conflicts. Nor would such an exception make sense: the sale

46

process is a judicial proceeding, not a private transaction, and the parties that are subject to the power of the court are entitled to decision-makers who are free of an appearance of bias. As a practical matter, it is hard to swallow the assertion – which was not backed by evidence – that there are no law firms or investment banks that were both free of conflicts and capable of advising the Special Master.

Moreover, even if the district court's premise were correct, that would underscore the importance of full disclosure to permit parties to the proceeding to make a knowing waiver in advance. In this case, not only was the nature of the Advisors' entanglements with participants in the bidding process not properly disclosed, but Weil also continued to deepen its relationships with Elliott over the course of the proceeding and Evercore continued to seek engagements with the 2020 Bondholders. *Supra* pp.21-23. That exacerbates the appearance problem: Weil and Evercore "had a duty to remain neutral . . . and to provide objective, unbiased information to" the court. *Kensington*, 368 F.3d at 303; *see also Jenkins v. Sterlacci*, 849 F.2d 627, 632 (D.C. Cir. 1988) ("[I]t is sufficient, and necessary, that an individual who accepts an appointment as a special master scrupulously avoid any undertaking, as an advocate or otherwise, that would tend or appear to compromise his impartiality as a decisionmaker."). Weil and Evercore violated those obligations by pursuing these undeniably lucrative engagements while they were supposed to be serving as neutral and impartial arms of the district court.

**B.    The Discretionary Judgments Favoring Elliott Contribute to the Appearance of Bias**

On the assumption that the district court was free to reject the highest available conforming bid in favor of a "better" though lower bid, having neutral advisors becomes critical to ensure that any discretion is not exercised – consciously or unconsciously – to favor one bidder's interests.  The approach that the Special Master and his Advisors urged on the court was skewed in Elliott's favor in a manner that aggravates rather than mitigates the appearance of bias.

Most fundamentally, when weighing the risk that the 2020 Bondholders would block the closing of Gold Reserve's bid, the Special Master ignored all the reasons that a payment to the 2020 Bondholders would be an unnecessary diversion of value from the attached creditors.  The validity of the 2020 bonds remains subject to legal dispute.  Although the district court's opinion seemingly treated the Southern District of New York's September 2025 summary judgment ruling as dispositive, *see* A416, that ruling is on appeal to the Second Circuit, which reversed the district court once previously.[14]  Furthermore, when the Special Master made his recommendation, the Southern District had not ruled, and that

_____

[14] In the prior appeal, the Second Circuit ruled that Venezuelan law governs the validity of the 2020 notes; the Venezuelan opposition government recognized by the United States long has argued that, under Venezuelan law, the 2020 notes and purported pledge are invalid; and the U.S. government twice has supported that interpretation, including in its recent Statement of Interest in SDNY. A8522-23 (Statement of Interest).

48

later ruling cannot explain the Special Master's earlier preference for Elliott.

Moreover, even if the 2020 Bondholders were to prevail, they *still* would present

no actual risk to the Gold Reserve financing unless OFAC were to change its long-

standing policy and lift the suspension of the 2020 Bondholders' ability to exercise

their rights under the pledge.  *See* OFAC, FAQ 595 (Jan. 20, 2022; updated

Dec. 19, 2025) (explaining "transactions related to the sale or transfer of CITGO

shares in connection with the P[D]VSA 2020 8.5 percent bond are prohibited,

unless specifically authorized by OFAC"), https://ofac.treasury.gov/faqs/595;

A275 (¶ 33) (explaining "[o]ne form of OFAC guidance is Frequently Asked

Questions"); *see also*, *e.g.*, A5877-79; A13200 (12:19-13:6); D.I.2273 at 4.

By the same token, the Special Master disregarded the continued risk that

the 2020 Bondholders would interfere with *Elliott's* transaction, notwithstanding

the TSA.  For one thing, as Gold Reserve explained, the TSA contains several

off-ramps that would permit some number of Bondholders to withdraw from the

agreement, depriving Elliott of the two-thirds majority that it claims is sufficient

to allow for release of the collateral.  *E.g.*, A9089-96; A8248-59; A13141-43

(459:5-469:1), A13146-48 (480:22-487:4).  If the 2020 Bondholders prevail in

their appeal and are able to secure OFAC permission to enforce their collateral –

which is what would be required for the 2020 Bondholders to pose any threat to

*Gold Reserve's* proposed transaction – they would have an incentive to avoid the

discounted settlement with Elliott. And the TSA further assumes that the signatory bondholders have authority to release the collateral securing the 2020s; in fact, under the plain terms of the Indenture, they do *not* have that authority without the written consent of the issuer – PDVSA – which has not been secured. A5393-94 (¶ 9.02(b)).

The Special Master's preference for Elliott's bid is perplexing too in that it conflicted with the guidance the district court previously provided and the Special Master's reasoning in recommending Gold Reserve's bid. The court instructed the Special Master and his Advisors that a settlement with the 2020s likely could *not* justify a price difference of even $1 billion. And the Special Master himself indicated that Gold Reserve's bid would be preferable to Red Tree's (which was supported by a TSA with the 2020s) even if Red Tree could narrow the price difference to $2 billion. Yet the Special Master recommended the Elliott bid over Gold Reserve's revised bid despite a price difference *twice* that which the court had said would be excessive (and equal to the price difference the Special Master indicated would be unacceptable). To be sure, the court was persuaded to accept the recommendation notwithstanding its earlier guidance, but that simply underscores the concern that the Advisors' preference for Elliott influenced the outcome.

50

Given knowledge of the Advisors' relationship with Elliott, other judgment calls over the course of the sale process likewise raise questions of bias: for example, the Special Mater recommended Elliott's September 2024 bid, even though it contemplated placing the entire proceeds of the sale in escrow indefinitely, prioritizing the 2020 Bondholders and the Alter Ego claimants, and depriving the judgment creditors of any recovery for years – while Elliott reaped the benefits of owning CITGO. That bid was abandoned because of the parties' *universal* opposition. *Supra* pp.11-12. It is natural to wonder, in retrospect, whether the recommendation was the product of bias in Elliott's favor.

## C. Weil's and Evercore's Conflicts of Interest Are Imputed to the Special Master and the District Court Under *Kensington*

Under *Kensington*, the Advisors' conflicts of interest extend to the Special Master and the district court even with no claim that either Mr. Pincus or Judge Stark was non-neutral. Weil's and Evercore's impact on the sale process has been pervasive: the Advisors dominated the sale process from the beginning, effectively carrying out the Special Master's functions and incurring thousands of hours and millions of dollars in billings. *Supra* p.8. "[W]here, as here, [an adjudicator] surrounds himself with individuals who may not be truly disinterested," "there is an almost irrebuttable presumption that a judge is 'tainted' and must be disqualified." *Kensington*, 368 F.3d at 308.

"For purposes of § 455(a) disqualification, it does not matter whether the district court judge [or Special Master] actually harbors any bias against" Gold Reserve or toward Elliott or the non-judgment creditors who stand to benefit from the Special Master's recommendation. *Alexander*, 10 F.3d at 162. In *Kensington*, this Court emphasized that the district judge – who had consulted with advisors who themselves had conflicts of interest – had not "done anything wrong or unethical or biased." 368 F.3d at 294. Nevertheless, the advisors' conflict was imputed to the judge and required his disqualification given the appearance of bias. *See School Asbestos*, 977 F.2d at 778 (noting that Section 455(a) "reflects Congress's view that the adjudication of a case by a judge with an actual *or* apparent bias is an 'abuse of judicial power' . . . [and] a threat to the integrity of the judicial system") (quoting *Roche v. Evaporated Milk Ass'n*, 319 U.S. 21, 31 (1943)).

In *Kensington*, this Court found that advisors' conflicts of interest required disqualification of the district judge given "the importance of the Advisors' role" and their "unique level of influence" over the district judge, which created an impermissible appearance of bias. 368 F.3d at 304. There, the judge had "met with the Advisors as a group on only four occasions for a total of eighteen hours," after which the advisors "became functionally obsolete." *Id*. at 306. Here, as noted, the Advisors played a much more extensive role.

52

*Kensington* did not involve a special master, but that distinction makes no difference. The Special Master's Advisors have interacted directly with the district court, both in public proceedings, where the Advisors speak for the Special Master, and in at least 11 *ex parte* meetings and communications, with the Advisors heavily involved in decision-making. *Cf. Kensington*, 368 F.3d at 309. At a recent *ex parte* conference with the Special Master and his Advisors, the court acknowledged that it had been "dealing with other things," had "no insight into what [the Special Master is] doing day-to-day, and what the status of the bids are," and "should just remain, curious, but not have you fill me in on anything." A6573-74. This underscores the critical role that the Advisors have played.

Furthermore, under *Kensington*, it is "immaterial" under Section 455(a) whether an advisor has "actually affected the judge's decision." 368 F.3d at 307. What matters is the appearance of partiality that a conflict of interest creates. Because the Special Master and the district court admittedly have relied heavily on the Advisors to design and administer the sale process and in deciding which bids to recommend, that appearance of partiality requires disqualification of both the Special Master and the court.

### D.    Gold Reserve's Disqualification Motion Was Procedurally Proper

The parties opposing Gold Reserve's disqualification motion advanced, and the district court adopted, two related procedural objections to Gold Reserve's disqualification motion.  Both objections are meritless.

*First*, the district court held that Gold Reserve's motion was untimely because a set of discovery responses the Special Master served on March 24, 2025 disclosed that Weil had represented Elliott on a single engagement that had ended eight months earlier and had lasted for only four weeks.  But Gold Reserve's decision not to move for disqualification based on that disclosure did not render untimely its present disqualification motion (filed October 9, 2025).  That disclosure indicated that Elliott was not a client of Weil when the bidding process restarted in March 2025.  At the September 9, 2025 deposition of Elliott's assistant general counsel, Gold Reserve learned for the first time that both Weil and Evercore have years-long relationships with Elliott that were ongoing and that have continued concurrently with their purportedly impartial role in this sale process.  A12650; A12671-72 (16:10-23, 242:12-244:25), A12675-81 (248:4-249:9, 257:12-20, 260:24-263:2).  The next day, Gold Reserve notified the court of these conflicts and requested that the Advisors fully disclose the fees paid from all interested parties.  A12078-79.  Ultimately, these disclosures revealed for the first time the $170 million in fees paid to the Advisors, and Gold Reserve ever since has been

54

pursuing this issue diligently. A10195; A10217; A12917-18. Earlier disclosure of a four-week engagement that involved less than $100,000 in fees and that ended the prior year does not render a motion based on different, later-disclosed facts untimely.

Notably, in *Kensington*, the district court's advisors' concurrent representation of claimants in an "unrelated asbestos-driven bankruptcy" was "a matter of public record"; it was disclosed in public "trade periodicals"; and it was known by "many of the attorneys involved" in the matter. 368 F.3d at 302, 313. Nevertheless, this Court made clear that "nothing short of actual knowledge of the facts giving rise to the recusal motions and the Petitions for Mandamus would satisfy the § 455(a) timeliness factor here." *Id.* at 314. That is because "plac[ing] the burden on the Petitioners to uncover" the conflict "does not further the purpose of § 455(a), which mandates, at a minimum, the appearance of neutrality and impartiality in the administration of justice." *Id.* at 313 (cleaned up). Not only did Gold Reserve lack the requisite knowledge that Weil still was representing Elliott throughout the sale process, including when the process restarted in March 2025, but also the Special Master could not justify why his discovery responses failed to disclose these key facts. An accusation of untimeliness is untenable where the Advisors – acting with the Special Master as "an arm of the Court," A2444 (¶ 20) – concealed the information essential to assess the extent of the conflict.

55

*Second*, the district court ruled, in the alternative, that Gold Reserve waived the recusal grounds asserted in its motion.  The basis for this waiver ruling was that Evercore's engagement letter with the Special Master, which was filed publicly on the court's docket, disclosed that Evercore "may in the past have had, and may currently or in the future have," A10428, commercial relationships with the Sale Process Parties.  Weil's engagement letter contained similar language.  While Weil's letter was never made public, the court ruled that "this is an industry standard provision, of which the Movants had at least constructive knowledge." A10428 n.10.

Like the district court's timeliness ruling, this waiver ruling cannot be reconciled with this Court's reasoning in *Kensington*.  Evercore's vague, equivocal disclosures that it "may in the past have had, and may currently or in the future have," relationships with the Sale Process Parties did not give Gold Reserve "actual knowledge" of the grounds for recusal that it later uncovered, nor did it "place[] the burden on" Gold Reserve to investigate any then-hypothetical conflicts lurking behind Evercore's language.  *Kensington*, 368 F.3d at 313-14. And the terms of Weil's engagement letter were not even disclosed publicly.

"Waiver is the intentional relinquishment or abandonment of a known right." *LeBoon v. Lancaster Jewish Cmty. Ctr. Ass'n*, 503 F.3d 217, 225 (3d Cir. 2007) (cleaned up).  Neither the parties opposing disqualification nor the district court

56

have identified any intentional act by which Gold Reserve consented to the Advisors' conflicts of interest, of which Gold Reserve did not have actual knowledge until the disclosures following the September 9, 2025, deposition.

## CONCLUSION

The Court should vacate the district court's sale order and order the matter reassigned on remand.

Respectfully submitted,

/s/ *Aaron M. Panner*

MATTHEW H. KIRTLAND
NORTON ROSE FULBRIGHT US LLP
799 Ninth Street NW, Suite 1000
Washington, DC 20001
(202) 662-0200
matthew.kirtland@
nortonrosefulbright.com

AARON M. PANNER
DANIEL S. SEVERSON
COLLIN R. WHITE
DENNIS D. HOWE
KELLOGG, HANSEN, TODD,
  FIGEL & FREDERICK, P.L.L.C.
1615 M Street, N.W., Suite 400
Washington, D.C. 20036
(202) 326-7921
apanner@kellogghansen.com
dseverson@kellogghansen.com
cwhite@kellogghansen.com
dhowe@kellogghansen.com

KEVIN J. MANGAN
MATTHEW P. WARD
STEPHANIE SMIERTKA RILEY
WOMBLE BOND DICKINSON (US) LLP
1313 North Market Street, Suite 1200
Wilmington, Delaware 19801
(302) 252-4320
kevin.mangan@wbd-us.com
matthew.ward@wbd-us.com
stephanie.riley@wbd-us.com

MICHAEL BOWE
TYLER PURINTON
BRITHEM LLP
565 Fifth Avenue
New York, NY 10017
(646) 653-9173
mbowe@brithem.com
purinton@brithem.com

*Counsel for Appellant Gold Reserve Ltd.*

January 8, 2026

# STATUTORY ADDENDUM

1.    28 U.S.C. § 455 provides:

**28 U.S. § 455.  Disqualification of justice, judge, or magistrate judge**

**(a)** Any justice, judge, or magistrate judge of the United States shall disqualify himself in any proceeding in which his impartiality might reasonably be questioned.

**(b)** He shall also disqualify himself in the following circumstances:

**(1)** Where he has a personal bias or prejudice concerning a party, or personal knowledge of disputed evidentiary facts concerning the proceeding;

**(2)** Where in private practice he served as lawyer in the matter in controversy, or a lawyer with whom he previously practiced law served during such association as a lawyer concerning the matter, or the judge or such lawyer has been a material witness concerning it;

**(3)** Where he has served in governmental employment and in such capacity participated as counsel, adviser or material witness concerning the proceeding or expressed an opinion concerning the merits of the particular case in controversy;

**(4)** He knows that he, individually or as a fiduciary, or his spouse or minor child residing in his household, has a financial interest in the subject matter in controversy or in a party to the proceeding, or any other interest that could be substantially affected by the outcome of the proceeding;

**(5)** He or his spouse, or a person within the third degree of relationship to either of them, or the spouse of such a person:

**(i)** Is a party to the proceeding, or an officer, director, or trustee of a party;

**(ii)** Is acting as a lawyer in the proceeding;

**(iii)** Is known by the judge to have an interest that could be substantially affected by the outcome of the proceeding;

**(iv)** Is to the judge's knowledge likely to be a material witness in the proceeding.

**(c)** A judge should inform himself about his personal and fiduciary financial interests, and make a reasonable effort to inform himself about the personal financial interests of his spouse and minor children residing in his household.

**(d)** For the purposes of this section the following words or phrases shall have the meaning indicated:

**(1)** "proceeding" includes pretrial, trial, appellate review, or other stages of litigation;

**(2)** the degree of relationship is calculated according to the civil law system;

**(3)** "fiduciary" includes such relationships as executor, administrator, trustee, and guardian;

**(4)** "financial interest" means ownership of a legal or equitable interest, however small, or a relationship as director, adviser, or other active participant in the affairs of a party, except that:

**(i)** Ownership in a mutual or common investment fund that holds securities is not a "financial interest" in such securities unless the judge participates in the management of the fund;

**(ii)** An office in an educational, religious, charitable, fraternal, or civic organization is not a "financial interest" in securities held by the organization;

**(iii)** The proprietary interest of a policyholder in a mutual insurance company, of a depositor in a mutual savings association, or a similar proprietary interest, is a "financial interest" in the organization only if the outcome of the proceeding could substantially affect the value of the interest;

**(iv)** Ownership of government securities is a "financial interest" in the issuer only if the outcome of the proceeding could substantially affect the value of the securities.

**(e)** No justice, judge, or magistrate judge shall accept from the parties to the proceeding a waiver of any ground for disqualification enumerated in subsection (b).  Where the ground for disqualification arises only under subsection (a), waiver

may be accepted provided it is preceded by a full disclosure on the record of the basis for disqualification.

**(f)** Notwithstanding the preceding provisions of this section, if any justice, judge, magistrate judge, or bankruptcy judge to whom a matter has been assigned would be disqualified, after substantial judicial time has been devoted to the matter, because of the appearance or discovery, after the matter was assigned to him or her, that he or she individually or as a fiduciary, or his or her spouse or minor child residing in his or her household, has a financial interest in a party (other than an interest that could be substantially affected by the outcome), disqualification is not required if the justice, judge, magistrate judge, bankruptcy judge, spouse or minor child, as the case may be, divests himself or herself of the interest that provides the grounds for the disqualification.

2.    Delaware Code title 8, § 324 provides:

**Del. Code tit. 8, § 324.  Attachment of shares of stock or any option, right or interest therein; procedure; sale; title upon sale; proceeds.**

**(a)** The shares of any person in any corporation with all the rights thereto belonging, or any person's option to acquire the shares, or such person's right or interest in the shares, may be attached under this section for debt, or other demands, if such person appears on the books of the corporation to hold or own such shares, option, right or interest.  So many of the shares, or so much of the option, right or interest therein may be sold at public sale to the highest bidder, as shall be sufficient to satisfy the debt, or other demand, interest and costs, upon an order issued therefor by the court from which the attachment process issued, and after such notice as is required for sales upon execution process.  Except as to an uncertificated security as defined in § 8-102 of Title 6, the attachment is not laid and no order of sale shall issue unless § 8-112 of Title 6 has been satisfied.  No order of sale shall be issued until after final judgment shall have been rendered in any case.  If the debtor lives out of the county, a copy of the order shall be sent by registered or certified mail, return receipt requested, to such debtor's last known address, and shall also be published in a newspaper published in the county of such debtor's last known residence, if there be any, 10 days before the sale; and if the debtor be a nonresident of this State shall be mailed as aforesaid and published at least twice for 2 successive weeks, the last publication to be at least 10 days before

the sale, in a newspaper published in the county where the attachment process issued. If the shares of stock or any of them or the option to acquire shares or any such right or interest in shares, or any part of them, be so sold, any assignment, or transfer thereof, by the debtor, after attachment, shall be void.

**(b)** When attachment process issues for shares of stock, or any option to acquire such or any right or interest in such, a certified copy of the process shall be left in this State with any officer or director, or with the registered agent of the corporation.  Within 20 days after service of the process, the corporation shall serve upon the plaintiff a certificate of the number of shares held or owned by the debtor in the corporation, with the number or other marks distinguishing the same, or in the case the debtor appears on the books of the corporation to have an option to acquire shares of stock or any right or interest in any shares of stock of the corporation, there shall be served upon the plaintiff within 20 days after service of the process a certificate setting forth any such option, right or interest in the shares of the corporation in the language and form in which the option, right or interest appears on the books of the corporation, anything in the certificate of incorporation or bylaws of the corporation to the contrary notwithstanding.  Service upon a corporate registered agent may be made in the manner provided in § 321 of this title.

**(c)** If, after sale made and confirmed, a certified copy of the order of sale and return and the stock certificate, if any, be left with any officer or director or with the registered agent of the corporation, the purchaser shall be thereby entitled to the shares or any option to acquire shares or any right or interest in shares so purchased, and all income, or dividends which may have been declared, or become payable thereon since the attachment laid.  Such sale, returned and confirmed, shall transfer the shares or the option to acquire shares or any right or interest in shares sold to the purchaser, as fully as if the debtor, or defendant, had transferred the same to such purchaser according to the certificate of incorporation or bylaws of the corporation, anything in the certificate of incorporation or bylaws to the contrary notwithstanding.  The court which issued the levy and confirmed the sale shall have the power to make an order compelling the corporation, the shares of which were sold, to issue new certificates or uncertificated shares to the purchaser at the sale and to cancel the registration of the shares attached on the books of the corporation upon the giving of an open end bond by such purchaser adequate to protect such corporation.

**(d)** The money arising from the sale of the shares or from the sale of the option or right or interest shall be applied and paid, by the public official receiving the same, as by law is directed as to the sale of personal property in cases of attachment.

# CERTIFICATE OF COMPLIANCE

1.      This document complies with the type-volume limit of Federal Rule of Appellate Procedure 32(a)(7)(B) because, excluding the parts of the document exempted by Federal Rule of Appellate Procedure 32(f), this document contains 12,989 words, as certified by the word-count function of the word-processing system (Microsoft Office Word 365) used to prepare the document.

2.      This document complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5), the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6), and 3d Circuit L.A.R. 32.1(c), because this document has been prepared in a proportionally spaced typeface using Microsoft Office Word 365 in 14-point Times New Roman font.

3.      In addition, pursuant to 3d Circuit L.A.R. 31.1(c), the undersigned hereby certifies that the text of the electronic brief filed with the Court is identical to the paper copies, that a virus detection program (CrowdStrike) has been run on the electronic file, and that no virus was detected.

Dated:  January 8, 2026

/s/ *Aaron M. Panner*
Aaron M. Panner
*Counsel for Appellant*
*Gold Reserve Ltd.*

## CERTIFICATE OF FILING AND SERVICE

I certify that, on January 8, 2026, the foregoing Brief of Appellant Gold Reserve Ltd. was filed electronically with the Clerk of Court and served on counsel of record through CM/ECF.

## CERTIFICATE OF BAR MEMBERSHIP

Pursuant to 3d Circuit L.A.R. 28.3(d) and 46.1, I, Aaron M. Panner, hereby certify that I am a member in good standing of the bar of the United States Court of Appeals for the Third Circuit.

Dated:  January 8, 2026

/s/ *Aaron M. Panner*
Aaron M. Panner
*Counsel for Appellant*
*Gold Reserve Ltd.*