# United States Court of Appeals

*for the*

# Third Circuit

---

Case Nos. 25-3347, 25-3348, 25-3349, 25-3350,
25-3363, 25-3453 to 25-3494, 25-3563, and 25-3564

CRYSTALLEX INTERNATIONAL CORPORATION

– v. –

BOLIVARIAN REPUBLIC OF VENEZUELA

---

Bolivarian Republic of Venezuela, Appellant in No. 25-3347

PDV Holding, Inc., Appellant in No. 25-3348

CITGO Petroleum Corporation, Appellant in No. 25-3349

Petróleos de Venezuela, S.A., Appellant in No. 25-3350

Gold Reserve Ltd., Appellant in No. 25-3363

XYQ US, LLC, Appellant in No. 25-3563 and 25-3564

---

ON APPEALS OF AN ORDER OF THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE NO. 17-MC-151-LPS AND 22-MC-347-LPS
(HON. LEONARD P. STARK)

## BRIEF FOR APPELLANT XYQ US, LLC

DAVID ELSBERG
MICHAEL DUKE
GARRETT GERBER
ELSBERG BAKER & MARURI PLLC
1 Penn Plaza
New York, New York 10119
(212) 597-2600

*Counsel for Appellant XYQ US, LLC*

January 8, 2026

 COUNSEL PRESS    (800) 4-APPEAL • (389295)

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Rule 26.1(a) of the Federal Rules of Appellate Procedure, XYQ US, LLC states that its parent corporations are FFI Fund Ltd., FYI Ltd., and Olifant Fund, Ltd. and that no publicly held corporation owns 10 percent or more of its stock. Pursuant to Local Appellate Rule 26.1.1, XYQ US, LLC states that, to its knowledge, no publicly held corporation which is not a party to this proceeding has a financial interest in the outcome of this case.

**TABLE OF CONTENTS**

**Page**

CORPORATE DISCLOSURE STATEMENT ........................................................ i

TABLE OF AUTHORITIES ........................................................................... iii

INTRODUCTION .......................................................................................... 1

JURISDICTION............................................................................................. 2

STATEMENT OF ISSUES .............................................................................. 2

STATEMENT OF RELATED CASES .............................................................. 3

STATEMENT OF THE CASE......................................................................... 3

STANDARD OF REVIEW ............................................................................. 5

SUMMARY OF ARGUMENT ........................................................................ 5

ARGUMENT ............................................................................................... 5

   I.  THE DISTRICT COURT'S ORDER VIOLATES DELAWARE LAW ....... 5

     A.  The District Court's Analysis is Legally Impermissible and
Unsupported by the Record........................................................... 6

       1.  Delaware law required selection of the highest bid ........................ 7

       2.  The district court deviated from its own court-ordered
procedures........................................................................... 8

       3.  Even if "expected value" were a permissible lens, the district
court's analysis was legally erroneous and unsupported by
the record ........................................................................... 10

         i.  There is no evidence that the 2020 Bondholders
would—or could—block Gold Reserve's transaction............. 11

         ii.  The TSA is structurally incapable of delivering the
promised certainty ................................................... 13

         iii.  Elliott's bid carries greater regulatory and antitrust
closing risk than Gold Reserve's ............................. 16

4.    The court's expected value analysis is fatally flawed because it incorrectly assumed a failed Gold Reserve bid would result in zero recovery—while ignoring the $2 billion cost of accepting Elliott's lower bid..........................................17

CONCLUSION ...................................................................................20

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Crystallex Int'l Corp. v. Bolivarian Republic of Venezuela*,
   932 F.3d 126 (3d Cir. 2019) ..................................................................2, 7

*Frank's GMC Truck Ctr., Inc. v. Gen. Motors Corp.*,
   847 F.2d 100 (3d Cir. 1988) ......................................................................13

*Garza v. Marine Transp. Lines, Inc.*,
   861 F.2d 23 (2d Cir. 1988) ........................................................................15

*Int'l Multifoods Corp. v. Commercial Union Ins. Co.*,
   309 F.3d 76 (2d Cir. 2002) ........................................................................14

*Marblegate Asset Mgmt., LLC v. Educ. Mgmt. Corp.*,
   846 F.3d 1 (2d Cir. 2017) ..........................................................................15

## Statutes

8 *Del. C.* § 324 ............................................................................... 5, 12

U.S.C. § 1291 ..................................................................................2

U.S.C. § 1330 ..................................................................................2

U.S.C. § 1367 ..................................................................................2

U.S.C. § 1605 ..................................................................................2

## Rules

F.R.A.P. 26.1............................................................................... i

F.R.A.P. 28(i) ............................................................... *passim*

iv

**INTRODUCTION**

This appeal does not ask the Court to choose between competing bidders. The question presented is whether it was reversible error for the district court to discard Delaware's statutorily mandated "highest bidder" rule, abandon its own court-ordered sale procedures, and then destroy $2 billion in value based on speculation untethered from the record. The district court's opinion and order should be reversed.

The district court's November 25 opinion and November 29 order approved the sale of Petróleos de Venezuela Holding, Inc. ("PDVH") shares to Amber Energy, Inc. ("Amber"), a subsidiary of Elliott Investment Management L.P. ("Elliott")—even though another qualified bidder offered a higher price—based on the court's invented "expected value" theory.[1] That theory, and the court's application of it, contravenes Delaware law, defies court-ordered sale procedures, and is foreclosed by the evidentiary record.

Pursuant to Federal Rule of Appellate Procedure 28(i), XYQ US, LLC ("XYQ") incorporates by reference the Brief of Appellant Gold Reserve Ltd. ("Gold Reserve" and the "Gold Reserve Brief") as specified below, and writes separately to make a narrow and decisive point: even if the district court were permitted to depart from Delaware's "highest bidder" mandate and engage in expected-value reasoning,

---

[1] Throughout this brief, "Amber" and "Elliott" are used interchangeably.

its analysis collapses under scrutiny. The district court assigned near-certainty to Elliott's closing while discounting the higher bid of Dalinar Energy Corporation, a subsidiary of appellant Gold Reserve,[2] based on hypothetical risks that are (1) rendered non-existent by mandates from the Office of Foreign Assets Control ("OFAC"), (2) unsupported by the record evidence, and (3) contradicted by the very transaction structure the district court relied upon. The court erred by basing its ruling on unfounded conjecture.

The sale order should be vacated.

## JURISDICTION

The district court had jurisdiction under 28 U.S.C. §§ 1330, 1367, and 1605(a)(6). *See Crystallex Int'l Corp. v. Bolivarian Republic of Venezuela*, 932 F.3d 126, 132-52 (3d Cir. 2019). This Court has jurisdiction under 28 U.S.C. § 1291 to review the district court's November 29, 2025 final order, JA0429, and prior interlocutory orders that merge with the judgment. On December 27, 2025, XYQ timely appealed. JA0012.

## STATEMENT OF ISSUES

Pursuant to F.R.A.P. 28(i), XYQ adopts by reference the first Issue Presented in the Gold Reserve Brief: Whether the district court violated the Delaware law requirement that attached assets be sold to "the highest bidder," 8 *Del. C.* § 324(a),

---

[2] This brief refers to the bidding entity as "Gold Reserve" for simplicity.

and the procedures governing the sale of PDVH shares by accepting Elliott's lower bid over Gold Reserve's higher qualified bid.  The answer is yes.

## STATEMENT OF RELATED CASES

Pursuant to F.R.A.P. 28(i), XYQ adopts by reference the Statement of Related Cases in the Gold Reserve Brief

## STATEMENT OF THE CASE

Pursuant to F.R.A.P. 28(i), XYQ adopts by reference Sections A, B, C, D, E, F, and H of the Statement of the Case in the Gold Reserve Brief.

XYQ appears in the appeal as the successor-in-interest to Siemens Energy, Inc. ("SEI").  SEI's predecessor, the Dresser-Rand Company, was a judgment creditor of Petróleos de Venezuela S.A. ("PDVSA").  *See generally, XYQ US, LLC v. Petróleos de Venezuela S.A.*, C.A. No. 1:22-mc-00347-LPS (D. Del.).  In the district court's "waterfall" order of creditors, SEI ranked eleventh (JA0287-88), and the district court eventually valued SEI's claim against PDVSA (as of an estimated closing date of June 30, 2026) at $232,705,880.67.  JA0288.  XYQ also participated in Gold Reserve's bidding consortium: The Gold Reserve bid included XYQ's commitment to effectuate a credit bid of the full SEI judgment (in which XYQ held a 100% subparticipation interest), valued at $211,384,366.59 as of December 31, 2024.  JA0340; JA5918; JA5921; JA6501.

3

On December 17, 2025, SEI, Morgan Stanley Senior Funding, Inc., and XYQ entered into an agreement which elevated XYQ's subparticipation interest to direct ownership of the PDVSA judgment. *See* JA6501; D.I. 2589, Decl. of Justin M. Forcier.[3] By order dated December 23, 2025, the District Court substituted XYQ for SEI as the real party in interest. D.I. 2597. On January 5, 2026, this Court amended the case captions for several consolidated appeals to likewise substitute XYQ in place of SEI. *See, e.g.,* No. 25-3447, Dkt. 151. Accordingly, XYQ's role in this appeal and the court-supervised sale process is identical to SEI's role as a judgment creditor participating in the priority waterfall and as a partner in Gold Reserve's bidding consortium.

XYQ adopts by reference parts of the Gold Reserve Brief pursuant to F.R.A.P. 28(i) because the adopted arguments—challenging the district court's departure from Delaware's "highest bidder" mandate and from the court's own sale procedures—directly affect the relief available to XYQ. Approval of a lower-priced sale reduces the proceeds available for distribution through the priority waterfall and correspondingly diminishes recovery on the SEI judgment, now held by XYQ. Vacatur of the sale order and remand for a sale conducted in accordance with governing law and the court-ordered procedures would redress that injury by

---

[3] "D.I." references the district court's docket entries in No. 17-mc-151-LPS.

4

restoring the opportunity for a higher-value transaction.  Although Gold Reserve was a bidder, the adopted arguments are not bidder-specific; they address legal and procedural errors that independently and materially harm XYQ's interests as a judgment creditor and warrant reversal.

## STANDARD OF REVIEW

Pursuant to F.R.A.P. 28(i), XYQ adopts by reference the Standard of Review in the Gold Reserve Brief.

## SUMMARY OF ARGUMENT

Pursuant to F.R.A.P. 28(i), XYQ adopts by reference the Summary of Argument I in the Gold Reserve Brief.

## ARGUMENT

## I.   THE DISTRICT COURT'S ORDER VIOLATES DELAWARE LAW

Pursuant to F.R.A.P. 28(i), XYQ adopts by reference Argument Section I of the Gold Reserve Brief in its entirety.  Specifically, XYQ adopts by reference Gold Reserve's arguments:  (i) that the sale order violates 8 *Del. C.* § 324, which mandates that attached shares be sold at public sale to the highest bidder, requires an objective, price-based comparison among qualified bidders, and does not permit selection of a lower-priced bid based on subjective considerations such as expected value or certainty of closing; (ii) that Gold Reserve submitted a qualified, conforming bid that exceeded Elliott's bid by approximately $2 billion under the district court's own definition of price and, once the Special Master determined Gold Reserve was

5

qualified and selected it as the final recommended bidder, Delaware law required acceptance of that bid; (iii) that the district court violated its own court-ordered sale procedures by considering a post-recommendation bid that failed to satisfy the overbid requirements, abandoning bidder protections negotiated and adopted after years of litigation, and relying on a settlement with the owners of bonds issued by PDVSA and maturing in 2020 (the "2020 Bondholders") that the district court had previously expressly excluded from the evaluation framework; and (iv) that the district court's sole justification for approving a lower-priced bid—purportedly greater "certainty of closing"—is legally impermissible, speculative, unsupported by the record, and cannot justify disregarding the highest qualified bid under Delaware law.

For these reasons, as set forth more fully in Argument I of the Gold Reserve Brief, the sale order must be vacated.

### A. The District Court's Analysis is Legally Impermissible and Unsupported by the Record

This was not a two-party dispute that could be resolved by choosing a single "winner" or "loser." It was a multi-creditor proceeding in which numerous judgment creditors with attachment orders against PDVH stock ("AJCs") invested extraordinary resources—millions of dollars and thousands of hours—to secure their position in the priority order, design and litigate a sale framework, evaluate

competing bids, and ensure that the attached shares were sold in a manner that maximized sale proceeds.

The AJCs did not participate to favor Elliott or Gold Reserve. Their shared objective—and the animating purpose of the *Crystallex International Corporation v. Bolivarian Republic of Venezuela* proceeding—was to maximize the proceeds from the sale of the PDVH shares for the benefit of the largest number of AJCs. That objective was embedded in the governing framework. The Special Master proposed, and the district court adopted, a process under which the "[p]rice paid for the PDVH Shares will be evaluated based on the amount of Attached Judgments expected to be satisfied by the purchase price." JA5559; *see also* JA5626-52 (adopting this recommendation).

By abandoning Delaware law and its own rules in favor of a flawed "expected value" analysis, the court did more than choose Elliott over Gold Reserve. It eliminated approximately $2 billion in recovery to judgment creditors without evidentiary support.

### 1.    Delaware law required selection of the highest bid

Delaware law leaves no room for the district court's approach. Section 324(a) requires a public sale "to the highest bidder," which was Gold Reserve. *See* 8 *Del. C.* § 324(a).

7

There is no dispute that Gold Reserve submitted a qualified, conforming bid. Once Gold Reserve was deemed qualified, the qualitative inquiry ended. Among qualified bidders, Delaware law permits only one remaining comparison—price. Gold Reserve was the clear winner: its bid exceeded Elliott's by approximately $2 billion under the district court's own definition of "price."

The Special Master initially applied that rule. He determined that Gold Reserve was qualified, recommended it as the final bidder, and authorized execution of a purchase agreement. He then reversed course, recommended a bid more than $2 billion lower than Gold Reserve's—based solely on qualitative considerations—and rejected the "highest bid[]." That violated Delaware law.

### 2.    The district court deviated from its own court-ordered procedures

The district court compounded its statutory error by discarding the carefully negotiated and extensively litigated bidder protections.

After the Special Master determined that Gold Reserve was a qualified bidder, the district court laid down the rules of the road. It expressly excluded consideration of "any requirement or condition with respect to the 2020 Bond Entities other than that bidders acknowledge that the 2020 Bond Entities purport to have a pledge of 50.1% of the equity of CITGO Holding, Inc." JA5529-30. The Stock Purchase Agreement ("SPA") between Gold Reserve and the Special Master and the sale procedures both required that any post-recommendation "Competing Proposal"

8

exceed the recommended bid by at least the overbid minimum, which the Special Master could raise or lower at his discretion—but not eliminate. JA5618, JA5639, JA6054.

Thus, after years of litigation, the rules were settled: (1) the shares would be sold to the highest qualified bidder, (2) evaluation criteria would not include conditions tied to the 2020 Bondholders, and (3) any topping bid had to exceed the leading bid by at least $50 million.

Those protections were abandoned almost overnight. The overbid requirement was scrapped. The Special Master pivoted to a bid billions of dollars lower than Gold Reserve's—explicitly because of the purported "certainty of closing" associated with the Elliott bid's inclusion of a Transaction Support Agreement ("TSA") signed by a portion of the 2020 Bondholders—the very criterion that the district court had repeatedly rejected. *E.g.*, JA7428 ("Most significantly, the Amber Sale Transaction virtually eliminates any closing risks associated with the SDNY Litigation, by delivering a settlement with the PDVSA 2020 Bondholders.").

The district court sat by while the Special Master abdicated his duty to fetch the highest price. That failure did not just harm Gold Reserve. By discarding the carefully negotiated and heavily litigated bidder protections and procedures, the district court sanctioned a sales process that erased approximately $2 billion of value

9

that would otherwise flow to AJCs like XYQ. A process that destroys value—and the parties' expectations—at this scale is reversible error.

> **3. Even if "expected value" were a permissible lens, the district court's analysis was legally erroneous and unsupported by the record**

Even assuming the district court could lawfully depart from Delaware's "highest bidder" mandate, the expected value analysis it performed cannot withstand scrutiny.

In its November 25 opinion, the district court announced for the first time that "[e]xpected value analysis is the standard way by which to assess and quantify uncertainty associated with litigation, like the uncertainty associated with the 2020s Litigation." JA0349. The district court cited no precedent and no evidence to justify that shift, and it ignored the fact that Gold Reserve's bid had already been deemed sufficiently reliable to warrant the Special Master's recommendation just months earlier. *See id.*

The district court then compounded its error by declaring that Gold Reserve's bid could exceed Elliott's expected value only if it had at least a 74.58% likelihood of closing. JA0351. That threshold was an *ipse dixit* expected value cutoff—untethered from testimony, expert analysis, the record, and any findings by the court.

The flaw was obvious. The court conceded that its calculation counterfactually "assumes that the [Elliott] Bid has a 100% certainty of closing." *Id.*

10

Rather than correct that defect, the district court dismissed it as inconsequential, asserting (without analysis) that Gold Reserve's likelihood of closing was "so much lower than 75%" that Elliott's expected value was "clearly greater." *Id.*

That conclusory statement is not an "expected value" analysis. The district court never meaningfully performed one. *See* JA0258. It did not assess the risk that the TSA would unravel. *See id.* It did not assign any probability to the 2020 Bondholders blocking a sale to Gold Reserve. And it did not grapple with the regulatory risks associated with the Elliott bid. *See id.*

A proper analysis would have compelled the opposite conclusion. The record shows that: (1) there is no evidentiary basis to conclude that the 2020 Bondholders would or could enjoin a Gold Reserve transaction, (2) the TSA is structurally incapable of delivering the closing certainty that the district court credited to it, and (3) Elliott's bid carries greater—and unaddressed—regulatory and antitrust risk than Gold Reserve's.

> **i.    There is no evidence that the 2020 Bondholders would—or could—block Gold Reserve's transaction**

The record contains no testimony, document, or analysis suggesting that the 2020 Bondholders would seek to block Gold Reserve's closing—much less that they could meet the standards for preliminary injunctive relief. No witness identified a single provision of the Pledge and Security Agreement ("Pledge") or the indenture governing the PDVSA 2020 Bonds ("Indenture") that Gold Reserve's financing

11

violates.  And no witness offered any basis for discounting Gold Reserve's bid by billions of dollars based on the purported risk posed by the 2020 Bondholders.

To the contrary, the 2020 Bondholders represented to Judge Failla that they were not seeking to enjoin the Delaware proceedings, or Gold Reserve's bid. JA8609.

The district court's speculation also ignores OFAC's longstanding prohibition on foreclosure or exercise of the Pledge.  JA0291; JA8511; *see also* JA5878 (explaining that OFAC might "continue to suspend [General License 5] beyond the date of the expected closing of sale of the PDVH shares").  OFAC has repeatedly suspended General License 5, most recently through General License 5T, which remains in effect until at least February 3, 2026.  U.S. Dep't of Treasury, OFAC FAQ No. 595 (Dec. 19, 2025).  OFAC guidance confirms that transactions involving the PDVSA 2020 pledge are prohibited absent specific authorization.  *Id.*; *see also* JA0275 (explaining "one form of OFAC guidance is Frequently Asked Questions").  The district court's contrary "expected value" haircut ignores this federal prohibition, even though the Special Master's own advisor conceded that, absent a change in OFAC policy, the supposed threat posed by the 2020 Bondholders "does not exist."  JA13200 (12:19-13:6).

Even if OFAC policy changed, injunctive relief would remain unlikely.  Any potential diminution in collateral value is compensable with money damages and

therefore cannot support irreparable harm. *E.g.*, *Frank's GMC Truck Ctr., Inc. v. Gen. Motors Corp.*, 847 F.2d 100, 102 (3d Cir. 1988) ("The availability of adequate monetary damages belies a claim of irreparable injury."). The balance of equities and public interest also strongly disfavor enjoining satisfaction of long delayed judgments won by the AJCs.

### ii. The TSA is structurally incapable of delivering the promised certainty

The TSA is not a binding resolution. It is a contingent framework—an agreement laden with conditions precedent, discretionary consent rights, and termination provisions that make closing less—not more—certain. *See* JA8241. The district court failed to identify any provision of the TSA that compels performance by non-consenting holders or overcomes issuer consent requirements, nor did it assess the practical risk that any one of eleven independent fiduciaries could exercise the right to withhold approval "in their reasonable discretion" at multiple junctures. *E.g.*, JA8245.

The TSA requires approval of definitive documents by all parties. "Required Consenting 2020 Noteholders" retain discretion to withhold consent to any definitive document or amendment. *Id.* Multiple "commercially reasonable efforts" provisions further dilute enforceability. JA8250-54. The TSA also contains an "outside date" (JA8258), sale-order-dependent conditions (JA8255), and broad

Case: 25-3564     Document: 52     Page: 19     Date Filed: 01/08/2026

termination rights (JA8256-58), creating multiple exit ramps if timelines slip or disputes arise.

Even setting aside these numerous offramps, the TSA cannot deliver the release of collateral central to the district court's certainty "analysis."

Section 9.02 of the Indenture requires issuer consent for any amendment or waiver that releases collateral. JA5393. The district court nevertheless concluded that the issuer's consent under § 9.02(a) was "inapplicable" because the TSA relies on directions from holders to the trustee—rather than amendments, supplements, or waivers—and therefore permits a 66.67% supermajority to direct release of collateral notwithstanding section 9.02(b)(vi). JA0403-04. That conclusion misreads the governing documents and disregards settled principles of New York law.

The district court relied on Section 7.03 of the Pledge, which states that "the consent of the Holders of at least [66.67] % aggregate in principal amount of the outstanding Notes shall be required" for the release of Collateral. JA5458. But identifying a bondholder consent threshold does not displace issuer consent. By its plain text, the requirement is additive, not substitutive. Reading 7.03 to eliminate issuer consent would render Section 9.02(a) superfluous—an outcome New York law forbids. *Int'l Multifoods Corp. v. Commercial Union Ins. Co.*, 309 F.3d 76, 86 (2d Cir. 2002) ("We disfavor contract interpretations that render provisions of a

14

contract superfluous.") (citation omitted); *Garza v. Marine Transp. Lines, Inc.*, 861 F.2d 23, 27 (2d Cir. 1988) (explaining a contract interpretation that renders at least one clause superfluous "is not preferred and will be avoided if possible").

Section 9.02(a) expressly requires both issuer consent and the consent of at least 66.67% of 2020 Bondholders for any "amendment, supplement or waiver [that] may release any Lien on Collateral." Under the district court's reading, issuer refusal to release the Lien on the Collateral would be irrelevant: the same 66.67% of holders could simply invoke Section 7.03 to extinguish the lien anyway.[4] Extinguishing a recorded lien securing billions of dollars is a paradigmatic "modification" and "waiver" of the security documents—precisely the action the Indenture places behind the issuer-consent gate.

Nor does the TSA neutralize opposition from non-consenting bondholders. Approximately 25% of the 2020 Bondholders do not support the TSA and pose a significant hurdle to Elliott's bid. Section 9.02(b)(vi) protects "the right of each Holder to receive payment," and they retain the right to "pursue available State and federal law remedies" to enforce their payment rights. *Marblegate Asset Mgmt., LLC v. Educ. Mgmt. Corp.*, 846 F.3d 1, 16 (2d Cir. 2017). These non-consenting 2020 Bondholders have a significant incentive to litigate to recover value

---

[4] The Pledge "is subject to the terms of the Indenture, and in the event of any conflict[,] … the terms of the Indenture shall control." JA5461.

compromised by the settling bondholders—litigation that would derail or delay any closing.  Yet the district court discounted these risks entirely and assumed, without analysis, that the Elliott bid was certain to close.

### iii.    Elliott's bid carries greater regulatory and antitrust closing risk than Gold Reserve's

The district court never performed the basic step its "expected value" approach demands: assigning a probability to the risk that Elliott's bid would not close for regulatory reasons.  That omission is striking because Elliott's path to closing is regulatory-heavy.  It requires OFAC authorization, Committee on Foreign Investment-comfort, Hart-Scott-Rodino ("HSR") clearance, and multiple foreign merger clearances (Mexico, Morocco, and the Netherlands).  Each regime operates on  discretionary timelines—and can produce delay—that, under the TSA, could trigger termination rights.

Instead of confronting that risk, the district court incorrectly assumed that Elliott's regulatory path is near-certain, then relied on this flawed premise to conclude that Gold Reserve must have at least a 74.58% likelihood of closing to match the "expected value" of the Elliott bid.  JA0398-407.  The district court did not grapple with the risk created by multiple foreign filings, did not identify record evidence quantifying the probability of timely clearance, and did not explain why a bid requiring more approvals should be assumed safer than one requiring fewer.  *Id.*

16

The record points the other way. Elliott holds significant stakes in global energy and refining companies (including Phillips 66, Suncor, and BP), increasing merger-control complexity and the potential substantive issues across jurisdictions. JA8506. And its witnesses could not explain what would happen if foreign approvals were denied or delayed—an outcome that would directly affect timing and could jeopardize closing under the TSA. JA13144-45 (470:24-477:13); JA13195-96 (676:17-678:10). By contrast, Gold Reserve had already cleared HSR and required no foreign antitrust filings, materially reducing regulatory risk and timing uncertainty. *See* D.I. 2120 at 1-2.

In sum, the district court's "certainty" rationale is unsupported—and, in key respects, contradicted by—the record evidence. The hypothesized interference with Gold Reserve's closing by the 2020 Bondholders is speculative and gated by OFAC. The TSA is a contingent, opt-out framework that cannot deliver the legal releases it "promises." And Elliott's regulatory path is longer, more complex, and more failure-prone than Gold Reserve's. Treating Elliott as effectively risk-free while discounting a roughly $2 billion price differential was clear error.

### 4. The court's expected value analysis is fatally flawed because it incorrectly assumed a failed Gold Reserve bid would result in zero recovery—while ignoring the $2 billion cost of accepting Elliott's lower bid

Even if the district court were permitted to evaluate bids through an expected-value lens, its analysis rests on two compounding errors: (1) the incorrect

17

assumption that a failed Gold Reserve closing would yield a zero recovery, and (2) the failure to account for the guaranteed destruction of $2 billion in value by accepting Elliott's bid. Those errors led the court to exaggerate the risk of Gold Reserve's higher bid while ignoring the irreversible cost of accepting Elliott's lower one.

Contrary to the court's assumption, if Gold Reserve's transaction did not close, the asset would not vanish. The PDVH shares would remain intact, attached and available for resale under the court's continued supervision. Nothing in the record suggests that a failed closing would extinguish the asset, impair title, or foreclose a subsequent transaction—much less reduce the recoverable value to zero. At worst, the court would return to its prior position: overseeing a renewed process designed to maximize value for judgment creditors. The court would remain free to conduct another sale likely yielding substantial proceeds—potentially from the very transaction it ultimately approved. In short, the court overlooked the critical point: the downside of a failed Gold Reserve closing is mere delay, not destruction of value. The statutorily mandated "highest bidder" standard that narrowly focuses on price, not execution risk, is designed to prevent courts from making this very mistake.

Compounding that error, the court failed to recognize that approval of Elliott's bid produces a permanent and irreversible result: a sale at a price approximately $2

18

billion lower than Gold Reserve's.  Once that sale closes, the lost value cannot be recovered.

By assigning a zero payoff to the Gold Reserve downside, while ignoring the irrevocable $2 billion opportunity cost of Elliott's bid, the court overstated the risk of the higher offer and understated the cost of the lower one.  That analytical error drove the outcome.

*        *        *

Even if the district court could lawfully depart from Delaware's "highest bidder" mandate and its own rules of the road to conduct an "expected value" exercise, the record cannot sustain the analysis it performed.  There is no evidentiary foundation for the critical predicate that the 2020 Bondholders would or could enjoin or otherwise block the Gold Reserve closing; the TSA is structurally incapable of delivering the near 100% certainty the district court assigned to it; and Elliot's bid carries material regulatory and antitrust risks that were ignored.  The district court's expected value analysis is also fatally flawed because it assigns zero value to a failed Gold Reserve closing that would leave the asset intact, while disregarding the certain and irreversible loss of approximately $2 billion caused by accepting Elliott's lower bid.

19

## CONCLUSION

This Court should vacate the sale order, and remand with instructions to conform to Section 324 and the governing procedures.

Respectfully submitted,

s/ *David Elsberg*

DAVID ELSBERG
MICHAEL DUKE
GARRETT GERBER
ELSBERG BAKER & MARURI PLLC
1 Penn Plaza, Suite 4015
New York, New York 10119
(212) 597-2600
delsberg@elsberglaw.com
mduke@elsberglaw.com
ggerber@elsberglaw.com

*Counsel for Appellant XYQ US, LLC*

January 8, 2026

## CERTIFICATE OF COMPLIANCE

1.      This document complies with the type-volume limit of F.R.A.P. 32(a)(7)(B) because, excluding the parts of the document exempted by F.R.A.P. 32(f), this document contains 4,103 words, as certified by the word-count function of the word-processing system (Microsoft Office Word 365) used to prepare the document.

2.      This document complies with the typeface requirements of F.R.A.P. 32(a)(5), the type-style requirements of F.R.A.P. 32(a)(6), and 3d Circuit L.A.R. 32.1(c), because this document has been prepared in a proportionally spaced typeface using Microsoft Office Word 365 in 14-point Times New Roman font.

3.      In addition, pursuant to 3d Circuit L.A.R. 31.1(c), the undersigned hereby certifies that the text of the electronic brief filed with the Court is identical to the paper copies, that the Vipre Virus Protection, version 3.1 program has been run on the electronic file, and that no virus was detected.

Dated:  January 8, 2026

s/ *David Elsberg*
David Elsberg
*Counsel for Appellant*
*XYQ US, LLC*

## CERTIFICATE OF FILING AND SERVICE

I certify that, on January 8, 2026, the foregoing Brief of Appellant XYQ US, LLC was filed electronically with the Clerk of Court and served on counsel of record through CM/ECF.

Dated:  January 8, 2026

s/ *David Elsberg*
David Elsberg
*Counsel for Appellant*
*XYQ US, LLC*

**CERTIFICATE OF BAR MEMBERSHIP**

Pursuant to 3d Circuit L.A.R. 28.3(d) and 46.1, I, David Elsberg, hereby certify that I am a member in good standing of the bar of the United States Court of Appeals for the Third Circuit.

Dated:  January 8, 2026

s/ *David Elsberg*
David Elsberg
*Counsel for Appellant*
*XYQ US, LLC*