**Nos. 25-3347, 25-3348, 25-3349, 25-3350,**
**25-3363, 25-3453 to 25-3494, 25-3563, 25-3564**

# In the United States Court of Appeals
FOR THE THIRD CIRCUIT

CRYSTALLEX INTERNATIONAL CORPORATION,
*Plaintiff-Appellee,*
v.
BOLIVARIAN REPUBLIC OF VENEZUELA, ET AL.,
*Defendants-Appellants.*
(caption continued on following pages)

On Appeals from the United States District Court for the District of Delaware
Nos. 17-mc-151, 19-inc-79, 19-mc-290, 19-mc-342, 20-mc-257, 21-inc-18, 21-mc-46, 21-mc-481, 22-inc-68, 22-inc-69, 22-mc-131, 22-mc-156, 22-mc-263, 22-mc-264, 22-mc-347, 22-mc-453, 22-mc-464, 23-mc-298, 23-mc-340, 23-mc-378, 23-mc-379, 23-mc-397
(Hon. Leonard P. Stark, United States Circuit Judge)

## JOINT RESPONSE BRIEF OF FOUR CREDITORS

Christopher L. Carter
MORGAN, LEWIS & BOCKIUS LLP
One Federal Street
Boston, MA 02110
(617) 951-8063

Jody C. Barillare
MORGAN, LEWIS & BOCKIUS LLP
1201 N. Market Street, Suite 2201
Wilmington, DE 19801
(302) 574-7294

James D. Nelson
MORGAN, LEWIS & BOCKIUS LLP
1111 Pennsylvania Avenue, NW
Washington, DC 20004
(202) 739-5411

Edward H. Davis, Jr.
Fernando J. Menendez
SEQUOR LAW, P.A.
1111 Brickell Avenue, Suite 1250
Miami, FL 33131
(305) 372-8282

*Counsel for OI European Group B.V.*

Joshua S. Bolian
Jared A. Hagler
RILEY & JACOBSON, PLC
1906 West End Avenue
Nashville, Tennessee 37203
(615) 320-3700
jbolian@rjfirm.com
jhagler@rjfirm.com

F. Troupe Mickler IV
ASHBY & GEDDES
500 Delaware Ave., 8th Floor
P.O. Box 1150
Wilmington, DE 19899
(302) 654-1888
tmickler@ashbygeddes.com

*Counsel for ACL1 Investments Ltd., ACL2 Investments Ltd., and LDO (Cayman) XVIII Ltd.*

Alexander A. Yanos
ALSTON & BIRD, LLP
90 Park Avenue, 15th Floor
New York, NY 10016-1387
(212) 210-9400

Robert Poole
ALSTON & BIRD, LLP
1201 W. Peachtree St. NE, Suite 4900
Atlanta, GA 30309
(404) 881-4547

Laura Davis Jones
Peter J. Keane
PACHULSKI STANG ZIEHL & JONES LLP
919 North Market Street, 17th Floor
P.O. Box 8705
Wilmington, DE 19899-8705
(302) 652-4100

*Counsel for Northrop Grumman Ship Systems, Inc. (now known as Huntington Ingalls Incorporated)*

James E. Berger
Charlene C. Sun
Alice A. Gyamfi
DLA PIPER, LLP (US)
1251 Avenue of the Americas
New York, NY 10020
(212) 335-4715
james.berger@us.dlapiper.com
charlene.sun@us.dlapiper.com
alice.gyamfi@us.dlapiper.com

R. Craig Martin
Caleb Johnson
DLA PIPER, LLP (US)
1201 North Market Street
Suite 2100
Wilmington, DE 19801
(302) 468-5655
craig.martin@us.dlapiper.com
caleb.johnson@us.dlapiper.com

*Counsel for Rusoro Mining Ltd.*

---

TIDEWATER INVESTMENT SRL, ET AL.,
*Plaintiffs-Appellees,*
v.
BOLIVARIAN REPUBLIC OF VENEZUELA, ET AL.,
*Defendants-Appellants.*

---

OI EUROPEAN GROUP B.V.,
*Plaintiff-Appellee,*
v.
BOLIVARIAN REPUBLIC OF VENEZUELA, ET AL.,
*Defendants-Appellants.*

---

PHILLIPS PETROLEUM COMPANY VENEZUELA LTD, ET AL.,
*Plaintiffs-Appellees,*
v.
PETROLEOS DE VENEZUELA S.A., ET AL.,
*Defendants-Appellants.*

---

NORTHROP GRUMMAN SHIP SYSTEMS INC.,
*Plaintiff-Appellee,*
v.
MINISTRY OF DEFENSE OF THE REPUBLIC OF VENEZUELA, ET AL.,
*Defendants-Appellants.*

---

CONTRARIAN CAPITAL MANAGEMENT LLC, ET AL.,
*Plaintiffs-Appellees,*
v.
BOLIVARIAN REPUBLIC OF VENEZUELA, ET AL.,
*Defendants-Appellants.*

---

ACL1 INVESTMENTS LTD, ET AL.,
*Plaintiffs-Appellees,*
v.
BOLIVARIAN REPUBLIC OF VENEZUELA, ET AL.,
*Defendants-Appellants.*

---

RUSORO MINING LTD,
*Plaintiff-Appellee*,
v.
BOLIVARIAN REPUBLIC OF VENEZUELA, ET AL.,
*Defendants-Appellants*.

---

RED TREE INVESTMENTS LLC,
*Plaintiff-Appellee,*
v.
PETROLEOS DE VENEZUELA S.A., ET AL.,
*Defendants-Appellants*.

---

KOCH MINERALS SÀRL, ET AL.,
*Plaintiffs-Appellees,*
v.
BOLIVARIAN REPUBLIC OF VENEZUELA, ET AL.,
*Defendants-Appellants*.

---

CONOCOPHILLIPS GULF OF PARIA B.V.,
*Plaintiff-Appellee,*
v.
CORPORACION VENEZOLANA DEL PETROLEO, ET AL.,
*Defendants-Appellants*.

---

XYQ US, LLC,
*Plaintiff-Appellee,*
v.
PETROLEOS DE VENEZUELA S.A., ET AL.,
*Defendants-Appellants*.

---

GOLD RESERVE INC.,
*Plaintiff-Appellee,*
v.
BOLIVARIAN REPUBLIC OF VENEZUELA, ET AL.,
*Defendants-Appellants*.

---

CONOCOPHILLIPS PETROZUATA B.V., ET AL.,
*Plaintiffs-Appellees,*
v.
BOLIVARIAN REPUBLIC OF VENEZUELA, ET AL.,
*Defendants-Appellants.*

---

VALORES MUNDIALES S.L., ET AL.,
*Plaintiffs-Appellees,*
v.
BOLIVARIAN REPUBLIC OF VENEZUELA, ET AL.,
*Defendants-Appellants.*

---

RUDI LOVATI, ET AL.,
*Plaintiffs-Appellees,*
v.
BOLIVARIAN REPUBLIC OF VENEZUELA, ET AL.,
*Defendants-Appellants.*

---

GRAMERCY DISTRESSED OPPORTUNITY FUND LLC,
*Plaintiff-Appellee,*
v.
BOLIVARIAN REPUBLIC OF VENEZUELA, ET AL.,
*Defendants-Appellants.*

---

SAINT-GOBAIN PERFORMANCE PLASTICS EUROPE,
*Plaintiff-Appellee,*
v.
BOLIVARIAN REPUBLIC OF VENEZUELA, ET AL.,
*Defendants-Appellants.*

---

# TABLE OF CONTENTS

**Page**


INTRODUCTION .......... 1

STATEMENT OF ISSUES .......... 4

STATEMENT OF THE CASE .......... 4

- I. Procedural History of Four Creditors .......... 4
- II. Background Relevant to the Alter Ego Analysis .......... 10
- III. Sale Process Events Following the District Court's and This Court's Alter Ego Determinations .......... 14

SUMMARY OF ARGUMENT .......... 19

STANDARD OF REVIEW .......... 21

ARGUMENT .......... 22

- I. Collateral Estoppel Bars Relitigation of Whether Federal Law Governs the Alter Ego Analysis .......... 22
  - A. Collateral Estoppel Applies to the Issue of Attachment in this Case .......... 23
  - B. The Venezuela Parties' Counterarguments Fail .......... 28
- II. Rule 69 Addresses Execution Procedure, Not the Substantive Alter Ego Determination .......... 29
  - A. *Bancec* Supplies the Governing Federal Framework .......... 30
  - B. Rule 69 Does Not Import State Law Attribution Standards .......... 33
- III. Delaware Law Would Compel No Contrary Conclusion .......... 39
- IV. The District Court Properly Conducted the Expected Value Analysis .......... 42

CONCLUSION .......... 49

COMBINED CERTIFICATES OF COMPLIANCE .......... 51

CERTIFICATE OF SERVICE .......... 52

## TABLE OF CITATIONS

**Page(s)**

**CASES**

*Alevras v. Tacopina*,
226 F. App'x 222 (3d Cir. 2007) .......... 27

*Am. Dredging Co. v. Miller*,
510 U.S. 443 (1994) .......... 40

*Am. Ins. Ass'n v. Garamendi*,
539 U.S. 396 (2003) .......... 41

*Baptiste v. Bethlehem Landfill Co.*,
965 F.3d 214 (3d Cir. 2020) .......... 39

*Barkanic v. Gen. Admin. of Civ. Aviation of the People's Republic of China*,
923 F.2d 957 (2d Cir. 1991) .......... 36

*Berg Chilling Sys., Inc. v. Hull Corp.*,
369 F.3d 745 (3d Cir. 2004) .......... 44

*Blue Whale Corp. v. Grand China Shipping Dev. Co.*,
722 F.3d 488 (2d Cir. 2013) .......... 40

*Crystallex Int'l Corp. v. Bolivarian Republic of Venezuela*,
2021 WL 129803 (D. Del. Jan. 14, 2021) .......... 8, 24, 27

*Crystallex Int'l Corp. v. Bolivarian Republic of Venezuela*,
24 F.4th 242 (3d Cir. 2022) .......... *passim*

*Crystallex Int'l Corp. v. Bolivarian Republic of Venezuela*,
333 F. Supp. 3d 380 (D. Del. 2018) .......... 6, 11, 22, 24

*Crystallex Int'l Corp. v. Bolivarian Republic of Venezuela*,
932 F.3d 126 (3d Cir. 2019) .......... *passim*

*Deibler v. Atl. Props. Grp., Inc.*,
652 A.2d 553 (Del. 1995) .......... 43

*Democratic Republic of Congo v. Air Cap. Grp.*,
No. 12-cv-20607, 2018 WL 324976 (S.D. Fla. Jan. 8, 2018) .......... 37

*Dexia Credit Loc. v. Rogan*,
629 F.3d 612 (7th Cir. 2010) ....................................................................37

*First National City Bank v. Banco Para El Comercio Exterior de Cuba*,
462 U.S. 611 (1983)....................................................................*passim*

*Janvey v. Libyan Inv. Auth.*,
840 F.3d 248 (5th Cir. 2016) ....................................................................35

*Jean Alexander Cosmetics, Inc. v. L'Oreal USA, Inc.*,
458 F.3d 244 (3d Cir. 2006) ....................................................................23

*Jiménez v. Palacios*,
250 A.3d 814 (Del. Ch. 2019) ....................................................................40

*Kansas v. Garcia*,
589 U.S. 191 (2020)....................................................................41

*Karaha Bodas Co. v. Perusahaan Pertambangan Minyak Dan Gas Bumi Negara*,
313 F.3d 70 (2d Cir. 2002) .................................................................... 35-36

*Laborers' Int'l Union of N. Am., AFL-CIO v. Foster Wheeler Corp.*,
26 F.3d 375 (3d Cir. 1994) ....................................................................42

*Mars Steel Corp. v. Cont'l Ill. Nat'l Bank & Tr. Co. of Chi.*,
834 F.2d 677 (7th Cir. 1987) (Posner, J.)....................................................................43

*Monzon v. De La Roca*,
910 F.3d 92 (3d Cir. 2018) ....................................................................42

*N.J. Retail Merchants Ass'n v. Sidamon Eristoff*,
669 F.3d 374 (3d Cir. 2012) ....................................................................41

*Northrop Grumman Ship Sys. v. Ministry of Def. of the Republic of Venez.*,
850 F. App'x 218 (5th Cir. 2021)....................................................................7

*Off. Comm. of Unsecured Creditors v. Columbia Gas Sys. Inc. (In re Columbia Gas Sys. Inc.)*,
997 F.2d 1039 (3d Cir. 1993) ....................................................................41

*OI Eur. Grp. B.V. v. Bolivarian Republic of Venezuela*,
2019 WL 2185040 (D.D.C. 2019)....................................................................5

*OI Eur. Grp. B.V. v. Bolivarian Republic of Venezuela*,
663 F. Supp. 3d 406 (D. Del. 2023)........................................................8, 13, 24

*OI Eur. Grp. B.V. v. Bolivarian Republic of Venezuela*,
73 F.4th 157 (3d Cir. 2023) ..........................................................................*passim*

*Parklane Hosiery Co. v. Shore*,
439 U.S. 322 (1979)..........................................................................................24

*Peloro v. United States*,
488 F.3d 163 (3d Cir. 2007) ...........................................................................23

*Perfect 10, Inc. v. Giganews, Inc.*,
847 F.3d 657 (9th Cir. 2017) ..........................................................................37

*Peterson v. Islamic Republic of Iran*,
627 F.3d 1117 (9th Cir. 2010) .................................................................. 35-36

*Prusky v. ReliaStar Life Ins. Co.*,
532 F.3d 252 (3d Cir. 2008) ...........................................................................22

*Republic of Argentina v. NML Capital, Ltd.*,
573 U.S. 134 (2014)...................................................................................... 37-38

*Rubin v. Islamic Republic of Iran*,
138 S. Ct. 816 (2018).......................................................................................33

*Rusoro Mining Ltd. v. Bolivarian Republic of Venezuela*,
300 F. Supp. 3d 137 (D.D.C. 2018)................................................................ 8-9

*Simmons v. City of Philadelphia*,
947 F.2d 1042 (3d Cir. 1991) ..........................................................................42

*State of São Paulo v. Am. Tobacco Co.*,
919 A.2d 1116 (Del. 2007)...............................................................................40

*Sullivan v. DB Invs., Inc.*,
667 F.3d 273 (3d Cir. 2011) ...........................................................................43

*Sys. Div., Inc. v. Teknek Elecs., Ltd.*,
253 F. App'x 31 (Fed. Cir. 2007) ....................................................................37

*Tidewater Inv. SRL v. Bolivarian Republic of Venezuela*,
2023 WL 7182179 (D. Del. Nov. 1, 2023)..................................................*passim*

*Travelers Cas. & Sur. Co. v. Ins. Co. of N. Am.*,
609 F.3d 143 (3d Cir. 2010) ....................................................................43

*Trust v. Kummerfeld*,
153 F. App'x 761 (2d Cir. 2005) ................................................................37

*United States ex rel. Small Bus. Admin. v. Pena*,
731 F.2d 8 (D.C. Cir. 1984)......................................................................39

*United States v. Bankoff*,
514 F. App'x 112 (3d Cir. 2013) ................................................................22

*VICI Racing, LLC v. T-Mobile USA, Inc.*,
763 F.3d 273 (3d Cir. 2014) ....................................................................44

*Watters v. Bd. of Sch. Dirs. of City of Scranton*,
975 F.3d 406 (3d Cir. 2020) ....................................................................22

*Weininger v. Castro*,
462 F. Supp. 2d 457 (S.D.N.Y. 2006) .........................................................30

*Wye Oak Tech., Inc. v. Republic of Iraq*,
72 F. Supp. 3d 356 (D.D.C. 2014)...............................................................35

**STATUTES**

28 U.S.C.
§ 1961.........................................................................................................6
§ 1963.....................................................................................................6, 9
§ 2072.......................................................................................................30
§ 2255.......................................................................................................27

Foreign Sovereign Immunities Act
28 U.S.C. § 1603..........................................................................................10
28 U.S.C. § 1606..................................................................................... 33-34
28 U.S.C. § 1610............................................................................................6

**RULES**

Fed. R. Civ. P. 69 ..................................................................................*passim*

## INTRODUCTION[1]

OI European Group B.V. ("**OIEG**"); ACL1 Investments Ltd., ACL2 Investments Ltd., and LDO (Cayman) XVIII Ltd. (collectively, "**ACL**"); Northrop Grumman Ship Systems, Inc., formerly known as Ingalls Shipbuilding, Inc., and now known as Huntington Ingalls Incorporated ("**Huntington Ingalls**"); and Rusoro Mining Limited ("**Rusoro**," and collectively with OIEG, ACL, and Huntington Ingalls, the "**Four Creditors**") hereby join in and incorporate by reference Crystallex International Corporation's Response Brief and submit the following to address (i) the alter ego issue raised by the Venezuela Parties in their Opening Brief and (ii) the District Court's application of an expected value framework, grounded in record evidence and expert testimony, to discount the Dalinar Bid's higher headline price based on litigation and financing risk—a ruling that XYQ US, LLC ("**XYQ**") challenges in its Opening Brief.

The Venezuela Parties' Opening Brief attempts to reopen a question already resolved by this Court in this litigation: Whether the alter ego determination relevant to these writs is governed by federal common law or by Delaware's alter ego doctrine. As this Court already made clear, the answer is federal law. Both the District Court and this Court have applied the *Bancec* framework to the same

[1] Capitalized terms used but not defined in this Introduction have the meanings ascribed to them elsewhere in this Response Brief.

PDVSA shares at issue in this appeal and have affirmed the writs on that basis. Recasting the argument as a Rule 69 issue does not alter the governing law or this Court's prior holdings.

The Venezuela Parties' effort fails for three independent reasons.

***First***, collateral estoppel bars it. The issue presented here—whether federal common law under *Bancec* or Delaware law governs the alter ego analysis for purposes of attaching PDVSA's non-immune assets—was litigated, resolved, and necessary to prior rulings sustaining these writs. The Venezuela Parties had a full and fair opportunity to press that argument and did so repeatedly. Having lost it, they may not relitigate the same issue by restating it in slightly different terms.

***Second***, and independently, the argument rests on a flawed premise. Rule 69 governs the mechanics of execution. It does not supply the substantive standard for determining when the assets of a sovereign instrumentality may be treated as those of the sovereign. That threshold determination, whether PDVSA is Venezuela's alter ego in this FSIA context, is governed by federal common law under *Bancec*, which this Court has already applied. Only after that determination is made does Rule 69 direct courts to borrow state procedures to carry execution into effect.

***Finally***, even if Delaware law were relevant, it would not change the result. Delaware has articulated no sovereign-specific alter ego doctrine that displaces the federal framework governing foreign sovereign instrumentalities. And any state law

rule that conflicted with *Bancec* would yield to the federal common law developed to ensure nationally uniform treatment in matters affecting foreign relations.

The Venezuela Parties offer no basis to disturb the repeatedly affirmed attachments under the governing federal standard. This Court should (once again) affirm the writs.

XYQ separately challenges the District Court's valuation methodology, arguing that the court erred in applying an expected value framework to assess litigation and financing risk. That argument also fails. Courts routinely use expected value to account for litigation risk and uncertainty. The District Court did exactly that here, relying on record evidence and expert testimony admitted at trial—including testimony from Gold Reserve's own expert. XYQ identifies no legal bar to this methodology and offers no developed argument otherwise. Its remaining objections merely challenge the District Court's factual findings, which are reviewed on appeal for clear error.

Accordingly, neither the Venezuela Parties nor XYQ provide any basis to disturb the affirmed attachments or the District Court's record-supported valuation analysis.

## STATEMENT OF ISSUES

I. Whether the District Court erred in concluding that federal common law authorized attachment of property belonging to PDVSA to satisfy the Republic's judgment debts.

II. Whether the District Court erred in applying an expected value framework, grounded in record evidence and expert testimony, to discount Gold Reserve's higher headline bid based on litigation and financing risk.

## STATEMENT OF THE CASE

### I. Procedural History of Four Creditors

*OIEG*. OIEG is a Netherlands-incorporated company and an indirect, wholly owned subsidiary of O-I Glass, Inc., a Delaware corporation headquartered in Perrysburg, Ohio. OIEG is the majority shareholder of two companies that owned and operated glass container manufacturing facilities in the Bolivarian Republic of Venezuela (the "**Republic**" or "**Venezuela**").

OIEG's circumstances closely parallel those of Crystallex International Corporation ("**Crystallex**"). Both are judgment creditors whose valuable commercial property in Venezuela was unlawfully expropriated during the Chávez regime. At the time of OIEG's expropriations, Petróleos de Venezuela, S.A. ("**PDVSA**") functioned as an alter ego of the Republic; it remained so in 2018, when this Court issued its decision in *Crystallex International Corp. v. Bolivarian*

*Republic of Venezuela*, 932 F.3d 126 (3d Cir. 2019) ("**Crystallex II**"), and it has remained so since.

After Venezuela expropriated OIEG's two glass factories in 2010, OIEG commenced arbitration proceedings before the International Centre for Settlement of Investment Disputes ("**ICSID**") on September 7, 2011. *See OI Eur. Grp. B.V. v. Bolivarian Republic of Venezuela*, 2019 WL 2185040, at *2 (D.D.C. 2019). On March 10, 2015, the arbitral tribunal issued an award finding that Venezuela had expropriated OIEG's interests and ordering Venezuela to pay $372,461,982 in damages and $5,750,000 in costs and expenses, plus interest. *See id.*

Although the award became binding under Article 53 of the ICSID Convention, Venezuela sought annulment. *See id.* at *2-3. The annulment committee denied that application on December 6, 2018, reaffirmed the award, and awarded OIEG additional costs and expenses. *See id.*

On May 21, 2019, the United States District Court for the District of Columbia (the "**D.C. District Court**") granted OIEG's motion for summary judgment, confirmed the arbitral award, and entered judgment in OIEG's favor. *See* JA4225-26. The judgment consisted of (i) $372,461,982 in principal, plus interest from October 26, 2010 through May 21, 2019; (ii) $5,750,000 in arbitration costs and expenses, plus interest from March 10, 2015 through May 21, 2019; (iii) $3,864,811.05 in annulment-related costs and expenses, plus interest from

December 6, 2018 through May 21, 2019; and (iv) post-judgment interest on the aggregate amount of $583,500,067.44, calculated pursuant to 28 U.S.C. § 1961 from May 21, 2019 until paid in full. *See* JA4226-27.

On November 1, 2019, the D.C. District Court authorized OIEG to pursue enforcement remedies against Venezuela under 28 U.S.C. §§ 1963 and 1610(c). *See* JA4225. OIEG registered its judgment in the District of Delaware on November 4, 2019. *See id.* OIEG then sought a writ of attachment *fieri facias* against the shares of PDV Holding, Inc. ("**PDVH**") held by its parent, PDVSA, asserting collateral estoppel based on the District Court's alter ego determination in *Crystallex International Corp. v. Bolivarian Republic of Venezuela*, 333 F. Supp. 3d 380 (D. Del. 2018) ("**Crystallex I**"). The District Court initially denied the motion, holding that OIEG was required to establish by a preponderance of the evidence that PDVSA continued to function as Venezuela's alter ego. *See* JA4225. On April 30, 2021, the District Court presided over a joint evidentiary hearing to consider OIEG's and Huntington Ingalls's evidence that PDVSA remained Venezuela's alter ego. *See* JA0143. On March 23, 2023, the District Court issued its order and opinion agreeing with OIEG and Huntington Ingalls and granting OIEG's amended motion, finding that PDVSA had, in fact, remained Venezuela's alter ego. *See* JA0140-200.

*Huntington Ingalls*. Judgment creditor Huntington Ingalls entered into a $315 million contract in 1997 with Venezuela for the refurbishment of two missile-armed

frigates for the Venezuelan Navy at the company's Pascagoula shipyard. *Northrop Grumman Ship Sys. v. Ministry of Def. of the Republic of Venez.*, 850 F. App'x 218, 221 (5th Cir. 2021). In 2002, a dispute arose as Huntington Ingalls sought compensation from Venezuela for the costs of extensive additional work needed on the aging vessels. *Id.* In accordance with the governing contract, Huntington Ingalls demanded arbitration that same year. *Id.* After sixteen years of protracted litigation, Huntington Ingalls finally received an award in the amount of $128,862,457.27 against Venezuela in 2018. *Id.* at 221-24; JA4235.

Award in hand, Huntington Ingalls promptly instituted enforcement proceedings in the United States. *See Northrop Grumman Ship Sys., Inc. v. Ministry of Def. of Republic of Venez.*, Misc. No. 02-785 (S.D. Miss.). In June 2020, the United States District Court for the Southern District of Mississippi entered a judgment enforcing Huntington Ingalls's award in the amount of $137,977,646.43 plus post-judgment interest. JA4236; *see also Northrop Grumman Ship Sys., Inc. v. Ministry of Def. of Republic of Venez.*, Misc. No. 20-257, D.I. 1 (D. Del. July 31, 2020). In line with its dilatory litigation strategy, Venezuela appealed that decision, which the Fifth Circuit ultimately affirmed. *See Northrop Grumman Ship Sys.*, 850 F. App'x at 230. In the meantime, Huntington Ingalls received permission to register its judgment in the District of Delaware, where it sought a writ of attachment *fieri facias* on shares in PDVH held by Venezuela's alter ego, PDVSA. *See* JA4235; *see*

*also Northrop Grumman Ship Sys., Inc. v. Ministry of Def. of Republic of Venez.*, Misc. No. 20-257, D.I. 25, 26 (D. Del. Feb. 19, 2021). Huntington Ingalls thereafter sought to prove that PDVSA was, and remains, the alter ego of Venezuela, such that Huntington Ingalls could attach PDVSA's shares in PDVH to satisfy its judgment against Venezuela. *Id.* After participating in a joint evidentiary hearing with OIEG, the District Court confirmed that the alter ego relationship first found in its 2018 *Crystallex* decision continued to exist in 2023 and granted Huntington Ingalls's motion. *See* JA0140-200.

*ACL*. ACL owns bonds issued by Venezuela. *OI Eur. Grp. B.V. v. Bolivarian Republic of Venezuela*, 663 F. Supp. 3d 406, 416 (D. Del. 2023) ("**OIEG I**"). After Venezuela defaulted on the bonds, ACL filed a breach of contract action in the Southern District of New York. On December 7, 2020, that court entered a judgment against Venezuela for more than $118 million. *Id.* On February 5, 2021, ACL registered its judgment in the District of Delaware. *Id.* Like OIEG, ACL moved to attach the PDVH shares. The District Court granted ACL's motion, along with OIEG's, on March 23, 2023. JA0202 (Order).

*Rusoro*. Rusoro is a Canadian corporation that acquired controlling interests in 24 Venezuelan companies holding 58 mining concessions and contracts. *See Rusoro Mining Ltd. v. Bolivarian Republic of Venezuela*, 300 F. Supp. 3d 137, 141-142 (D.D.C. 2018). Beginning in 2009, the Central Bank of Venezuela issued a

series of resolutions that "significantly altered the legal regime for the export of gold" by imposing oppressive restrictions on foreign gold mining entities like Rusoro. *Id.* at 142-43. These restrictions laid the groundwork for President Hugo Chávez to nationalize the gold mining sector and seize control over the property and mining rights of all gold-producing entities in the country, resulting in the expropriation of Rusoro's mining rights and other assets by the Venezuelan government. *See id.*

Rusoro commenced arbitration on July 17, 2012. On August 22, 2016, the arbitral tribunal unanimously found that Venezuela breached Art. VII of the Canada-Venezuela BIT by expropriating Rusoro's investment in Venezuela without compensation. *See id.* The D.C. District Court confirmed Rusoro's arbitration award on March 1, 2018, and issued a judgment in Rusoro's favor for $967.7 million, plus pre- and post-award interest and costs. *See id.*

Rusoro registered its judgment with the District Court on November 4, 2021, pursuant to 28 U.S.C. § 1963. *Rusoro Mining Limited v. Bolivarian Republic of Venezuela.*, Misc. No. 21-481, D.I. 1 (D. Del. Nov. 4, 2021). Rusoro then moved the District Court for an order authorizing the issuance of a writ of attachment *fieri facias* against the PDVH Shares, which the District Court granted on March 23, 2023, after finding that PDVSA was the alter ego of Venezuela. *See id.* at D.I. 44.

## II. Background Relevant to the Alter Ego Analysis

Venezuela is a sovereign state and a judgment debtor of the Four Creditors. PDVSA is Venezuela's state-owned oil company. Venezuela established PDVSA in 1975, following the nationalization of its oil industry, to coordinate, oversee, and control the country's oil and gas operations. PDVSA qualifies as an agency or instrumentality of Venezuela within the meaning of the Foreign Sovereign Immunities Act ("**FSIA**"), 28 U.S.C. § 1603(b).

As this Court explained in affirming the District Court's 2018 determination that the Republic and PDVSA are alter egos:

> [T]he relationship between PDVSA and Venezuela has tightened significantly since 2002, when then-President Hugo Chávez fired roughly 40% of the PDVSA workforce for protesting increased Venezuelan control over the company. Since then PDVSA's presidents have generally been senior members of the Venezuelan president's cabinet, including members of the Venezuelan military. Venezuela has also passed various laws that require PDVSA to fund both government initiatives and discretionary government funds. Venezuela controls PDVSA's domestic oil production, sales, and pricing. It also requires that PDVSA supply Venezuela and its strategic allies with oil at below-market rates.
>
> Also relevant to this appeal are the various bonds that PDVSA has issued over the past decade or so. . . . [These] bonds have an outstanding face value of approximately $1.684 billion and are secured by a 50.1% collateral interest in PDVH's shares of Citgo Holding, Inc. as security for the bonds. According to the Bondholders, PDVSA has also issued roughly $25 billion in bonds to U.S. and non-U.S. capital markets investors.

> President Nicolas Maduro became the President of Venezuela in 2013. This year Juan Guaidó, Venezuelan's opposition leader and president of the National Assembly, has made efforts to oust Maduro and take control of the Venezuelan government. The United States Government recognized Guaidó as the rightful leader of Venezuela on January 23, 2019.
>
> Five days later, as part of a broader effort to convince the Maduro regime to cede power, the Office of Foreign Assets Control of the U.S. Department of the Treasury ("OFAC") imposed new sanctions against PDVSA by adding it to the List of Specially Designated Nationals and Blocked Persons. . . . [T]he U.S. Government has also promulgated several executive orders limiting transfer of Venezuelan or PDVSA-controlled assets in the United States.

*Crystallex II*, 932 F.3d at 135 (internal citation modified and headings omitted).

On August 19, 2018, the District Court granted Crystallex's motion for a writ of attachment pursuant to Federal Rule of Civil Procedure 69 and denied PDVSA's motion to dismiss. *See Crystallex I*, 333 F. Supp. 3d at 386. The Venezuela Parties appealed, arguing that Crystallex held a judgment against the Republic, not PDVSA, and that the District Court therefore erred in applying federal alter ego principles under *First National City Bank v. Banco Para El Comercio Exterior de Cuba*, 462 U.S. 611 (1983) ("**Bancec**"), to treat PDVSA as subject to attachment and execution under Rule 69. *See* PDVSA's Briefs in 18-2797 dated December 10, 2018 and February 6, 2019; Republic's Brief in 18-2797 dated April 3, 2019.

On July 29, 2019, this Court affirmed the District Court's issuance of the writ of attachment. *See Crystallex II*, 932 F.3d at 139 ("[S]o long as PDVSA is

Venezuela's alter ego under *Bancec*, the District Court had the power to issue a writ of attachment on [PDVSA's] non-immune assets to satisfy the judgment against the country.").

Following that affirmance, additional judgment creditors of Venezuela and PDVSA registered their judgments in this District and moved for writs of attachment against the PDVH Shares, relying on the alter ego determination upheld in *Crystallex II*. *See, e.g.*, *OI Eur. Grp. B.V. v. Bolivarian Republic of Venezuela*, Misc. No. 19-290 (D. Del. Feb. 2, 2019); *OI Eur. Grp. B.V. v. Bolivarian Republic of Venezuela*, Misc. No. 19-290 (D. Del. Nov. 4, 2019); *Northrop Grumman Ship Sys., Inc. v. Ministry of Def. of the Republic of Venez.*, Misc. No. 20-257 (D. Del. Sept. 15, 2020); *ACL1 Invs. Ltd. v. Bolivarian Republic of Venezuela*, Misc. No. 21-46 (D. Del. Feb. 5, 2021); *Rusoro Mining Ltd. v. Bolivarian Republic of Venezuela*, Misc. No. 21-481 (D. Del. Nov. 4, 2021).

The Venezuela Parties then sought another bite at the apple by appealing the District Court's order declining to quash Crystallex's attachment. On January 18, 2022, this Court dismissed that appeal, concluding that the order was not a final decision. *See Crystallex Int'l Corp. v. Bolivarian Republic of Venezuela*, 24 F.4th 242, 256-58 (3d Cir. 2022) ("**Crystallex III**"). In recounting the procedural history, the Court reiterated its determination in *Crystallex II* that PDVSA is Venezuela's alter ego under federal common law and noted PDVSA's concession that "the legal

standard for alter ego . . . applied in this case [is] federal common law." *Crystallex III*, 24 F.4th at 247 n.2.

Those principles governed the subsequent proceedings. On March 23, 2023, the District Court granted writs of attachment for OIEG, ACL, Huntington, and Rusoro, and again held that PDVSA is Venezuela's alter ego under federal common law, permitting attachment of PDVSA's shares of PDVH. *See OIEG I*, 663 F. Supp. 3d at 430-31.

The Venezuela Parties again appealed, contending that Rule 69(a) required application of Delaware law and that the District Court erred in applying federal common law to the alter ego analysis. *See* Republic's Opening Br., No. 23-1647, D.I. 34; PDVSA's Br., No. 23-1647, D.I. 37.

On July 7, 2023, this Court once more concluded that PDVSA is Venezuela's alter ego under federal common law: "Considering the totality of Venezuela's control over PDVSA, it is clear PDVSA is Venezuela's alter ego." *OI Eur. Grp. B.V. v. Bolivarian Republic of Venezuela*, 73 F.4th 157, 172 (3d Cir. 2023) ("**OIEG II**") (quoting *Crystallex II*, 932 F.3d at 141). The Court affirmed the District Court's judgment to the extent it denied sovereign immunity to PDVSA but declined to address the attachment of PDVSA's shares, concluding that the issue fell outside the scope of its limited appellate jurisdiction in that appeal. *See id.*

In subsequent proceedings below, the Venezuela Parties again argued that Delaware law governs the alter ego analysis. *See Tidewater Inv. SRL v. Bolivarian Republic of Venezuela*, 2023 WL 7182179, at *2 (D. Del. Nov. 1, 2023) ("**Tidewater**"). Relying on *Crystallex II*, the District Court held that collateral estoppel bars the Venezuela Parties from relitigating whether federal common law applies to judgment creditors' motions for writs of attachment against the PDVH shares held by PDVSA. *See id*. at *4-8.

The Venezuela Parties now raise that same alter ego issue in the present appeals.

## III. Sale Process Events Following the District Court's and This Court's Alter Ego Determinations

After years of implementation of the sale process procedures approved by the District Court, the Special Master recommended—and the District Court approved—the bid submitted by Red Tree Investments, LLC as the stalking horse bid (the "**Stalking Horse Bid**"). *See* JA0307-09. In its order approving the Stalking Horse Bid, the District Court directed that the minimum bid for the Topping Period should be the bid that appeared to have the "greatest likelihood of closing," and emphasized that a successful bid must account for the litigation risk posed by the 2020 Bondholders. JA0310. The 2020 Bondholders are holders, or an ad hoc group of holders, of certain bonds issued by PDVSA in 2020 (the "**2020 Bonds**"), who assert a security interest in 50.1% of the common stock of CITGO Holding, a

subsidiary of PDV Holding, Inc. (“**PDVH**”), pursuant to an indenture (the “**Indenture**”) and a security and pledge agreement (the “**Pledge**”). *See* JA0289.

Within that framework, during the pre-approval period in which competing bidders could submit offers superior to the Stalking Horse Bid (the “**Topping Period**”), the Special Master received competing bids for the PDVH Shares, including a bid from Dalinar Energy Corporation (“**Dalinar**”), a vehicle formed by a consortium assembled by Gold Reserve Ltd. (“**Gold Reserve**”), and a bid from Amber Merger Sub LLC, a wholly owned subsidiary of Amber Energy Inc. (“**Amber**”), an affiliate of Elliott Investment Management L.P. *See* JA0314. The sale procedures authorized the Special Master to request revised bids following the close of the Topping Period and, after commencement of the no-shop period, to consider unsolicited proposals with District Court approval. *See* JA0314 and JA0386. On July 2, 2025, the Special Master filed a Notice of Final Recommendation recommending that the PDVH Shares be sold to Dalinar pursuant to the Dalinar stock purchase agreement (the “**Dalinar SPA**”). *See* JA0320-21.

During the no-shop period, however, the Special Master received an unsolicited competing proposal from Amber that included a transaction support agreement (the “**TSA**”) with the 2020 Bondholders, which Dalinar’s bid did not include. *See* JA0123. With authorization from the District Court, the Special Master

engaged with Amber and determined that its proposal constituted a "Superior Proposal" within the meaning of the Dalinar SPA. *See* JA0324-27.

Pursuant to the Dalinar SPA, Dalinar then submitted a revised bid that, among other things, increased the purchase price to $7.9 billion (the "**Dalinar Bid**"). *See* JA0327 ¶ 236. Dalinar's revised proposal nevertheless continued to exclude any settlement with the 2020 Bondholders and any committed financing for the proposed transaction. The Special Master ultimately rejected the Dalinar Bid and issued an Updated Final Recommendation in favor of Amber's revised August 22, 2025 bid (the "**Amber Bid**") at a purchase price of $5.892 billion because, among other reasons, it addressed the 2020 Bondholder litigation risk through a $2.125 billion settlement under the TSA. *See* JA0327-28.

The Dalinar Bid relied on acquisition financing secured by the assets of CITGO Petroleum Corporation through a multi-step transaction: first, a newly-formed special purpose vehicle would incur billions of dollars in debt and distribute loan proceeds to judgment creditors; and second, that special purpose vehicle would merge with CITGO Petroleum. *See* JA0341-42 ¶¶ 304-307. The record reflected that the 2020 Bondholders consistently objected to this structure on the ground that it impaired their security interests. *See* JA0398; JA6669 (2020 Bondholders' Objections to Special Master's Final Recommendation); *Petróleos de Venezuela, S.A. v. MUFG Union Bank N.A.*, No. 19 Civ. 10023, D.I. 384 (S.D.N.Y. July 7,

2025). The 2020 Bondholders repeatedly asserted that they would seek injunctive relief against the proposed transaction. *Id.* The impact of potential litigation by the 2020 Bondholders on the Dalinar Bid's value was therefore a key focus of the sale hearing and related pre- and post-hearing briefing. *See*, *e.g.*, JA6645-6648 (Red Tree's Objections to Special Master's Final Recommendation); JA7111-7124 (Gold Reserve's Response to Objections to Special Master's Final Recommendation); JA7435-7439 (Notice of Special Master's Updated Final Recommendation); JA8548 (Crystallex's Response to Objections to Special Master's Updated Final Recommendation).

At the sale hearing, the District Court received expert testimony concerning how to account for risk in valuing competing bids. As the District Court explained, "Expected value analysis is the standard way by which to assess and quantify uncertainty associated with litigation, like the uncertainty associated with the 2020s Litigation." JA0349 ¶ 337. The expected value of a bid is the sum of the probability of each possible outcome multiplied by the value of each possible outcome. JA0349 ¶ 338. Here, there were two possible outcomes: one where the Dalinar Bid's transaction closed for its headline value, and one where the transaction was blocked for zero value. JA0349 ¶ 339.

Applying that framework, the District Court found that "[a]t the start of the Sale Hearing . . . the expected value of the Dalinar Bid was $3.95 billion, which is

50% of the headline value of $7.899 [billion]." JA0350 ¶ 341. The District Court based its "fair assumption" that each of the two possible outcomes had an equal likelihood on testimony and evidence elicited from Gold Reserve: Gold Reserve's internal analyses described the 2020 Bondholder litigation as having a 50% probability of succeeding; Gold Reserve's CEO so testified at the hearing. *See* JA0350 ¶ 340. While the sale hearing was underway, Judge Failla of the Southern District of New York issued a decision holding that the 2020 Bonds are valid under Venezuelan law and granting summary judgment in favor of the 2020 Bondholders. *See* JA0334. The District Court found that this ruling clarified the legal status of the 2020 Bonds and underscored the transactional risk associated with the Dalinar Bid, which did not address the 2020 Bondholders' asserted rights. *See* JA0334-37. Accordingly, the District Court found that "[b]y the conclusion of the Sale Hearing, the expected value of the Dalinar Bid cannot have been any greater than it was at the start and, almost certainly, was lower." JA0350 ¶ 342.

Following the sale hearing, the District Court denied Gold Reserve's motion to strike the Amber Bid, authorized termination of the Dalinar SPA and execution of the Amber agreement, and approved the Amber Bid in its November 25, 2025 order (the "**Sale Order**"). *See* JA0336 (Sale Opinion); JA0256 (Sale Order).

After entry of the Sale Order, on December 2, 2025, the Venezuela Parties and Gold Reserve appealed the Sale Order and related rulings to this

Court. Additional appeals followed, including by XYQ, after the Sale Order was docketed in the related District Court actions.

In that procedural posture, this Response Brief addresses (i) the Venezuela Parties' contention—previously rejected by both the District Court and this Court—that the District Court erred in concluding that federal common law permits attachment of property belonging to PDVSA to satisfy the Republic's judgment debts, and (ii) the District Court's application of an expected value framework, grounded in record evidence and expert testimony, to account for litigation and financing risk in evaluating the Dalinar Bid's higher headline price, a determination that XYQ now challenges.

## SUMMARY OF ARGUMENT

I. The Court should not consider the Venezuela Parties' argument that federal common law does not govern the alter ego inquiry because they are barred from re-raising that argument under the doctrine of collateral estoppel. The Venezuela Parties previously litigated whether federal common law (under *Bancec*) or Delaware law governs the alter ego analysis in these proceedings before the District Court and they lost. This Court then affirmed the alter ego finding under federal common law and, on that basis, upheld the writs of attachment. Having lost the issue repeatedly, the Venezuela Parties may not revive it by reframing their argument as a challenge under Rule 69.

Nor does this Court's pendent appellate jurisdiction discussion in *OIEG II* and *Crystallex III* leave the validity of the attachments unresolved. Those decisions addressed only the scope of appellate jurisdiction in particular procedural postures, not the merits of attachment or the law governing it. This Court had already affirmed the writs of attachment in *Crystallex II* under the federal *Bancec* framework, and subsequent opinions reiterated that the writs rested on that federal standard. The Venezuela Parties already had their day in court and an appeal in which they challenged the application of federal common law to the alter ego finding. This Court should not give them another.

II. Even if collateral estoppel did not apply, the Venezuela Parties' Rule 69 theory for applying Delaware *substantive* law to the alter ego question fails on the merits. Rule 69 governs execution *procedure*, not the substantive standards for attributing ownership or control between a foreign sovereign and its instrumentality. The alter ego inquiry is one of substance; it answers whether a sovereign instrumentality's assets are legally reachable to satisfy a judgment against the sovereign at all. Under *Bancec*, that determination is governed by federal common law. Rule 69 operates only after that threshold showing, supplying the procedural means of execution against property already deemed reachable. Consistent with that framework, the Venezuela Parties cite no authority applying Rule 69 to displace *Bancec* in the foreign sovereign context. This Court should not be the first.

III. In any event, applying Delaware law would not change the result here. Delaware law does not articulate a sovereign-specific alter ego standard for state-owned instrumentalities, and a federal court would therefore be required to predict how the Delaware Supreme Court would rule. Delaware courts have recognized that disputes implicating foreign sovereigns and foreign relations are best governed by federal law, providing substantial reason to conclude that Delaware would follow the federal *Bancec* framework. And to the extent any Delaware rule conflicts with *Bancec*, it would be displaced, because attribution of responsibility between a foreign sovereign and its instrumentality occupies a field committed to federal regulation and nationally uniform rules.

IV. XYQ's challenge to the District Court's valuation methodology also fails as a matter of law and under the applicable standard of review. The District Court properly applied an expected value framework to account for litigation and financing risk, and XYQ identifies no authority prohibiting that approach. Its remaining arguments merely dispute the District Court's fact-bound assessment of risk and likelihood of closing, which is reviewed for clear error. XYQ cannot meet that demanding standard.

## STANDARD OF REVIEW

This Court reviews findings of fact for clear error and legal questions de novo, including de novo review of the "ultimate determination whether to treat PDVSA as

Venezuela's alter ego." *Crystallex II*, 932 F.3d at 136. The applicable burden of proof is a "preponderance of the evidence." *Id*. at 145-46.

This Court likewise reviews "de novo" the District Court's "application of collateral estoppel," *Prusky v. ReliaStar Life Ins. Co.*, 532 F.3d 252, 265 (3d Cir. 2008), as well as its "interpret[ation] and appli[cation] [of this Court's] mandate," *United States v. Bankoff*, 514 F. App'x 112, 114 (3d Cir. 2013). This Court may affirm "on any ground supported by the record." *Watters v. Bd. of Sch. Dirs. of City of Scranton*, 975 F.3d 406, 412 (3d Cir. 2020).

## ARGUMENT

### I. Collateral Estoppel Bars Relitigation of Whether Federal Law Governs the Alter Ego Analysis

The Venezuela Parties' effort to reopen the validity of the writs under Delaware alter ego law is foreclosed by collateral estoppel. The District Court held that federal alter ego law governs and that PDVSA is the Republic's alter ego under *Bancec*. *See Crystallex I*, 333 F. Supp. 3d at 396. This Court previously affirmed the issuance of the writs on that same ground:

> The parties raise a host of issues. We group them into three core inquiries: (A) whether the Bancec "alter ego" doctrine determines the District Court's jurisdiction to attach PDVSA's assets (it does), (B) the scope of the Bancec inquiry and whether its factors are satisfied here (they are), and (C) whether PDVSA's shares of PDVH are immune from attachment under the Sovereign Immunities Act (they are not).

*Crystallex II*, 932 F.3d at 136; *see also OIEG II*, 73 F.4th at 165 ("[S]o long as PDVSA is Venezuela's alter ego under *Bancec*, the District Court had the power to issue a writ of attachment on that entity's non-immune assets to satisfy the judgment against the country."); *Crystallex III*, 24 F.4th at 248 n.2 ("Before it lost its prior appeal to this Court, PDVSA conceded that the legal standard for alter-ego . . . applied in this case [is] federal common law." (citing *Bancec*)).

After losing this issue at least twice before this Court and three times before the District Court, the Venezuela Parties cannot revive it by recasting the analysis under a Delaware alter ego doctrine in hopes of reaching a different outcome.

**A. Collateral Estoppel Applies to the Issue of Attachment in this Case**

Collateral estoppel applies when "(1) the identical issue was previously adjudicated; (2) the issue was actually litigated; (3) the previous determination was necessary to the decision; and (4) the party being precluded from relitigating the issue was fully represented in the prior action." *Tidewater*, 2023 WL 7182179, at *4 (quoting *Jean Alexander Cosmetics, Inc. v. L'Oreal USA, Inc.*, 458 F.3d 244, 249 (3d Cir. 2006)). A party may also be estopped from advancing a position that was already presented and lost in a prior proceeding against a different adversary if the party had a "full and fair" opportunity to litigate the issue in the prior proceeding, *see Peloro v. United States*, 488 F.3d 163, 175 (3d Cir. 2007), and there is no unique unfairness to the estopped party from the non-mutual collateral estoppel, such as a

lack of incentive to litigate the issue in the earlier proceeding or conflicting decisions on the same issue. *See Parklane Hosiery Co. v. Shore*, 439 U.S. 322, 331-32 (1979).

The precise issue presented here—whether federal common law as articulated in *Bancec* governs the alter ego inquiry or whether Delaware law applies—was litigated in related proceedings before both the District Court and this Court.[2] *See Crystallex II*, 932 F.3d at 136; *OIEG II*, 73 F.4th at 165; *Crystallex I*, 333 F. Supp. 3d at 396; *OIEG I*, 663 F. Supp. 3d at 430-31; *Tidewater*, 2023 WL 7182179, at *4-8. The Venezuela Parties had a full and fair opportunity to litigate this issue, had every incentive to do so in the earlier litigation, and did so vigorously.

In *Crystallex II*, the Venezuela Parties argued that Crystallex held a judgment against the Republic, not PDVSA, and that the District Court therefore could not invoke the *Bancec* alter ego doctrine to assert subject-matter jurisdiction over PDVSA for purposes of attaching and executing on PDVSA's property under Rule 69.[3] This Court rejected that argument, holding that the District Court "properly used *Bancec* to extend its jurisdiction to assets held nominally by PDVSA," and that

[2] Application of collateral estoppel is all the more appropriate in these proceedings given that Venezuela's judgment creditors, including the Four Creditors here, became parties to and participated in the *Crystallex* sale process on the basis of this Court's and the District Court's holdings that *Bancec* governs the alter ego analysis. As the parties now come before this Court as intertwined participants in a consolidated appeal, those legal holdings are effectively law of the case.

[3] *See* PDVSA's Briefs in 18-2797 dated December 10, 2018 and February 6, 2019; Republic's Brief in 18-2797 dated April 3, 2019.

"in *ordinary* FSIA attachment proceedings—*i.e.*, those that do not involve judgments based on state-sponsored terrorism—the judgment holder may reach the assets of the foreign judgment debtor by satisfying the *Bancec* factors." *Crystallex II*, 932 F.3d at 138-39 (emphasis in original). Exercising its jurisdiction over final judgments, this Court therefore affirmed "the grant of Crystallex's motion for a writ of attachment under Federal Rule of Civil Procedure 69." *Id.* at 136.

After losing that appeal, the Venezuela Parties moved to quash the attachment in the District Court. *See Crystallex III*, 24 F.4th at 249.[4] On appeal from the District Court's refusal to do so, this Court recounted the prior procedural history and explained that it previously "agreed with the District Court's reasoning . . . and affirmed the District Court's orders, ***including the writ of attachment***." *Id.* at 247 (emphasis added). "In an argument that raised the District Court's sense of déjà vu," the Court noted that the Venezuela Parties "sought to litigate the alter ego status of PDVSA once again, arguing this time that Delaware alter ego law controlled." *Id.*

[4] In their opening brief, the Venezuela Parties appear to treat this Court's background statement in *Crystallex III* that "Delaware law requires showing fraud—not just extensive control—to seize the property of a non-debtor like PDVSA" as a holding that Delaware alter ego law, rather than *Bancec*, governs the validity of the writ. *See* Venezuela Parties' Opening Brief at 25. That reading overstates the import of the passage. In the relevant section of *Crystallex III*, this Court was recounting the procedural history of the case, including PDVSA's prior argument that Delaware alter ego law applied, and acknowledging what Delaware law requires as a matter of black-letter law. 24 F.4th at 247-48. The Court did not hold that Delaware law displaced *Bancec*, nor did it retreat from or second-guess its earlier affirmance in *Crystallex II* of the application of *Bancec* in upholding the issuance of the writ.

The Court further recounted that, "[b]efore it lost its prior appeal to this Court, PDVSA conceded that 'the legal standard for alter-ego . . . applied in this case [is] federal common law.'" *Id*. at 247.

Undeterred, the Venezuela Parties pressed the same position yet again in *OIEG II*, arguing in this Court that "Rule 69(a) unambiguously provides that state law (here, Delaware law) governs," and that "[r]ather than apply that clear state law, the district court instead ruled that federal common law controls and that the attachments were proper on the same (erroneous) alter-ego analysis . . . ." Republic's Opening Br. in 23-1647, Docket No. 34; *see also* PDVSA's Br. in 23-1647, Docket No. 37 (identifying as an issue presented "[w]hether the District Court erred in concluding that federal common law displaces Delaware state law under Federal Rule 69 in enforcement actions against foreign sovereigns and their instrumentalities"). This Court again found that "[c]onsidering the totality of Venezuela's control over PDVSA, it is clear PDVSA is Venezuela's alter ego" and that "[a]s in *Crystallex II*, we draw from the '*Bancec* factors' . . . ." *OIEG II*, 73 F.4th at 172 (quoting *Crystallex II*, 932 F.3d at 141).

Against that settled backdrop, the Venezuela Parties respond by myopically focusing on a "new" argument concerning whether Rule 69 requires application of Delaware law to the attachment issue. *See* Venezuela Parties' Opening Br. at 26-28, 37-43. But a new argument on an issue already resolved by the Court does not

reopen that issue. *See, e.g.*, *Crystallex Int'l Corp. v. Bolivarian Republic of Venezuela*, 2021 WL 129803, at *10 (D. Del. Jan. 14, 2021) ("Once an *issue* is raised and determined, it is the entire *issue* that is precluded, not just the particular arguments raised in support of it in the first case." (quoting *Alevras v. Tacopina*, 226 F. App'x 222, 231 (3d Cir. 2007))).

The Third Circuit's decision in *Alevras v. Tacopina* illustrates this principle. There, the plaintiff had previously sought post-conviction relief under 28 U.S.C. § 2255, alleging ineffective assistance of counsel based on specific acts and omissions by his criminal defense attorney. *See* 226 F. App'x at 225-26. After those claims were litigated and rejected, the plaintiff filed a civil action asserting legal malpractice and related claims against the same attorney, premised on the same underlying conduct. *See id.* at 226-27. The Third Circuit held that issue preclusion barred the malpractice action because the post-conviction proceedings had already resolved the factual and professional-reasonableness determinations essential to the civil claims. *See id.* at 228-33. This Court further explained that issue preclusion applies even where a plaintiff repackages the same alleged deficiencies under different legal theories. *See id.*

As the District Court correctly held, the Venezuela Parties are not entitled to a third attempt to reframe the same issues to avoid issue preclusion:

> The Venezuela Parties now attempt to frame the issue to make it seem different than the one resolved, twice,

> against them in previous litigation. They argue that in order to attach the PDVH shares owned by PDVSA, Rule 69 requires application of Delaware law to the alter ego analysis. But this is not a different issue; it is merely a different statement in support of the same position raised previously: that Delaware law should be used to determine PDVSA's alter ego status for purposes of attaching the PDVH shares owned by PDVSA.

*Tidewater*, 2023 WL 7182179, at *5 (internal citations omitted).

**B. The Venezuela Parties' Counterarguments Fail**

Seeking to avoid the consequences of this Court's rejection of their prior arguments against attachment, the Venezuela Parties contend that this Court found no pendent appellate jurisdiction over the issue in prior litigation and therefore has not yet resolved it, pointing to *OIEG II* and *Crystallex III*. *See* Venezuela Parties' Opening Br. at 37, 40.

This Court's jurisdictional observation, however, addressed only the scope of interlocutory appellate jurisdiction in those cases, not the merits of attachment or the law governing it. The Third Circuit declined to consider attachment in *OIEG II* and the District Court's refusal to quash the writ of attachment in *Crystallex III* because the respective appeals did not confer jurisdiction to do so—not because the attachment question remained open or was governed by a different legal standard. *See Crystallex III*, 24 F.4th at 256-58; *OIEG II*, 73 F.4th at 176. Jurisdictional sequencing does not nullify or reopen a prior merits ruling.

Before *OIEG II*, this Court had already expressly "affirm[ed] the District Court's order granting the writ of attachment." *Crystallex II*, 932 F.3d at 133. That language is not incidental. An affirmance of a writ necessarily affirms the legal foundation on which the writ rests. This Court reiterated and expressly linked the validity of the writs to satisfaction of the federal *Bancec* standard, not to any supplemental showing under Delaware alter ego doctrine. *See OIEG II*, 73 F.4th at 165; *Crystallex III*, 24 F.4th at 247 ("[T]he District Court held . . . PDVSA was Venezuela's alter ego under federal common law [and] issued the writ of attachment. . . . [W]e agreed with the District Court's reasoning [in *Crystallex II*] and affirmed the District Court's orders, including the writ of attachment."). By affirming the writs, the Court adopted the legal framework that rendered them lawful, which was federal common law under *Bancec* rather than Delaware law.

## II. Rule 69 Addresses Execution Procedure, Not the Substantive Alter Ego Determination

Even apart from collateral estoppel, the Venezuela Parties' effort to recast the alter ego determination as a question governed by Delaware law under Rule 69 rests on a basic misreading of Rule 69 itself, the Supreme Court's decisions in *Bancec*, and controlling Third Circuit authority.

Rule 69(a) provides that the "procedure on execution—and in proceedings supplementary to and in aid of judgment or execution—must accord with the procedure of the state where the court is located, but a federal statute governs to the

extent it applies." Fed. R. Civ. P. 69(a). When no federal statute applies, the rule directs courts to borrow state procedures for execution. As a rule of civil procedure, however, Rule 69(a) cannot "modify any substantive right," 28 U.S.C. § 2072(b), and it does not require application of the forum state's substantive law, *see Tidewater*, 2023 WL 7182179, at *8; *Weininger v. Castro*, 462 F. Supp. 2d 457, 492 (S.D.N.Y. 2006) (recognizing Rule 69(a) does not apply if a federal statute applies, or if the state law "conflict[s] with federal law.").

The Venezuela Parties contend that alter ego analysis falls within the "procedure on execution" because it determines whether a judgment debtor holds an attachable interest in property, and that Delaware law therefore governs, including its requirement of a showing of fraud. Venezuela Parties' Opening Br. at 29. That argument collapses a critical distinction. Alter ego analysis does not prescribe how execution proceeds. It answers the antecedent question of ownership and control. Rule 69 presupposes that threshold determination and supplies only the procedural means by which a judgment creditor may execute against property that the governing substantive law—*Bancec*—already renders reachable.

### A. *Bancec* Supplies the Governing Federal Framework

As this Court recognized in *Crystallex II*, *Bancec* supplies the governing framework for determining whether the assets of a sovereign instrumentality may be reached in execution and whether a court has authority to issue a writ.

In *Bancec*, the Cuban government created Banco Para El Comercio Exterior de Cuba as a state-owned bank to conduct the nation's foreign trade. *See* 462 U.S. at 613-14. Although organized as a separate legal entity with the capacity to contract, hold property, and sue or be sued, Bancec was wholly owned, financed, and controlled by the Cuban state. *See id.* at 624. During its operations, Bancec entered into transactions for the sale of Cuban sugar to a U.S. purchaser. *See id.* at 611. To facilitate that transaction, First National City Bank, now Citibank, issued a letter of credit in Bancec's favor. *See id.* at 613. Shortly after Bancec sought payment under the letter of credit, the Cuban government nationalized and seized all Citibank assets and branches in Cuba as part of a broader expropriation of U.S. owned property. *See id.* at 614.

Following the seizure, Citibank credited the amount due under the letter of credit to a Cuban government account, but treated that payment as a partial setoff against the far larger losses it incurred when its Cuban assets were confiscated. *See id.* at 615. Bancec then commenced suit in federal court in New York to recover the unpaid balance under the letter of credit. *See id.* Citibank answered by asserting a counterclaim seeking to offset the value of its seized Cuban assets against Bancec's claim. *See id.* at 616-17.

While the litigation was pending, the Cuban government dissolved Bancec. *See id.* Its banking assets and liabilities were transferred to Cuba's central bank, and

its foreign trade functions and claims were distributed among other government trading entities. *See id*. The lawsuit nevertheless proceeded in Bancec's name. *See id*.

The FSIA governs when a foreign sovereign or its instrumentality is immune from suit and when that immunity is lifted, but it does not address how liability and assets are allocated between a sovereign and its instrumentalities once immunity falls away. *See id*. at 620-22. In *Bancec*, the instrumentality argued that, although it could be sued under the FSIA, the statute required courts to honor its separate juridical status, shielding it from responsibility for Cuba's conduct and barring any reduction of its recovery based on Cuba's seizure of Citibank property. *See id*. The Supreme Court rejected that position. *See id*. It held that, because the FSIA is silent on attribution of responsibility between a sovereign and its instrumentality, the issue is governed by ***federal common law***, which permits courts to disregard formal separateness where equity so requires. *See id*. at 622-34. The Court did not look to state law to answer this question. *See id*. at 622 n.11.

Interpreting federal common law, the Supreme Court identified, and this Court has recognized, two related circumstances in which the presumption of separateness may be overcome: Extensive control by the sovereign and conduct that would work a fraud or injustice. *See id*. at 628-30; *Crystallex II*, 932 F.3d at 140 ("[W]e recognize *Bancec* establishes a disjunctive test for when the separate

identities of sovereign and instrumentality should be disregarded: when there is 'extensive[ ] control,' and when not disregarding separate identities would work a 'fraud or injustice.'" (quoting *Rubin v. Islamic Republic of Iran*, 138 S. Ct. 816, 823 (2018))). The Court declined to adopt a rigid formula for applying these principles, instead leaving lower courts with the task of evaluating them in light of the facts of each case. *See Rubin*, 138 S. Ct. at 823. Over time, the courts of appeals converged on a set of *Bancec* factors, many of which Congress later incorporated into the FSIA itself. *See id*. at 818.

From *Bancec* flows a settled rule: Federal common law governs the sovereign instrumentality relationship, and alter ego liability may rest on extensive control alone without proof of fraud. *See Crystallex II*, 932 F.3d at 143 ("The District Court concluded correctly that [under] *Bancec* . . . [c]ontrol alone, if sufficiently extensive, is an adequate basis to disregard an instrumentality's separate status."). Rule 69 does not permit resort to state law that conflicts with that federal standard.

### B. Rule 69 Does Not Import State Law Attribution Standards

In essence, the Venezuela Parties now attempt to resurrect an argument the Supreme Court already rejected in *Bancec*, repackaged under a different procedural heading. Section 1606 of the FSIA provides that, once a foreign sovereign or its instrumentality lacks immunity, it is "liable . . . to the same extent as a private individual under like circumstances." 28 U.S.C. § 1606. In *Bancec*, the sovereign

instrumentality argued that this provision required courts to apply the same law that would govern a private party, which in practice would mean state law. *See Bancec*, 462 U.S. at 622 n.11. The Supreme Court rejected that contention, holding that Section 1606 does not address how liability is attributed between a foreign sovereign and its instrumentality. *See id.* That silence, the Court explained, calls for application of federal common law rather than state law because attribution questions implicate foreign relations and demand nationally uniform rules. *See id.*

The Venezuela Parties now advance the same theory through Rule 69. They contend that, because Rule 69 borrows state procedure, it also imports state alter ego standards. The argument fails for the same reasons discussed in *Bancec*.

Rule 69, like Section 1606, says nothing about how liability or ownership is attributed among foreign sovereign entities. Where a provision is silent on attribution, it cannot be read to mandate state law. Only after the legal determination of ownership and control is made under the federal *Bancec* framework does Rule 69 direct courts to apply state procedures to carry out execution against the property. The Venezuela Parties' approach would reverse that sequence, permitting state law to displace the federal standard governing sovereign separateness, a result *Bancec* squarely rejected. *See Tidewater*, 2023 WL 7182179, at *8 ("As the Supreme Court itself stated in *Bancec*, 462 U.S. at 622 n.11, the determination of a sovereign instrumentality's alter ego status is a matter bearing on the nation's foreign relations

that 'should not be left to divergent and perhaps parochial state interpretations.' Moreover, the pertinent alter ego relationship is that 'between Venezuela and PDVSA, neither of which is a Delaware corporation.'"); *see also Janvey v. Libyan Inv. Auth.*, 840 F.3d 248, 264 (5th Cir. 2016) (applying "federal law, not foreign law or state law" in deciding whether an agency or instrumentality of a foreign state has overcome an alter ago theory); *Wye Oak Tech., Inc. v. Republic of Iraq*, 72 F. Supp. 3d 356, 359 (D.D.C. 2014) ("Thus, under FSIA causes of action arising out of state substantive law, federal courts apply federal common law to the attribution of liability among state entities.").

It is no wonder, then, that the Venezuela Parties fail to cite authority supporting their position. Take, for example, their misplaced reliance on *Peterson v. Islamic Republic of Iran*, 627 F.3d 1117, 1130 (9th Cir. 2010), and *Karaha Bodas Co. v. Perusahaan Pertambangan Minyak Dan Gas Bumi Negara*, 313 F.3d 70, 83 (2d Cir. 2002) ("**Karaha**"). Neither case analyzes an alter ego relationship between a foreign sovereign and its instrumentality. They merely show that courts look to state law to determine what assets and procedures are available to a judgment creditor, whether it is an interest in a payment due to a third party, *Peterson*, 627 F.3d at 1130, or certain trust funds, *Karaha*, 313 F.3d at 83—just as the District Court looked to Delaware law to identify corporate shares as attachable assets by means of a writ of attachment *fieri facias*, *see* JA1743, JA1812. Neither *Peterson*

nor *Karaha* supports the incredible suggestion that "courts adjudicating judgment-enforcement suits against foreign states and instrumentalities routinely apply state law to ***all dispositive questions***." Venezuela Parties' Opening Br. at 26 (emphasis added).

Indeed, the court's application of Indonesian law in *Karaha* to determine the property interests of a foreign sovereign over certain funds runs counter to the Venezuela Parties' argument. To reach its conclusion, *Karaha* engaged in a choice-of-law analysis, relying heavily upon *Barkanic v. Gen. Admin. of Civil Aviation of the People's Republic of China*, 923 F.2d 957 (2d Cir. 1991). *See Karaha*, 313 F.3d at 84-85. *Barkanic*, in turn, recognized that *Bancec* established an exception to applying state law to FSIA claims: "[T]he language of [*Bancec*] indicates that the application of federal law" as to the "the attribution of liability among entities of a foreign state" in the alter ego analysis "was an exception to the general rule of applying state substantive law to FSIA claims, and was based on the special nature of questions involving the amenability of a foreign sovereign to suit in the United States." *Barkanic*, 923 F.2d at 960 n.2. The very foundation of *Karaha* therefore rejects the Venezuela Parties' position.

*Karaha* and *Peterson* aside, the Venezuela Parties cite no authority in which a federal court has invoked Rule 69 as the procedural vehicle for attaching the property of a foreign sovereign or its instrumentality. *See* Venezuela Parties'

Opening Br. at 26. Rather, they cite only cases involving ***private corporations***, which would not trigger *Bancec*'s application of federal common law. *See Perfect 10, Inc. v. Giganews, Inc.*, 847 F.3d 657, 677 (9th Cir. 2017) (applying Rule 69 as a procedural mechanism to apply state-law principles in post-judgment enforcement against private corporate actors); *Dexia Credit Loc. v. Rogan*, 629 F.3d 612, 623 (7th Cir. 2010) (same); *Sys. Div., Inc. v. Teknek Elecs., Ltd.*, 253 F. App'x 31, 34-35 (Fed. Cir. 2007) (same); *Trust v. Kummerfeld*, 153 F. App'x 761, 762-63 (2d Cir. 2005) (same); *Democratic Republic of Congo v. Air Cap. Grp.*, No. 12-cv-20607, 2018 WL 324976, at *3 (S.D. Fla. Jan. 8, 2018) (applying Rule 69 to post-judgment discovery against private corporate actors). Such cases clearly fall outside the ambit of *Bancec*, which governs the matter currently before the Court.

The Venezuela Parties' reliance on *Republic of Argentina v. NML Capital, Ltd.* ("**NML**"), 573 U.S. 134 (2014), is likewise misplaced. The Venezuela Parties contend that *NML* stands for the proposition that, once sovereign immunity is overcome, Rule 69 governs judgment enforcement "as it would for any private party." Venezuela Parties' Opening Br. at 26. That assertion stretches *NML* well beyond its holding. In *NML*, Argentina defaulted on its external debt, prompting a bondholder to pursue collection actions in New York. *See* 573 U.S. at 136-38. To assist in enforcing the resulting judgments, the bondholder sought post-judgment discovery by serving subpoenas on nonparty banks for records concerning

Argentina's worldwide financial transactions. *See id.* The Supreme Court held that the FSIA does not bar discovery in aid of execution directed at a foreign sovereign's extraterritorial assets. *See id.* at 139-46. It did not announce a general rule equating sovereign and private judgment debtors for all aspects of enforcement. *See id.* at 138 ("The Second Circuit affirmed, holding that because the Discovery Order involves discovery, not attachment of sovereign property, and because it is directed at third-party banks, not at Argentina itself, Argentina's sovereign immunity is not infringed."); *see also id.* at 140 ("The single, narrow question before us is whether the Foreign Sovereign Immunities Act specifies a different rule [for discovery under Rule 69(a)(2)] when the judgement debtor is a foreign state.").

The question before the Court in *NML* was narrow: Whether the FSIA grants foreign sovereigns special protection from discovery in aid of execution. *See id.* at 140. The Court expressly framed its analysis in terms of discovery, not in terms of whether particular assets could be seized or how alter ego issues should be resolved. Rule 69 addresses the mechanisms by which a judgment may be enforced, but it does not answer antecedent questions of legal ownership or juridical separateness, particularly where assets are held by a sovereign instrumentality. As *Bancec* makes clear, whether an instrumentality should be treated as the sovereign's alter ego is governed by federal common law, not state law. *NML* did not hold otherwise.

And because the Venezuela Parties offer ***no argument*** that the attachment was improper under federal common law, that law governing means the attachments should be affirmed (again).

## III. Delaware Law Would Compel No Contrary Conclusion

Even if Delaware law applied, it would not require a different attachment result, for at least two reasons.

***First***, Delaware law does not appear to offer a rule tailored to the sovereign-specific inquiry applicable to state-owned instrumentalities. The Venezuela Parties simply assume, without support, that Delaware's corporation-specific alter ego rules would apply equally in a foreign sovereign context. But Delaware law is unsettled on that question, so even if it were relevant, this Court would be required to predict how the Delaware Supreme Court would rule. *See Baptiste v. Bethlehem Landfill Co.*, 965 F.3d 214, 225 (3d Cir. 2020) ("In the absence of a controlling decision by the Pennsylvania Supreme Court, a federal court applying that state's substantive law must predict how Pennsylvania's highest court would decide this case." (quoting *Berrier v. Simplicity Mfg., Inc.*, 563 F.3d 38, 45-46 (3d Cir. 2009))). There is substantial reason to conclude that it would adopt the federal approach.[5]

---

[5] Federal common law governs alter ego and veil piercing questions whenever a substantive federal interest is implicated. *See United States ex rel. Small Bus. Admin. v. Pena*, 731 F.2d 8, 10 (D.C. Cir. 1984) (explaining that federal common law applies to veil-piercing inquiries in cases implicating federal interests, and applying local law only because "the SBA's recovery . . . satisfied the only federal interest in the

Delaware courts have recognized that questions implicating foreign sovereigns and foreign relations are governed by federal law. *See State of São Paulo v. Am. Tobacco Co.*, 919 A.2d 1116, 1123 & n.27 (Del. 2007) (holding that Brazilian states suing Delaware corporations could not invoke *parens patriae* standing under Delaware common law where federal law did not recognize such standing for foreign sovereigns); *Jiménez v. Palacios*, 250 A.3d 814, 835 (Del. Ch. 2019), *aff'd*, 237 A.3d 68 (Del. 2020) (recognizing in dispute between boards appointed by rival Venezuelan governments that "ordering our relationships with other members of the international community must be treated exclusively as an aspect of federal law," not Delaware corporate law). Accordingly, Delaware courts would likely apply the federal alter ego standard developed for government entities, which undoubtedly reflects the distinctive features of state-owned instrumentalities and the foreign relations concerns they present—as discussed in *Bancec*.

***Second***, even to the extent Delaware law actually articulated a standard governing foreign sovereigns and state-owned entities that was at odds with *Bancec*,

---

entire case," leaving the parties' remaining rights "to be defined solely by reference to local law."). Courts have applied the same principle in admiralty, where the federal interest in uniformity supersedes any competing state interest. *See, e.g.*, *Blue Whale Corp. v. Grand China Shipping Dev. Co.*, 722 F.3d 488, 497 (2d Cir. 2013) ("When the choice is between state law and federal common law, the federal interest in maintaining uniformity in the quintessentially federal realm of admiralty supersedes any competing interest in applying state law." (citing *Am. Dredging Co. v. Miller*, 510 U.S. 443 (1994))).

it would be preempted. State law is preempted where it "fall[s] into a field that is implicitly reserved exclusively for federal regulation." *Kansas v. Garcia*, 589 U.S. 191, 208 (2020). The Supreme Court has indicated that determining whether the separate juridical status of a foreign sovereign's instrumentality should be respected occupies such a field. *See Bancec*, 462 U.S. at 622 (declining to give conclusive effect to state law on that issue); *see also Am. Ins. Ass'n v. Garamendi*, 539 U.S. 396, 413 (2003) ("[T]he 'concern for uniformity in this country's dealings with foreign nations' that animated the Constitution's allocation of the foreign relations power to the National Government" counsels that "an exercise of state power" should yield in narrowly drawn, foreign-relations-specific circumstances like this case). State law may be displaced by federal common law just like federal statutes. *See N.J. Retail Merchants Ass'n v. Sidamon Eristoff*, 669 F.3d 374, 392 (3d Cir. 2012) ("It is undisputed that state law can be preempted by federal common law as well as federal statutes."); *Off. Comm. of Unsecured Creditors v. Columbia Gas Sys. Inc. (In re Columbia Gas Sys. Inc.)*, 997 F.2d 1039 (3d Cir. 1993) (applying federal common law over state law to determine trust obligations for customer refunds under federal energy regulations). So, even if Delaware law is what the Venezuela Parties claim, it would conflict with *Bancec* and thus would be preempted.

## IV. The District Court Properly Conducted the Expected Value Analysis

XYQ contends that the District Court both legally and factually erred in conducting an expected value analysis. XYQ's Opening Brief at 10-11. XYQ is wrong. Courts, including the Third Circuit, apply the expected value framework for the same purpose as the District Court. The District Court's expected value analysis was firmly grounded in the factual record and in expert testimony admitted at trial, including Gold Reserve's.

The sole legal error XYQ posits is the District Court's use of expected value as a methodology to value a bid in the face of litigation uncertainty. XYQ's Opening Brief at 10. Yet while faulting the District Court for supposedly citing "no precedent" and "no evidence" in support of the expected value framework, XYQ offers nothing beyond its own accusation of error to support that claim. Any such argument is therefore waived. *See Monzon v. De La Roca*, 910 F.3d 92, 106 n.90 (3d Cir. 2018) (party waived argument when it "failed to develop [the] argument beyond two sentences"); *Laborers' Int'l Union of N. Am., AFL-CIO v. Foster Wheeler Corp.*, 26 F.3d 375, 389 (3d Cir. 1994) ("'[A] passing reference to an issue . . . will not suffice to bring that issue before this court.'") (quoting *Simmons v. City of Philadelphia*, 947 F.2d 1042, 1066 (3d Cir. 1991) (plurality opinion), *cert. denied*, 503 U.S. 985 (1992)).

Regardless, XYQ's argument fails by its own standard. Courts regularly use expected value to measure risk and uncertainty. *See Sullivan v. DB Invs., Inc.*, 667 F.3d 273, 322 (3d Cir. 2011) (considering the "expected value of litigating the action rather than settling it at the current time" to assess the risks of establishing damages for settlement approval purposes); *Mars Steel Corp. v. Cont'l Ill. Nat'l Bank & Tr. Co. of Chi.*, 834 F.2d 677, 682 (7th Cir. 1987) (Posner, J.) (discussing the expected value of litigation outcomes). And the District Court relied on well-supported expert testimony—including testimony from Gold Reserve's expert—to conclude that expected value is the "standard way by which to assess and quantify uncertainty associated with litigation." JA0349 ¶ 337 (citing expert testimony from both Red Tree's and Gold Reserve's experts).

The remainder of XYQ's challenges are mere attempts to relitigate the District Court's factual findings. All agree that such findings are reviewed for clear error. XYQ's Opening Brief at 5[6]; *see also Deibler v. Atl. Props. Grp., Inc.*, 652 A.2d 553, 558 (Del. 1995) (an appellate court must affirm findings of fact so long as they are "supported by evidence sufficient to permit a reasonable fact-finder to so conclude"). XYQ must therefore show that the District Court's findings either are " 'completely

[6] XYQ "adopts by reference the Standard of Review in the Gold Reserve Brief," XYQ's Opening Brief at 5, which in turn acknowledges that the "District Court's findings of fact are reviewed for clear error." Gold Reserve's Opening Brief at 26 (quoting *Travelers Cas. & Sur. Co. v. Ins. Co. of N. Am.*, 609 F.3d 143, 156 (3d Cir. 2010)).

devoid of minimum evidentiary support displaying some hue of credibility or bear[ ] no rational relationship to the supportive evidentiary data.'" *VICI Racing, LLC v. T-Mobile USA, Inc.*, 763 F.3d 273, 283 (3d Cir. 2014) (quoting *Berg Chilling Sys., Inc. v. Hull Corp.*, 369 F.3d 745, 754 (3d Cir. 2004)). XYQ comes nowhere close to meeting this demanding standard.

***First***, contrary to XYQ's assertion, record evidence supported the District Court's conclusion that the 2020 Bondholders posed a risk to Gold Reserve's bid. XYQ's Opening Brief at 11; JA0342 ¶ 310. Gold Reserve's bid relied on a financing structure dependent on billions of dollars in loans secured by the assets of CITGO Petroleum Corporation. JA0341-42 ¶¶ 304-07. That structure consisted of three steps. First, a special purpose vehicle with no assets of its own, Adolin Holdings, would incur a $4.5 billion secured bridge loan from Gold Reserve's financing sources. JA0341 ¶ 304. Second, Adolin would distribute the proceeds of those loans to holders of Attached Judgments in cash. JA0341-42 ¶ 306. Third, following the cash disbursement, Adolin would merge with CITGO Petroleum, resulting in CITGO Petroleum becoming the borrower under the acquisition financing and securing the loans with liens on its assets. *Id.* Throughout the sale process, the 2020 Bondholders consistently asserted that this structure impaired their 50.1% security interest in CITGO Holding's shares by loading the collateral with debt. *See, e.g.*,

*Petroleos de Venezuela S.A. v. MUFG Union Bank, N.A.*, No. 19 Civ. 10023, D.I. 384, at 2-4 (S.D.N.Y. July 7, 2025); JA0398.

XYQ now claims that the 2020 Bondholders could not and would not prevent Gold Reserve's bid from closing in order to protect their rights in CITGO Petroleum. XYQ's Opening Brief at 11. But XYQ ignores that the expected value analysis expressly considered the ***risk*** that the 2020 Bondholders would ultimately succeed in preventing Gold Reserve's bid from closing. It did not require a final determination on the merits of whether the 2020 Bondholders would in fact prevail.

In XYQ's telling, the 2020 Bondholders posed no risk at all to Gold Reserve's bid. The record shows otherwise. For example, XYQ contends that there was no evidence that Gold Reserve's transaction would violate either the Pledge or the Indenture governing the 2020 Bondholders' rights. *See* XYQ's Opening Brief at 11. That misses the point. The 2020 Bondholders never asserted that Gold Reserve's financing would violate the ***Pledge***—nor could they, because Gold Reserve was not a party to that contract. Rather, the concern was that the transaction would violate the 2020 Bondholders' ***rights*** under the Pledge, a distinct issue. XYQ engages in the same misdirection by suggesting that no risk existed because the 2020 Bondholders represented that they would not seek to enjoin Gold Reserve's bid. XYQ's Opening Brief at 12. The 2020 Bondholders would have challenged Gold Reserve's ***financing structure***, not the bid itself. *See* JA0343 ¶ 311. Such an action

still threatened the viability of the bid, because, as Gold Reserve's CEO confirmed, the bid could not close absent the ability to secure the financing debt with CITGO Petroleum's assets. JA0342 ¶ 309.

XYQ also contends that the District Court's finding of risk "ignores" that OFAC regulations would allegedly prohibit any attempt by the 2020 Bondholders to exercise their rights. XYQ's Opening Brief at 12. Specifically, XYQ argues that OFAC's repeated extensions of the suspension under General License 5 necessarily mean that the 2020 Bondholders will be unable to exercise their rights under the Pledge. *Id.* But, as the District Court explained, the fact that OFAC has extended the suspension in the past does not mean that it could not, at any time, lift or decline to extend it in the future. JA0399. The District Court further acknowledged that "at least one reasonable reading" of OFAC's guidance regarding enforcement would permit the 2020 Bondholders to enforce their rights even if General License 5 remained in place. JA0399-400. This line of attack simply repackages factual arguments that Gold Reserve made and lost. *Id.* None comes close to clear error.

Nor was there any clear error in the District Court's fact-bound decision to make certain "simplifying assumptions," including that the Amber Bid has a 100% certainty of closing. JA0351. Gold Reserve's CEO testified that he was advised that, as of the start of the sale hearing, the outcome of the SDNY Litigation was a "coin toss." JA0350 ¶ 340. Gold Reserve's own internal analysis, produced in

discovery, said the same. *Id*. By the end of the Sale Hearing, Judge Failla had ruled in favor of the 2020 Bondholders on summary judgment. *Id*. Gold Reserve's financing for its bid was terminated thereafter. *See* JA0351 ¶¶ 344-46. It was not clear error for the District Court to conclude that, as of the time of its ruling months later, simplifying assumptions would "not materially alter the analysis" because the likelihood that Gold Reserve's bid could close "is so much lower than 75%." JA0351 ¶ 345 n.9.

***Second***, the District Court did not err in conducting its expected value analysis, which XYQ claims rests on what it calls "two compounding errors." XYQ's Opening Brief at 17-18. But it was not error to assign a failed Gold Reserve bid zero value—a bid that does not close provides zero value to creditors. And, while XYQ suggests that the District Court should have subtracted the difference between the headline value of Gold Reserve's bid and Amber Energy's bid from Amber Energy's valuation as "lost value," the point of an expected value analysis is to assess how much risk is required to overcome that difference.

XYQ's arguments to the contrary defy common sense and basic math. Take XYQ's suggestion that the "failed bid" scenario had to account for the underlying value of the assets, because even if Gold Reserve's bid failed to close, creditors may recover some (unknown) amount at some (unknown) time from some other (unknown) bidder. *Id*. at 18. All of that has nothing to do with the value that ***Gold***

***Reserve's bid*** provides. XYQ also blithely brushes off the enormous costs of redoing the sale process in the event a bid does not close, describing the cost of a failed bid as "mere delay, not destruction of value." *Id.* at 12. But running a ***third*** sale process would necessarily destroy value by burning through millions more in the Special Master's fees and expenses, with these costs shouldered in large part by Attached Judgment Creditors. *See Crystallex Int'l Corp. v. Bolivarian Republic of Venezuela*, Misc. No. 17-151, D.I. 2016 (D. Del. Aug. 11 2025), D.I. 2571 (D. Del. Dec. 9, 2025) (Orders approving over $19 million in fees and expenses for the period from March 1, 2025 to August 31, 2025). This does not even account for the amounts Attached Judgment Creditors would have to shoulder in out-of-pocket legal fees spent to recover their judgments. Moreover, while XYQ notes that a hypothetical sale could yield the same or similar value for creditors, it disregards the possibility that changed circumstances could result in significantly ***less*** value. This is especially true where, as here, underlying and fluid geopolitical considerations may impact the sale. *See, e.g.*, Order, No. 25-3347, D.I. 153 (Order "invit[ing] the United States to address whether recent developments in Venezuela affect these appeals"). None of XYQ's quibbles with the District Court's expected-value analysis demonstrates error, let alone clear error. And these challenges certainly do not justify setting aside a sale providing billions in value to creditors who have already been denied what they are owed for years.

## CONCLUSION

For these reasons, the Court should affirm.

Dated: February 9, 2026

Respectfully submitted,

*s/ Christopher L. Carter*

Christopher L. Carter
MORGAN, LEWIS & BOCKIUS LLP
One Federal Street
Boston, MA 02110
(617) 951-8063

James D. Nelson
MORGAN, LEWIS & BOCKIUS LLP
1111 Pennsylvania Avenue, NW
Washington, DC 20004
(202) 739-5411

Jody C. Barillare
MORGAN, LEWIS & BOCKIUS LLP
1201 N. Market Street, Suite 2201
Wilmington, DE 19801
(302) 574-7294

Edward H. Davis Jr.
Fernando J. Menendez
SEQUOR LAW, P.A.
1111 Brickell Avenue, Suite 1250
Miami, FL 33131
(305) 372-8282

*Counsel for OI European Group B.V.*

*s/ Joshua S. Bolian*

Joshua S. Bolian
Jared A. Hagler
RILEY & JACOBSON, PLC
1906 West End Avenue
Nashville, Tennessee 37203
(615) 320-3700
jbolian@rjfirm.com
jhagler@rjfirm.com

F. Troupe Mickler IV
ASHBY & GEDDES
500 Delaware Ave., 8th Floor
P.O. Box 1150
Wilmington, DE 19899
(302) 654-1888
tmickler@ashbygeddes.com

*Counsel for ACL1 Investments Ltd., ACL2 Investments Ltd., and LDO (Cayman) XVIII Ltd.*

_s/ Alexander A. Yanos_

Alexander A. Yanos
ALSTON & BIRD, LLP
90 Park Avenue, 15th Floor
New York, NY 10016-1387
(212) 210-9400

Robert Poole
ALSTON & BIRD, LLP
1201 W. Peachtree St. NE, Suite 4900
Atlanta, GA 30309
(404) 881-4547

Laura Davis Jones
Peter J. Keane
PACHULSKI STANG ZIEHL & JONES LLP
919 North Market Street, 17th Floor
P.O. Box 8705
Wilmington, DE 19899-8705
(302) 652-4100

*Counsel for Northrop Grumman Ship Systems, Inc. (now known as Huntington Ingalls Incorporated)*

_s/ James E. Berger_

James E. Berger
Charlene C. Sun
Alice A. Gyamfi
DLA PIPER, LLP (US)
1251 Avenue of the Americas
New York, NY 10020
(212) 335-4715
james.berger@us.dlapiper.com
charlene.sun@us.dlapiper.com
alice.gyamfi@us.dlapiper.com

R. Craig Martin
Caleb Johnson
DLA PIPER, LLP (US)
1201 North Market Street
Suite 2100
Wilmington, DE 19801
(302) 468-5655
craig.martin@us.dlapiper.com
caleb.johnson@us.dlapiper.com

*Counsel for Rusoro Mining Ltd.*

## COMBINED CERTIFICATES OF COMPLIANCE

In accordance with Local Appellate Rules 28.3(d) and 46.1(e), I certify that all attorneys whose names appear on this brief are members in good standing of the bar of this Court or have filed an application for admission.

In accordance with Local Appellate Rule 31.1(c), I certify that the text of the electronic PDF version of this brief and the paper copies are identical and that Microsoft Defender Offline scanned the file and detected no virus.

In accordance with Federal Rule of Appellate Procedure 32(g)(1), I certify that this brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 11,690 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f) and Circuit Rule 32(e)(1), according to the word count of Microsoft Word 365. This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6) because it has been prepared in Times New Roman 14-point font, a proportionally spaced typeface.

Dated: February 9, 2026

*s/ Christopher L. Carter*
Christopher L. Carter

*Counsel for OI European Group B.V.*

**CERTIFICATE OF SERVICE**

I hereby certify that counsel for all parties are registered as Filing Users of the Court's CM/ECF system and that a copy of this brief will be served electronically on this date by operation of the Court's CM/ECF system.

Dated: February 9, 2026

*s/ Christopher L. Carter*
Christopher L. Carter

*Counsel for OI European Group B.V.*