Nos. 25-3347, 25-3348, 25-3349, 25-3350, 25-3363,
25-3453 to 25-3494, 25-3563 & 25-3564

---

**UNITED STATES COURT OF APPEALS FOR THE THIRD CIRCUIT**

---

CRYSTALLEX INTERNATIONAL CORPORATION

v.

BOLIVARIAN REPUBLIC OF VENEZUELA

Bolivarian Republic of Venezuela, Appellant in Nos. 25-3347, et al.
PDV Holding, Inc., Appellant in No. 25-3348
CITGO Petroleum Corporation, Appellant in No. 25-3349
Petróleos de Venezuela, S.A., Appellant in Nos. 25-3350, et al.
Gold Reserve Ltd., Appellant in No. 25-3363

---

On Appeals of an Order of the
United States District Court for the District of Delaware
Nos. 17-mc-151-LPS, et al. (Hon. Leonard P. Stark)

---

# REPLY BRIEF OF APPELLANT GOLD RESERVE LTD.

---

MATTHEW H. KIRTLAND
NORTON ROSE FULBRIGHT US LLP
799 Ninth Street, N.W., Suite 1000
Washington, D.C. 20001
(202) 662-0200

AARON M. PANNER
DANIEL S. SEVERSON
COLLIN R. WHITE
DENNIS D. HOWE
KELLOGG, HANSEN, TODD,
FIGEL & FREDERICK, P.L.L.C.
1615 M Street, N.W., Suite 400
Washington, D.C. 20036
(202) 326-7921

*Counsel for Appellant Gold Reserve Ltd.*

March 2, 2026

*(additional counsel listed on inside cover)*

KEVIN J. MANGAN
MATTHEW P. WARD
STEPHANIE SMIERTKA RILEY
WOMBLE BOND DICKINSON (US) LLP
1313 North Market Street, Suite 1200
Wilmington, Delaware 19801
(302) 252-4320

MICHAEL BOWE
TYLER PURINTON
BRITHEM LLP
565 Fifth Avenue
New York, New York 10017
(646) 653-9173

*Counsel for Appellant*
*Gold Reserve Ltd.*

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ... iii

INTRODUCTION AND SUMMARY OF ARGUMENT ... 1

ARGUMENT ... 3

I. THE APPROVAL ORDER VIOLATES DELAWARE'S "HIGHEST BIDDER" REQUIREMENT AND THE COURT'S PROCEDURES ... 3

A. Displacement of Gold Reserve's Bid by Elliott's Lower Bid Violated Delaware Law ... 3

1. The Consequences of the District Court's Legal Violations Do Not Insulate Those Violations from Review ... 4

2. The District Court Violated Delaware Law's "Highest Bidder" Requirement ... 5

B. The Approval Order Violated the Overbid Minimum ... 12

II. THE RELATIONSHIPS AMONG THE ADVISORS, ELLIOTT, AND THE 2020 BONDHOLDERS CREATE AN APPEARANCE OF BIAS REQUIRING DISQUALIFICATION AND VACATUR ... 15

A. Gold Reserve's Disqualification Motion Was Timely ... 15

B. Gold Reserve Did Not Waive Its Objection ... 19

C. The Advisors' Extensive Relationships with Parties Benefiting from the Advisors' Recommendations, Accentuated by Weil's Intervention for Elliott, Create an "Appearance of Bias" Under Section 455(a) ... 22

D. The Advisors' Bias Is Not Harmless and Requires Vacatur ... 26

CONCLUSION ... 28

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF FILING AND SERVICE

CERTIFICATE OF BAR MEMBERSHIP

## TABLE OF AUTHORITIES

Page(s)

### CASES

*Alexander v. Primerica Holdings, Inc.*, 10 F.3d 155 (3d Cir. 1993)........................26

*Andry*, *In re*, 921 F.3d 211 (5th Cir. 2019)............................................................13

*Appraisal of Regal Ent. Grp.*, *In re*, 2021 WL 1916364
(Del. Ch. May 13, 2021)..............................................................................9

*Arnold v. Society for Sav. Bancorp., Inc.*, 650 A.2d 1270 (Del. 1994).....................8

*Bakalis*, *In re*, 220 B.R. 525 (Bankr. E.D.N.Y. 1998)...........................................6, 9

*Castre, Inc.*, *In re*, 312 B.R. 426 (Bankr. D. Colo. 2004) ........................................8

*DFC Glob. Corp. v. Muirfield Value Partners*, 172 A.3d 346
(Del. 2017)..................................................................................................8

*Family Christian, LLC*, *In re*, 533 B.R. 600 (Bankr. W.D. Mich. 2015)..................8

*Farmland Indus., Inc.*, *In re*, 284 B.R. 111 (Bankr. W.D. Mo. 2002),
*aff'd*, 289 B.R. 122 (B.A.P. 8th Cir. 2003)...................................................15

*Huff Fund Inv. P'ship v. CKx, Inc.*, 2013 WL 587880
(Del. Ch. Nov. 1, 2013) .........................................................................5, 6

*IBM Corp.*, *In re*, 45 F.3d 641 (2d Cir. 1995) ........................................................21

*Jones v. Pittsburgh Nat'l Corp.*, 899 F.2d 1350 (3d Cir. 1990).............................25

*Kensington Int'l Ltd.*, *In re*:

353 F.3d 211 (3d Cir. 2003) ......................................................................15

368 F.3d 289 (3d Cir. 2004) .............................. 18, 19, 20, 21, 22, 23, 24, 27

*Lawsky v. Condor Cap. Corp.*, 2015 WL 4470332
(S.D.N.Y. July 21, 2015)............................................................................6

*LeBoon v. Lancaster Jewish Cmty. Ctr. Ass'n*, 503 F.3d 217
(3d Cir. 2007)..........................................................................................19

*Liljeberg v. Health Servs. Acquisition Corp.*, 486 U.S. 847 (1988) ........... 24, 27, 28

*Manti Holdings, LLC v. Authentix Acquisition Co.*, 261 A.3d 1199 (Del. 2021) ........... 13

*Massachusetts Sch. of Law at Andover, Inc. v. American Bar Ass'n*, 107 F.3d 1026 (3d Cir. 1997) ........... 23

*National Auto Brokers Corp. v. General Motors Corp.*, 572 F.2d 953 (2d Cir. 1978) ........... 21, 22

*Newtowne Vill. Serv. Corp. v. Newtowne Rd. Dev. Co.*, 772 A.2d 172 (Del. 2001) ........... 5

*Oklahoma Forge, LLC*, *In re*, 671 B.R. 297 (Bankr. N.D. Okla. 2025) ........... 15

*Omega Eng'g, Inc. v. Omega, S.A.*, 432 F.3d 437 (2d Cir. 2005) ........... 21

*OptiNose AS v. Currax Pharms., LLC*, 264 A.3d 629 (Del. 2021) ........... 13

*Pashaian v. Eccelston Props., Ltd.*, 88 F.3d 77 (2d Cir. 1996) ........... 22

*Porter v. Graves*, 104 U.S. 171 (1881) ........... 7

*Puerto Rico Am. Ins. Co. v. Rivera-Vazquez*, 603 F.3d 125 (1st Cir. 2010) ........... 13

*School Asbestos Litig.*, *In re*, 977 F.2d 764 (3d Cir. 1992) ........... 26

*Selkridge v. United of Omaha Life Ins. Co.*, 360 F.3d 155 (3d Cir. 2004) ........... 27

*Sullivan v. Max Spann Real Est. & Auction Co.*, 276 A.3d 92 (N.J. 2022) ........... 7

*Time Sales Fin. Corp.*, *In re*, 445 F.2d 385 (3d Cir. 1971) ........... 15

*Truskoski v. ESPN, Inc.*, 60 F.3d 74 (2d Cir. 1995) ........... 12

*United States v. Hallinan*, 75 F.4th 148 (3d Cir. 2023) ........... 13

*United States v. Nobel*, 696 F.2d 231 (3d Cir. 1982) ........... 20, 21

*United States v. Parse*, 789 F.3d 83 (2d Cir. 2015) ........... 19

*United States v. Schreiber*, 599 F.2d 534 (3d Cir. 1979)........................................20

*Vornado PS, L.L.C. v. Primestone Inv. Partners, L.P.*, 821 A.2d 296 (Del. Ch. 2002), *aff'd*, 2003 WL 1904666 (Del. Apr. 16, 2003)..................10

*Westinghouse Elec. Corp. v. Kerr-McGee Corp.*, 580 F.2d 1311 (7th Cir. 1978) ..........................................................................................22

**STATUTES AND RULES**

28 U.S.C. § 455(a)........................................................... 2, 3, 16, 18, 21, 22, 23, 27

28 U.S.C. § 455(b)(5)(iii)...............................................................................22

Del. Code Ann. tit. 8, § 324(a)........................................................................5, 6, 7

Fed. R. Civ. P. 53(a)(2)....................................................................................20

## INTRODUCTION AND SUMMARY OF ARGUMENT

The sale process went awry when the Special Master recommended abandoning Gold Reserve's $7.4 billion bid (later raised to $7.9 billion) in favor of Elliott's $5.9 billion bid. Accepting Elliott's bid violated the statutory requirement that the shares be sold to the "highest bidder." It also violated the court-ordered minimum-overbid requirement, embodied in "Bidder Protections" in Gold Reserve's Stock Purchase Agreement ("SPA"), that prohibited the Special Master from even engaging with, let alone accepting, a lower bid. Had Delaware law and the minimum-overbid requirement been respected, the court would have proceeded with the Sale Hearing on Gold Reserve's fully financed, final recommended bid for the PDVH shares.

Amber, Crystallex, and other creditors who stand to benefit from the below-market sale ask this Court to ignore these errors because Gold Reserve was no longer a qualified bidder when the court approved Elliott's bid. But Gold Reserve lost its financing only because the court canceled its SPA – no "ministerial" act but discretionary, and unlawful, judicial action. The fact that the court's challenged violations caused Gold Reserve to lose its financing cannot insulate those violations from review, and vacatur of the Approval Order would give Gold Reserve relief.

On the merits, Appellees' less-is-more arguments cannot square approval of Elliott's lower-priced bid with the statutory "highest bidder" mandate. "Highest bidder" means what it says. Even if the court's "best bid" inquiry were consistent with the statute, there was no proper finding that supposedly greater certainty of closing justified discarding $2 billion in payments to Delaware attached creditors when failure to close (also a risk inherent in Elliott's bid) would leave the PDVH shares' value intact. Appellees hardly defend the violation of the overbid minimum except to suggest that the district court was free to disregard its own orders and render contractual language meaningless.

Asked to explain the outcome, a reasonable observer would hardly overlook the Advisors' conflicts of interest. A senior Weil partner intervened on Elliott's behalf with other Weil lawyers advising the Special Master *in this very proceeding*. That striking fact came to light only because the district court authorized discovery after Elliott's counsel admitted what the Special Master earlier concealed – that Weil and Elliott had an extensive, growing relationship, not a single brief, concluded representation. Evercore, too, had far more to gain from Elliott's success than it had revealed. Gold Reserve's bid for disqualification under 28 U.S.C. § 455(a) – its *first* – was timely. And meritorious: beyond evidence of an extensive client relationship, the senior Weil partner appealed to the Advisors *expressly* on the basis that Elliott's frustration could jeopardize future business.

That *appearance* of favoritism, beyond anything any court of appeals has permitted under Section 455(a), requires disqualification.

Appellees prefer to get their money (or a screaming deal, in the case of Elliott) now. But this transaction's size argues for care, not haste; the proceeding has already taken years; and CITGO, one of the nation's largest oil refiners, is not going anywhere. The additional Delaware creditors who would have been compensated by a sale to the "highest bidder" – Gold Reserve – deserve no less.

## ARGUMENT

### I. THE APPROVAL ORDER VIOLATES DELAWARE'S "HIGHEST-BIDDER" REQUIREMENT AND THE COURT'S PROCEDURES

#### A. Displacement of Gold Reserve's Bid by Elliott's Lower Bid Violated Delaware Law

No party disputes the Delaware requirement that attached shares be sold "to the highest bidder." *See*, *e.g.*, Crystallex Br.51. Nor can anyone dispute that Gold Reserve's final recommended bid exceeded Elliott's by $1.5 billion (and its improved bid by $2 billion). Appellees instead argue that (1) Gold Reserve's bid was no longer viable at the time of approval (leaving Elliott's bid the highest) (Crystallex Br.51-58; Amber Br.48); and (2) Elliott's bid was more valuable and thus "highest" because of perceived greater certainty of closing (ConocoPhillips Br.24; Crystallex Br.58-60). Neither argument justifies the result.

### *1. The Consequences of the District Court's Legal Violations Do Not Insulate Those Violations from Review*

Contrary to Appellees' arguments, the termination of Gold Reserve's financing cannot justify the court's approval of Elliott's bid. The commitments terminated solely because the court cancelled Gold Reserve's SPA, at the Special Master's behest. Before Elliott's last-minute, lower-priced bid surfaced, the Special Master had recommended Gold Reserve's bid because it "had sufficient 'financial wherewithal and certainty of financing' as demonstrated by its financial commitment letters." JA0321. No one suggests otherwise. The court's order authorizing the Special Master to terminate Gold Reserve's SPA to favor Elliott's lower bid – which caused the loss of financing commitments, JA0410 – violated Delaware's "highest bidder" requirement. The violations of the minimum-overbid requirement were likewise unlawful.

Termination of Gold Reserve's SPA was hardly "ministerial" (Amber Br.49): it gave judicial imprimatur to the displacement of Gold Reserve's bid and eliminated its contractual right to purchase the shares (subject to district court approval). The Special Master knew that banks had conditioned continued financing commitments on Gold Reserve's maintaining the contractual right to purchase the shares; the Special Master and the court thus *knew* that cancellation of the SPA would undermine Gold Reserve's financing. *See* JA13389 (Tr.1407:16-18). This does *not* suggest that Gold Reserve's financing was "precarious" (Amber

Br.49); the Special Master had already determined that Gold Reserve's financing was solid, and the financing would not have been lost if the SPA had been honored.

Nor does the loss of committed financing preclude effective relief. If this Court determines that Gold Reserve's bid should not have been displaced, the district court on remand should be ordered to give Gold Reserve the opportunity to put its financing back together. At a minimum, by vacating the Approval Order, the Court would permit Gold Reserve (and others) to compete for the shares in a lawful process.

#### 2. *The District Court Violated Delaware Law's "Highest Bidder" Requirement*

**a.** Appellees provide no support for the argument that "highest bidder" in Section 324(a) means something other than exactly what it says. "If a statute is unambiguous, the plain meaning of the statute controls." *Newtowne Vill. Serv. Corp. v. Newtowne Rd. Dev. Co.*, 772 A.2d 172, 176 (Del. 2001). Appellees' argument (Amber Br.47; Crystallex Br.59) that the district court had discretion to select a bid *other than* the highest qualified bid based on greater closing certainty contradicts the statute. *See* Gold Reserve Br.28-32.

Appellees' cases reinforce that conclusion: none involves the selection of a lower bid under Section 324(a); all apply a different "business judgment" rule that affords discretion to consider more than price. For example, *Huff Fund Investment*

*Partnership v. CKx, Inc.*, 2013 WL 5878807 (Del. Ch. Nov. 1, 2013), involved an appraisal (not sale of attached shares); the court held that the merger price obtained after a "bidding war" provided a reasonable indication of market value. That conclusion did not change because another bidder offered slightly more (less than two percent) than the winning bid; the board was free to consider "more dimensions than just price" – that is, to *reject* the highest bid, which Section 324(a) does not permit. *See id.* at *14 n.135. *Lawsky v. Condor Capital Corp.*, 2015 WL 4470332 (S.D.N.Y. July 21, 2015), noted that, "[a] fiduciary *owes a duty* to consider more factors than just the price" – and because "the highest bid is not always the best bid," acceptance of that "lower bid" was consistent with the receiver's fiduciary obligations. *Id.* at *9 (emphasis added). Likewise, *In re Bakalis*, 220 B.R. 525, 533 (Bankr. E.D.N.Y. 1998) – which Gold Reserve cited to illustrate the *difference* between Section 324(a)'s "highest bidder" requirement and the more flexible "highest and best" standard – emphasizes that "[t]he inclusion of 'best' in [the phrase 'highest and best'] is not mere surplusage"; it permits selection of a more advantageous lower bid. Under Appellees' reading of "highest bidder," the inclusion of "best" in other statutes would be surplusage.

**b.** Appellees get no further by arguing (Four Creditors Br.42-48) that the district court could speculate about the "value" of Elliott's bid and determine that because of supposedly greater closing certainty Elliott's bid was "higher." To

start, this cannot be squared with the statute's language, which mandates *both* a "public sale" and sale "to the highest bidder." Del. Code Ann. tit. 8, § 324(a). When two qualified bids are offered in a public sale, there is no ambiguity about which is higher: as in an auction (a form of public sale), the highest bid wins. *See Porter v. Graves*, 104 U.S. 171, 174 (1881) ("When the law requires a sale of property . . . to be made at public auction, after due notice, it is for the purpose of inviting competition among bidders that the highest price may be obtained for what is sold."); *Sullivan v. Max Spann Real Est. & Auction Co.*, 276 A.3d 92, 106 (N.J. 2022) ("Once the auction commences, the seller must accept the highest bid."). With a $7.4 billion Final Recommended Bid in hand, Delaware law did not permit the Special Master to prefer, or the district court to approve, a bid for $5.9 billion.

Appellees urge (Four Creditors Br.43) that the district court could discount Gold Reserve's bid by perceived risk that the 2020 Bondholders would block the transaction. But, as a matter of law, a court cannot compare the value of two bids based on relative certainty of closing absent a finding that failure to close will impair the value of the property to be sold (and by how much). The district court did not do this. Instead, it incorrectly assumed that only two outcomes were possible: if Gold Reserve's bid closed, creditors would receive $7.9 billion; if it did not, creditors would receive $0. But this is wrong. If Gold Reserve (or any other purchaser) failed to close, the PDVH shares would remain attached and *could*

*still be sold*. By preferring Elliott's bid, the district court *guaranteed* that Delaware creditors will receive $2 billion less than Gold Reserve offered. Even if a "best value" inquiry were permitted under Delaware law (it is not), for that result to be sustainable, the district court would have had to calculate the likely loss of value (below the $5.9 billion that Elliott offered) and find that the risk would outweigh the certain loss of $2 billion. *Cf. In re Family Christian, LLC*, 533 B.R. 600, 628 (Bankr. W.D. Mich. 2015) (denying sale confirmation where "none of the proponents of the sale . . . have presented . . . evidence upon which the court can make an informed decision regarding the relationship of the sale price to the value of the assets being sold"); *In re Castre, Inc.*, 312 B.R. 426, 429 (Bankr. D. Colo. 2004) (approving sale to highest bidder, despite closing concerns, after performing quantitative analysis of present value given risk). The court did not even attempt this calculation.

None of Appellees' cases supports the court's approach. ConocoPhillips cites (at 17-18) irrelevant cases involving valuation of corporate shares, *see Arnold v. Society for Sav. Bancorp., Inc.*, 650 A.2d 1270, 1282 (Del. 1994) ("share valuation was too unreliable to be material"); a case where the Chancery Court, in an appraisal, assigned too little weight to the deal price after a "robust and conflict-free" sale process, *DFC Glob. Corp. v. Muirfield Value Partners*, 172 A.3d 346, 372 (Del. 2017); and a case explaining the discounted cash flow valuation method,

*see In re Appraisal of Regal Ent. Grp.*, 2021 WL 1916364 (Del. Ch. May 13, 2021). None involved discounting an unconditional offer backed by committed financing or anything similar.

The Four Creditors cite (at 43) cases involving valuation of litigation claims for assessing settlement fairness; but the value of a failed claim *is* zero. Here, even if the 2020 Bondholders prevail in their litigation, even if OFAC changes its long-standing policy preventing the bondholders from exercising rights under their Pledge[1]; even if a court were to grant an injunction (*but see* XYQ Br.11-13); and even if the bondholders actually blocked the transaction (rather than settling with Gold Reserve, as they settled with Elliott), the PDVH shares could be sold to someone else. That is why, even under standards more flexible than the governing "highest bidder" rule, Appellees cite no case in which a court has approved the decision to sacrifice anything like the magnitude of value at issue here. *See, e.g.*, *Bakalis*, 220 B.R. at 533 (difference of $700,000, six percent of purchase price).

To be sure, had Gold Reserve not closed – notwithstanding testimony at the hearing that it is able and determined to do so, *see* JA0346-47, and the Special Master's earlier recommendation – reopening the public sale process would entail

[1] *See, e.g.*, JA5877 (district court noting that "the risk to closing posed by the 2020 Bondholders . . . appears to be dependent on (perhaps among other conditions) . . . persuading OFAC to change the position to which it has consistently adhered for over five years"); *see also* XYQ Br.12.

uncertainty, delay, and expense. *See* Four Creditors Br.48 ("millions more in . . . fees and expenses"). But no one argues – and there is no evidence – that such costs approach the $2 billion that the district court tossed aside.

**c.** Contrary to Appellees' arguments (ConocoPhillips Br.17), the district court's undisputed authority to establish bidding criteria undermines rather than supports the decision to reject the highest *qualified* bid.[2] By establishing criteria for qualified bids in advance, the district court defined whether a particular offer counted as a bid at all. The court established the criteria through a contentious process after considering the positions of all participants. Rules established in advance ensure that qualified bids can be compared based on price because all meet the same court-ordered criteria. Indeed, a core purpose of the heavily litigated criteria was to avoid a repeat of the failed process that had resulted in the Special Master's recommendation of a prior (universally opposed) Elliott bid. *See* Gold Reserve Br.11-12.

Had a settlement with the 2020 Bondholders been required, Gold Reserve could have negotiated one. But the district court was adamant that such a

---

[2] Crystallex cites (at 52) *Vornado PS, L.L.C. v. Primestone Investment Partners, L.P.*, 821 A.2d 296, 316 (Del. Ch. 2002), decided under New York (not Delaware) law, for the proposition that a party without valid financing is properly disqualified. But Gold Reserve's bid was backed by committed financing. *See supra* p. 4.

settlement was not required – while also making clear that bidders could not make offers contingent on favorable resolution of the 2020 Bondholders' claims (which Elliott, with the Special Master's acquiescence, had previously attempted to do). *See* Gold Reserve Br.11-12, 36-37. By rejecting Gold Reserve's bid for failure to reach a settlement with the 2020 Bondholders – though neither Gold Reserve's bid nor its financing was conditioned on the outcome of the 2020 Bondholders' litigation – the district court upended the rules.

No Appellee argues that the inclusion of certainty of close among the evaluation criteria gave the district court *carte blanche* to select a lower bid, nor can that evaluation criterion be read as inconsistent with Delaware's "highest bidder" requirement. *See* Gold Reserve Br.36. In approving the selection of Red Tree's stalking horse bid, the court made clear that, while it "seems sensible to set as the minimum bid for beginning the Topping Period the bid that appears to have the greatest likelihood of closing, . . . any bid [the court] is likely to approve at the conclusion of the Sale Process will need a balance that places much greater emphasis on price and lesser emphasis on certainty." JA5874. Gold Reserve followed that guidance.

No bidder could eliminate closing risk "entirely." Crystallex Br.54. Elliott itself, as of this writing, cannot close. *See also* XYQ Br.13-17. If the district court

believed that a settlement with the 2020 Bondholders was a condition for a qualified bid, the time to decide that was *before* the bidding.

### B. The Approval Order Violated the Overbid Minimum

Appellees cannot justify the district court's failure to enforce the overbid minimum, which was mandated by the court's orders and the terms of the SPA. That provision, after setting the overbid minimum of $50 million, gives the Special Master discretion to "lower or raise" it – not to eliminate it, much less to accept a price below Gold Reserve's recommended bid. *See* Gold Reserve Br.39. Indeed, the "Bidder Protections" established by the district court, as reflected in the SPA, did not permit the Special Master even to engage with a potential bidder unless it has submitted a "Competing Proposal" – which must satisfy the "overbid minimum." JA6052-54. Appellees cannot explain away the plain language. *Cf.* Amber Br.46 (paradoxically asserting, without explanation, that reading the overbid provision to require an overbid would "conflict[] with . . . the provision's text").

Appellees argue that reviewing courts defer to a district court's interpretation of its own orders. Amber Br.46; Crystallex Br.55. But deference to interpretation is one thing; ignoring violations of an order's clear terms is another. *Compare Truskoski v. ESPN, Inc.*, 60 F.3d 74, 77 (2d Cir. 1995) (per curiam) (upholding district court's finding that judgment did not require payment of

pension benefits when the judgment “made no mention of pension rights” and “the pension-benefits question had not been raised or argued”); *United States v. Hallinan*, 75 F.4th 148, 152 (3d Cir. 2023) (upholding court’s reading of prior order as supported by its “primar[y]” reasoning), *with In re Andry*, 921 F.3d 211, 214 (5th Cir. 2019) (district court “abused its discretion” where it misconstrued its own rules); *Puerto Rico Am. Ins. Co. v. Rivera-Vazquez*, 603 F.3d 125, 134 (1st Cir. 2010) (inconsistent application of local rules required reversal). On Appellees’ (and the district court’s) reading, the overbid provisions of the SPO and the SPA are *meaningless* because the Special Master can accept *any* offer that he deems superior. Such an interpretation is wrong as a matter of law. *See OptiNose AS v. Currax Pharms., LLC*, 264 A.3d 629, 639 (Del. 2021) (rejecting interpretation that would render contractual right “essentially meaningless”); *Manti Holdings, LLC v. Authentix Acquisition Co.*, 261 A.3d 1199, 1208 (Del. 2021) (“Contracts will be interpreted to . . . not render any terms meaningless or illusory.”) (cleaned up).

Appellees also emphasize (Amber Br.46; Crystallex Br.55) that, in granting the Special Master discretion to lower the overbid minimum, the district court noted that flexibility could be “helpful for reasons including that ‘the evaluation criteria include criteria other than price.’” JA5639. But recognition that a *higher* bid, though higher by less than $50 million, may be considered does not give the

Special Master discretion to accept a *lower* bid. Had Elliott submitted a bid that exceeded Gold Reserve's by less than $50 million, the Special Master could have lowered the overbid minimum and asked for permission to engage. *See* JA6054. *But once the Special Master executed the SPA with Gold Reserve after the Topping Period, he could not displace Gold Reserve's bid with a lower one.*

The structure of the sale process, as the district court acknowledged, was to maximize price during the Topping Period – including by giving bidders assurance of protection that would incentivize higher bids. *See* Gold Reserve Br.1-2.[3] Gold Reserve invested tens of millions of dollars to gain committed financing and regulatory approvals in reliance on those protections; the Special Master and the district court gutted them.

Aside from arguing (ConocoPhillips Br.23) that violation of the overbid minimum is irrelevant because cancellation of Gold Reserve's SPA terminated its financing commitments, Appellees do not contest that, if the acceptance of Elliott's bid violated the court's orders and Gold Reserve's SPA, that procedural default warrants vacatur. Courts often reopen sales processes based on similar procedural

[3] For this reason, Weil's assurances to Elliott at the end of the Topping Period – which solicited a post-Topping Period proposal – were improper. *See* Gold Reserve Br.45 n.13. Had the overbid provision been respected, Elliott would have needed to at least match Gold Reserve's bid. The fact that the Special Master discarded the overbid provision to clear the way for Elliott's bid reinforces the appearance of bias.

errors. *See*, *e.g.*, *In re Oklahoma Forge, LLC*, 671 B.R. 297, 304 (Bankr. N.D. Okla. 2025); *In re Farmland Indus., Inc.*, 284 B.R. 111, 119 (Bankr. W.D. Mo. 2002), *aff'd*, 289 B.R. 122 (B.A.P. 8th Cir. 2003); *see also In re Time Sales Fin. Corp.*, 445 F.2d 385, 387 (3d Cir. 1971). Vacatur is required.

## II. THE RELATIONSHIPS AMONG THE ADVISORS, ELLIOTT, AND THE 2020 BONDHOLDERS CREATE AN APPEARANCE OF BIAS REQUIRING DISQUALIFICATION AND VACATUR

### A. Gold Reserve's Disqualification Motion Was Timely

Appellees cannot dispute that "[t]he test for recusal under § 455(a) is whether a reasonable person, *with knowledge of all the facts*, would conclude that the judge's impartiality might reasonably be questioned." *In re Kensington Int'l Ltd.*, 353 F.3d 211, 220 (3d Cir. 2003) (emphasis added). The crucial facts underlying Gold Reserve's disqualification petition were not known until September 2025, in part because the Special Master failed to disclose them in response to earlier discovery requests that fairly called for (some of) them. The facts that were revealed through later discovery – including that Elliott's lawyer *at Weil* intervened with advisors *at Weil* on behalf of Elliott *in the sale process* invoking the need *to promote Weil's future business with Elliott* – may explain the

Advisors' otherwise inexplicable pivot to Elliott's materially lower bid and, in all events, require disqualification under Section 455(a). Gold Reserve Br.40-53.[4]

Amber (at 32-36) and Crystallex (at 68-73) try to defend the district court's ruling (JA10427) that Gold Reserve's disqualification motion came too late. But Gold Reserve could not reasonably have known the relevant facts earlier. Appellees paradoxically rely on the Special Master's March 2025 response to the Venezuela Parties' discovery request, which asked for "any professional engagements in which You or Your advisors performed work for any bidder participating in the sale process, whether or not that work related to the PDVH Sale Process." JA5842. The Special Master said he would "produce a list of names of any bidder the Special Master or his advisors have performed work for and the date of any such engagements," *id.*; that list showed that Weil had represented "Elliott Investment Management L.P." for less than a month in 2024 but had no current engagement. JA12683. When Elliott's assistant general counsel was asked at his September 2024 deposition, "has Weil ever represented Elliott," however, he responded that his "understanding is that Weil has served as outside counsel for Elliott on certain matters" including current matters in the U.K. JA12672-73. Mr.

[4] The district court failed adequately to distinguish Gold Reserve's circumstances from those of the Venezuela Parties. *See*, *e.g.*, JA10429. Though the Venezuela Parties earlier sought disqualification, Gold Reserve did not.

Turkel also disclosed knowledge of multiple ad hoc creditor groups including Elliott that Evercore had advised, including one where Elliott was "one of the largest holders in the capital structure and in the group specifically," and Evercore stood to make "something in the neighborhood of 5 to $7 million" from the representation. JA12679, JA12681. Gold Reserve alerted the district court *the next day* (JA10417), which ordered additional discovery – revealing that Weil was representing Elliott in multiple ongoing matters, that the frequency of these new matters had increased as the sale process entered its critical phases, and that Weil had collected more than $4.6 million in fees from Elliott and its affiliates from 2023 to 2025 and more than $62 million in fees from the 2020 Bondholders since the Special Master initially retained Weil in May 2021. Gold Reserve Br.22-23. Further email discovery revealed, among other things, that the head of Weil's Restructuring Department had intervened for Elliott with the Weil team advising the Special Master, leading to the meeting with Elliott at which they recommended that Elliott pursue an approach that led to Elliott's subsequent bid. *Id.* at 18-19. The Special Master's March 2025 discovery responses were thus misleading at best.

Appellees argue (Amber Br.34; Crystallex Br.70) that Gold Reserve should have moved for disqualification in March 2025 since (they claim) Gold Reserve's motion presumes that any representation of Elliott would create an appearance of

impropriety. *See also* JA10425 ("new evidence was . . . cumulative"). But the Special Master's discovery response stated that Weil was *not* representing Elliott and had not done so since August 2024, when its single four-week engagement ended. Furthermore, as Amber recognizes (at 35), Gold Reserve's motion was based not just on the *existence* but the *extent and nature* of Weil's representation of Elliott, facts the Special Master chose not to disclose until forced to do so.[5] A reasonable observer might consider a single, concluded representation (involving less than $100,000 in fees) quite different from the ongoing relationships eventually disclosed.

As for Crystallex's suggestion (at 71) that Gold Reserve's motion was "strategic," if the Special Master had refused to engage with Elliott on its lower-priced bid – as the court's orders and SPA required – the Section 455(a) issue might not have arisen (as there would have been no reason to investigate an action never taken). But the Special Master *did* violate the court's orders and breach the SPA to favor Elliott; that led to additional inquiry which revealed important facts. There is nothing improper about Gold Reserve's timely enforcement of its right to an unbiased decisionmaker.

---

[5] Amber claims (at 35) that a standard that depends on the extent of the appearance-of-bias-creating representations would not be "workable," but that argument contravenes the governing standard, which considers "all the facts." *In re Kensington Int'l Ltd.*, 368 F.3d 289, 301 (3d Cir. 2004).

### B. Gold Reserve Did Not Waive Its Objection

Appellees' defense of the district court's waiver ruling likewise fails: Gold Reserve never waived the right to seek disqualification if the Advisors' relationships with a bidder gave rise to an appearance of bias. "Waiver is the intentional relinquishment or abandonment of a known right," *LeBoon v. Lancaster Jewish Cmty. Ctr. Ass'n*, 503 F.3d 217, 225 (3d Cir. 2007) (cleaned up), and "nothing short of actual knowledge of the facts giving rise to the recusal motions" will support a waiver, *Kensington*, 368 F.3d at 314. Even if Gold Reserve knew that the Advisors *might* represent, "in unrelated matters, participants in the Sale Process," JA10429, the knowledge of that possibility cannot bar a challenge based on new facts showing an appearance of bias. *See United States v. Parse*, 789 F.3d 83, 118 (2d Cir. 2015) ("A ruling that a litigant has 'waive[d]' a right because he failed 'to acquire sufficient information to make an informed decision,' is based on an erroneous view of the law.") (citation omitted).

Appellees misplace reliance on the Special Master's retention agreements with Evercore and Weil, but the retention agreement with Weil was not disclosed. Even assuming that such a disclaimer of conflicts would have been standard in a retention agreement with lawyers acting as officers of the court,[6] all that

[6] *Cf.* JA10428 n.10 (relying on retention agreement with private party; no evidence about comparable agreements).

Evercore's retention agreement stated was that "Evercore or one or more of its affiliates may in the past have had, and may currently or in the future have, investment banking, investment management, financial advisory, or other relationships with Sale Process Parties and their affiliates [and] potential parties to any transaction and their affiliates." The Special Master's agreement to that provision does nothing to alter *the Special Master's* obligation to disclose "any possible ground for disqualification known" to him – an obligation that extends to the Advisors (and which was not and could not be disclaimed in any retention agreement). *Kensington*, 368 F.3d at 314 (quoting *United States v. Schreiber*, 599 F.2d 534, 537 (3d Cir. 1979)); *see* Fed. R. Civ. P. 53(a)(2) (requiring special masters to "disclose[] any potential grounds for disqualification"). Likewise, the March 2025 disclosure of one prior representation of Elliott did not create any speak-now-or-forever-hold-your-peace obligation for Gold Reserve to seek disqualification based on undisclosed facts.

No precedent supports Appellees' argument that either the retention agreement or the limited disclosures in March 2025 served as notice to all participants that they would be waiving the right to object to an appearance of bias based on unknown facts. On the contrary, Appellees' cases illustrate how far this was from a knowing waiver. In *United States v. Nobel*, 696 F.2d 231, 236 (3d Cir. 1982), "the district judge . . . made a *full disclosure on the record of the relevant*

*facts* which now serve as the grounds" for the defendant's disqualification motion. (Emphasis added.) *See also id.* ("The judge advised . . . that he had a financial interest and that the interest was substantial."). In *Omega Engineering, Inc. v. Omega, S.A.*, 432 F.3d 437, 448 (2d Cir. 2005), the party seeking recusal "had *all information* necessary to move for recusal" seven months before doing so – unlike here, there was no new information. (Emphasis added.) In *National Auto Brokers Corp. v. General Motors Corp.*, 572 F.2d 953, 958-59 (2d Cir. 1978), all the facts underlying "plaintiffs' frivolous motion for . . . disqualification" (the judge's prior partnership in the law firm representing the defendant) were known months before the request for disqualification. And in *In re IBM Corp.*, 45 F.3d 641, 643 (2d Cir. 1995), the court *granted* the mandamus petition and required recusal under Section 455(a), even though the events giving rise to the motion occurred 12 years earlier, because it would have been "both premature and unnecessary" when no matters were pending before the district judge. The same reasoning applies here: until Gold Reserve knew the facts, its motion would have been premature.

As Crystallex's own case stresses: "the test to be applied [under Section 455(a)] is an objective one which assumes that a reasonable person *knows and understands all the relevant facts*." *Id.* Because the facts supporting Gold Reserve's motion were undisclosed before September 2025, Appellees cannot evade review.

### C. The Advisors' Extensive Relationships with Parties Benefiting from the Advisors' Recommendations, Accentuated by Weil's Intervention for Elliott, Create an "Appearance of Bias" Under Section 455(a)

Appellees, who are not under-lawyered, have no doubt boiled the oceans searching for any case in which facts like those before the Court have been held insufficient to support disqualification under Section 455(a). They have come up empty. *See* Amber Br.39-41 (attempting to distinguish *Kensington* but citing zero cases supporting the ruling below); Crystallex Br.74-82 (same).[7] Were this Court to affirm the district court's decision denying Gold Reserve's motion it would permit an appearance of bias beyond anything any court of appeals has allowed – ever.

Appellees' efforts to distinguish *Kensington* are unavailing: to start, that case held that recusal *was* required under Section 455(a) and therefore cannot establish that the facts at issue here are insufficient to warrant disqualification. In any event, Appellees' efforts to distinguish *Kensington* provide no basis for

---

[7] *Westinghouse Electric Corp. v. Kerr-McGee Corp.*, 580 F.2d 1311, 1322 (7th Cir. 1978), *cited in* Crystallex Br.76, involved a motion to disqualify counsel and had nothing to do with Section 455(a). *Auto Brokers*, 572 F.2d at 958, as noted above, involved a disqualification motion because the judge was a former partner in one of the firms, a motion that was both waived and "frivolous." And *Pashaian v. Eccelston Properties, Ltd.*, 88 F.3d 77, 83 (2d Cir. 1996), *cited in* Crystallex Br.79, was decided under a different provision, Section 455(b)(5)(iii), and involved a claim of prohibited financial interest based on the fact that a partner of one of the lawyers representing the party moving for recusal was married to a sister of the judge's wife – not *appearance* of bias.

affirmance. It is true that, in *Kensington*, the court was deciding legal issues that also would arise in unrelated bankruptcy proceedings where the advisors represented clients; here, there is no reason to expect that the court's *legal* determinations will apply to the Advisors' clients elsewhere. But *Kensington* recognizes that, where "an objective observer reasonably might question the impartiality" of a judge's *advisors*, *Massachusetts Sch. of Law at Andover, Inc. v. American Bar Ass'n*, 107 F.3d 1026, 1042 (3d Cir. 1997), that is itself a reason for disqualification under Section 455(a). That is true even if (as here) there is no claim of "wrongdoing or bias" on the part of the district judge. *Kensington*, 368 F.3d at 306. Recusal was required because, "[b]y their very position as representatives of the future asbestos claimants" in the unrelated bankruptcy, the advisors "signaled to all that they could not be non-partisan, benign, or neutral." *Id.* at 304. The same is true here: the Advisors' pervasive client relationships with Elliott and the 2020 Bondholders destroy any appearance of neutrality. And the fact that a Weil senior partner intervened on his client Elliott's behalf *in the sale process* and explicitly invoked the need to preserve Elliott as a client cements the appearance of bias. A reasonable observer would not need to draw inferences to

conclude that Weil had an "incentive . . . to advance" Elliott's position in the sale process (Crystallex Br.77); Weil did so.[8]

Like the district court, Crystallex (at 78) downplays the magnitude of the conflicts – all told, $170 million in fees from Elliott and the Bondholders paid to the Advisors over the past four years, *see* Gold Reserve Br.23 – by comparing those engagements to Weil's and Evercore's "multibillion-dollar annual revenue." But "the appearance of impropriety must be viewed from the perspective of the objective, reasonable layperson." *Kensington*, 368 F.3d at 303. Millions of dollars in fees is not walking-around money, including for Weil. "[T]he purpose of § 455 . . . is 'to promote public confidence in the integrity of the judicial process.'" *Id.* (quoting *Liljeberg v. Health Servs. Acquisition Corp.*, 486 U.S. 847, 860 (1988)). Disregarding the appearance problem here on the ground that Weil cannot rouse itself to worry about the loss of millions in fees – which is contrary to the evidence that Mr. Saferstein *was* worried about the loss of Elliott's business – ill-serves that purpose.

---

[8] The appearance of bias is particularly acute given that Elliott is one of the world's largest distressed investment hedge funds, and Weil's premier practice group is restructuring. A reasonable observer would thus have reason to be concerned that Weil would seek to leverage its one-off engagement for the Special Master to further develop its relationship with Elliott.

Crystallex echoes (at 80) the district court's comment that Elliott's outreach to Weil for assistance was "innocuous." But that episode – which may well have affected the outcome, *see* Gold Reserve Br.44-45 – illustrates that Elliott's relationship with Weil affected Weil's *incentives* in conducting the sale process. Because Elliott was Weil's valued client, Elliott's in-house counsel could call on Weil's Head of Restructuring, who brought influence to bear on more junior Weil lawyers advising the Special Master. And that senior lawyer made explicit that he would "hate for [Elliott] to not want to work with us," referring to Weil's ongoing engagements for Elliott *outside* the sale process. JA9998. Why would the Weil Advisors ignore that client relationship down the road?

Furthermore, the fact that the Special Master violated the overbid minimum and discarded $2 billion in creditor value – notwithstanding the district court's contrary guidance – reinforces the appearance of bias. *See* Gold Reserve Br.17; JA6611, JA6614. The point is not that "disagreement with [the Special Master's] decisions" is a sufficient "showing required [for] recusal." Amber Br.41 (quoting *Jones v. Pittsburgh Nat'l Corp.*, 899 F.2d 1350, 1356 (3d Cir. 1990)). Rather, it is that a reasonable observer, alert to the possibility that the Special Master favored Elliott, would have those suspicions reinforced rather than allayed by the Special Master's actions.

### D. The Advisors' Bias Is Not Harmless and Requires Vacatur

Contrary to Appellees' arguments (Amber Br.43-45; Crystallex Br.85-87), the assertion that Mr. Pincus and Judge Stark were personally free of bias does not cure the appearance problem. Harmless-error doctrine has limited scope in this context "because § 455(a) concerns not only fairness to individual litigants, but, equally important, it concerns 'the public's confidence in the judiciary, which may be irreparably harmed if a case is allowed to proceed before a judge who appears to be tainted.'" *Alexander v. Primerica Holdings, Inc.*, 10 F.3d 155, 162 (3d Cir. 1993) (quoting *In re School Asbestos Litig.*, 977 F.2d 764, 776 (3d Cir. 1992)).

The Advisors ran the sale process, as the district court has acknowledged. In Judge Stark's words, he had been "dealing with other things," had "no insight into what [the Special Master is] doing day-to-day, and what the status of the bids are," and "should just remain, curious, but not have you fill me in on anything." JA6573-74; *see also* JA10440 ("The Court, lacking the necessary expertise and experience, and also lacking the time . . . needed to appoint a qualified Special Master"). Mr. Pincus was little more involved: over the 14 months at issue, he himself claimed just over $700,000 in fees and expenses, compared to tens of millions for Weil alone. *See also* JA10441 ("[T]he Special Master required expert legal and investment banking assistance . . . . Weil alone has been paid . . . approximately $39.4 million for its work."). This Court need not find that the

district court abdicated ultimate decision-making responsibility to the Advisors – presumably Judge Wolin in *Kensington* did not do so either. Rather, the Advisors were involved precisely because neither the district court nor the Special Master could run the sale process independently; their decisions were based on the recommendations of the Advisors – including the crucial decision to supplant Gold Reserve's bid with that of their client Elliott and the request to cancel Gold Reserve's SPA. There is no credible argument that either Mr. Pincus or the district court were making decisions without relying on the Advisors' recommendations; they never claimed to be doing so.

Appellees' cases do not support affirmance. In *Liljeberg*, the Supreme Court announced the possibility of harmless-error review under Section 455(a), but then declined to apply it, reasoning that "there is a greater risk of unfairness in upholding the judgment in favor of *Liljeberg* than there is in allowing a new judge to take a fresh look at the issues." 486 U.S. at 868. In *Selkridge v. United of Omaha Life Insurance Co.*, this Court declined to vacate a pair of orders under Section 455(a) because "any trial judge presented with this record would be required *as a matter of law* to enter summary judgment in [the second order] and to decline to vacate the judgment in [the first]." 360 F.3d 155, 171 (3d Cir. 2004) (emphasis added). Even if the district court's decision was legally permissible, no one has argued that it was legally compelled rather than the product of

discretionary weighing of the relative advantages of competing bids – the type of situation where subtle bias matters most.

The "risk of injustice to the parties in the particular case," *Liljeberg*, 486 U.S. at 864, is evident; so too is the "risk that the denial of relief will produce injustice in other cases," *id.* No one should accept that in proceedings like this one, a biased decision-maker is par for the course. *Cf.* JA10441.

## CONCLUSION

The Court should vacate the district court's sale order, order the proceeding reassigned on remand, and order the district court to give Gold Reserve the opportunity to follow through on its final recommended bid.

Respectfully submitted,

/s/ *Aaron M. Panner*

AARON M. PANNER
DANIEL S. SEVERSON
COLLIN R. WHITE
DENNIS D. HOWE
KELLOGG, HANSEN, TODD, FIGEL & FREDERICK, P.L.L.C.
1615 M Street, N.W., Suite 400
Washington, D.C. 20036
(202) 326-7921
apanner@kellogghansen.com
dseverson@kellogghansen.com
cwhite@kellogghansen.com
dhowe@kellogghansen.com

MATTHEW H. KIRTLAND
NORTON ROSE FULBRIGHT US LLP
799 Ninth Street, N.W., Suite 1000
Washington, D.C. 20001
(202) 662-0200
matthew.kirtland@nortonrosefulbright.com

KEVIN J. MANGAN
MATTHEW P. WARD
STEPHANIE SMIERTKA RILEY
WOMBLE BOND DICKINSON (US)
1313 North Market Street
Suite 1200
Wilmington, Delaware 19801
(302) 252-4320
kevin.mangan@wbd-us.com
matthew.ward@wbd-us.com
stephanie.riley@wbd-us.com

MICHAEL BOWE
TYLER PURINTON
BRITHEM LLP
565 Fifth Avenue
New York, New York 10017
(646) 653-9173
mbowe@brithem.com
tpurinton@brithem.com

March 2, 2026

*Counsel for Appellant Gold Reserve Ltd.*

## CERTIFICATE OF COMPLIANCE

1. This document complies with the type-volume limit of Federal Rule of Appellate Procedure 32(a)(7)(B)(ii) because, excluding the parts of the document exempted by Federal Rule of Appellate Procedure 32(f), this document contains 6,493 words, as certified by the word-count function of the word-processing system (Microsoft Office Word 365) used to prepare the document.

2. This document complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5), the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6), and 3d Circuit L.A.R. 32.1(c), because this document has been prepared in a proportionally spaced typeface using Microsoft Office Word 365 in 14-point Times New Roman font.

3. In addition, pursuant to 3d Circuit L.A.R. 31.1(c), the undersigned hereby certifies that the text of the electronic brief filed with the Court is identical to the paper copies, that a virus detection program (CrowdStrike) has been run on the electronic file, and that no virus was detected.

Dated: March 2, 2026

/s/ *Aaron M. Panner*
Aaron M. Panner
*Counsel for Appellant*
*Gold Reserve Ltd.*

## CERTIFICATE OF FILING AND SERVICE

I certify that, on March 2, 2026, the foregoing Reply Brief of Appellant Gold Reserve Ltd. was filed electronically with the Clerk of Court and served on counsel of record through CM/ECF.

/s/ *Aaron M. Panner*
Aaron M. Panner
*Counsel for Appellant*
*Gold Reserve Ltd.*

## CERTIFICATE OF BAR MEMBERSHIP

Pursuant to 3d Circuit L.A.R. 28.3(d) and 46.1, I, Aaron M. Panner, hereby certify that I am a member in good standing of the bar of the United States Court of Appeals for the Third Circuit.

Dated: March 2, 2026

/s/ *Aaron M. Panner*
Aaron M. Panner
*Counsel for Appellant*
*Gold Reserve Ltd.*