Nos. 25-3347, 25-3348, 25-3349, 25-3350, 25-3363, 25-3453 to 25-3494, 25-3563, 25-3564

**IN THE UNITED STATES COURT OF APPEALS FOR THE THIRD CIRCUIT**

CRYSTALLEX INTERNATIONAL CORPORATION, ET AL.,

*Plaintiffs-Appellees,*

v.

BOLIVARIAN REPUBLIC OF VENEZUELA, ET AL.,

*Defendants-Appellants*.

(caption continued on following pages)

On Appeals from the United States District Court for the District of Delaware Nos. 17-mc-151, 19-mc-79, 19-mc-290, 19-mc-342, 20-mc-257, 21-mc-18, 21-mc-46, 21-mc-481, 22-mc-68, 22-mc-69, 22-mc-131, 22-mc-156, 22-mc-263, 22-mc-264, 22-mc-347, 22-mc-453, 22-mc-464, 23-mc-298, 23-mc-340, 23-mc-378, 23-mc-379, 23-mc-397
(Hon. Leonard P. Stark, United States Circuit Judge)

# VENEZUELA PARTIES' REPLY BRIEF

George M. Garvey
MUNGER, TOLLES & OLSON LLP
350 South Grand Avenue
50th Floor
Los Angeles, CA 90071
(213) 683-9100

Donald B. Verrilli, Jr.
Elaine J. Goldenberg
Ginger D. Anders
Xiaonan April Hu
Kyle A. Schneider
Nicole R. Allicock
Andrew J. Slottje
MUNGER, TOLLES & OLSON LLP
601 Massachusetts Avenue NW
Suite 500E
Washington, DC 20001
(202) 220-1100
Donald.Verrilli@mto.com

*Counsel for Bolivarian Republic of Venezuela*

TIDEWATER INVESTMENT SRL, ET AL.,
*Plaintiffs-Appellees,*
v.
BOLIVARIAN REPUBLIC OF VENEZUELA, ET AL.,
*Defendants-Appellants*.

OI EUROPEAN GROUP B.V.,
*Plaintiff-Appellee,*
v.
BOLIVARIAN REPUBLIC OF VENEZUELA, ET AL.,
*Defendants-Appellants*.

PHILLIPS PETROLEUM COMPANY VENEZUELA LTD, ET AL.,
*Plaintiffs-Appellees,*
v.
PETROLEOS DE VENEZUELA S.A., ET AL.,
*Defendants-Appellants*.

NORTHROP GRUMMAN SHIP SYSTEMS INC.,
*Plaintiff-Appellee,*
v.
MINISTRY OF DEFENSE OF THE REPUBLIC OF VENEZUELA, ET AL.,
*Defendants-Appellants*.

CONTRARIAN CAPITAL MANAGEMENT LLC, ET AL.,
*Plaintiffs-Appellees,*
v.
BOLIVARIAN REPUBLIC OF VENEZUELA, ET AL.,
*Defendants-Appellants*.

ACL1 INVESTMENTS LTD, ET AL.,
*Plaintiffs-Appellees,*
v.
BOLIVARIAN REPUBLIC OF VENEZUELA, ET AL.,
*Defendants-Appellants*.

RUSORO MINING LTD,
*Plaintiff-Appellee,*
v.
BOLIVARIAN REPUBLIC OF VENEZUELA, ET AL.,
*Defendants-Appellants*.

---

RED TREE INVESTMENTS LLC,
*Plaintiff-Appellee,*
v.
PETROLEOS DE VENEZUELA S.A., ET AL.,
*Defendants-Appellants*.

---

KOCH MINERALS SARL, ET AL.,
*Plaintiffs-Appellees,*
v.
BOLIVARIAN REPUBLIC OF VENEZUELA, ET AL.,
*Defendants-Appellants*.

---

CONOCOPHILLIPS GULF OF PARIA B.V.,
*Plaintiff-Appellee,*
v.
CORPORACION VENEZOLANA DEL PETROLEO, ET AL.,
*Defendants-Appellants*.

---

XYQ US, LLC,
*Plaintiff-Appellee,*
v.
PETROLEOS DE VENEZUELA S.A., ET AL.,
*Defendants-Appellants*.

---

GOLD RESERVE INC.,
*Plaintiff-Appellee,*
v.
BOLIVARIAN REPUBLIC OF VENEZUELA, ET AL.,
*Defendants-Appellants*.

---

CONOCOPHILLIPS PETROZUATA B.V., ET AL.,
*Plaintiffs-Appellees,*
v.
BOLIVARIAN REPUBLIC OF VENEZUELA, ET AL.,
*Defendants-Appellants*.

---

VALORES MUNDIALES S.L., ET AL.,
*Plaintiffs-Appellees,*
v.
BOLIVARIAN REPUBLIC OF VENEZUELA, ET AL.,
*Defendants-Appellants*.

---

RUDI LOVATI, ET AL.,
*Plaintiffs-Appellees,*
v.
BOLIVARIAN REPUBLIC OF VENEZUELA, ET AL.,
*Defendants-Appellants*.

---

GRAMERCY DISTRESSED OPPORTUNITY FUND LLC,
*Plaintiff-Appellee,*
v.
BOLIVARIAN REPUBLIC OF VENEZUELA, ET AL.,
*Defendants-Appellants*.

---

SAINT-GOBAIN PERFORMANCE PLASTICS EUROPE,
*Plaintiff-Appellee,*
v.
BOLIVARIAN REPUBLIC OF VENEZUELA, ET AL.,
*Defendants-Appellants*.

---

# TABLE OF CONTENTS

**Page**


INTRODUCTION .......... 1

ARGUMENT .......... 3

I. UNDER RULE 69, DELAWARE LAW DETERMINES THE VALIDITY OF THE REPUBLIC'S CREDITORS' WRITS OF ATTACHMENT. .......... 3

- A. Rule 69 Requires The Creditors To Satisfy Delaware's Alter-Ego Prerequisite To Execution Against Third-Party Property. .......... 4
- B. *Bancec* Does Not Displace Rule 69 Or Delaware Law. .......... 9
- C. The VPs' Rule 69 Argument Is Not Precluded. .......... 16

II. THE SALE CANNOT STAND IN LIGHT OF DISQUALIFYING CONFLICTS OF INTEREST. .......... 21

- A. There Was A Disqualifying Appearance Of Partiality Under Section 455(a). .......... 21
- B. There Was An Unwaivable Disqualifying Interest Under Section 455(b)(4). .......... 24
- C. There Was No Waiver Or Untimeliness. .......... 28
- D. The Sale Order Must Be Vacated. .......... 32

III. DEFECTS IN THE SALE PROCESS REQUIRE VACATUR .......... 36

- A. The Sale Price Is Grossly Inadequate. .......... 36
- B. The Grossly Inadequate Sale Price Is The Inevitable Consequence Of Errors In The Sale Process. .......... 38

CONCLUSION .......... 39

CERTIFICATE OF BAR MEMBERSHIP .......... 41

CERTIFICATE OF COMPLIANCE .......... 42

CERTIFICATE OF SERVICE .......... 43

CERTIFICATE OF ELECTRONIC FILING .......... 44

# TABLE OF AUTHORITIES

**Page(s)**

**FEDERAL CASES**

*Agudas Chasidei Chabad v. Russian Fed'n*,
110 F.4th 242 (D.C. Cir. 2024)....................19

*Alexander v. Primerica Holdings*,
10 F.3d 155 (3d Cir. 1993)....................22, 23

*Am. Elec. Power Co. v. Connecticut*,
564 U.S. 410 (2011)....................5, 10

*Arnold v. Blast Intermediate Unit 17*,
843 F.2d 122 (3d Cir. 1988)....................11

*B&B Hardware v. Hargis Indus.*,
575 U.S. 138 (2015)....................16, 19

*In re Cap. One*,
2024 WL 3463952 (E.D. Va. July 18, 2024)....................26

*Cassirer v. Thyssen-Bornemisza Collection Found.*,
596 U.S. 107 (2022)....................10, 14

*Christiansen v. Mech. Contractors Bid Depository*,
404 F.2d 324 (10th Cir. 1968)....................7

*Cinema 5 v. Cinerama*,
528 F.2d 1384 (2d Cir. 1976)....................22

*Citibank, N.A. v. Aralpa Holdings*,
714 F. Supp. 3d 416 (S.D.N.Y. 2024)....................7

*FG Hemisphere Assocs. v. Republique du Congo*,
455 F.3d 575 (5th Cir. 2006)....................11, 14, 15

*First Nat'l City Bank v. Banco Para El Comercio Exterio de Cuba*,
462 U.S. 611 (1983)....................1, 9, 12, 13

*Goldman v. Citigroup Glob. Markets*,
834 F.3d 242 (3d Cir. 2016)....................18

## TABLE OF AUTHORITIES
**(Continued)**

**Page(s)**

*Hook v. McDade*,
89 F.3d 350 (7th Cir. 1996) ....................................27

*Huron Holding v. Lincoln Mine Operating*,
312 U.S. 183 (1941)....................................7

*IBM v. Levin*,
579 F.2d 271 (3d Cir. 1978) ....................................22

*IFC Interconsult v. Safeguard International Partners, LLC*,
438 F.3d 298 (3d Cir. 2006) ....................................8

*Karaha Bodas Co. v. Perusahaan Pertambangan Minyak Dan Gas Bumi Negara*,
313 F.3d 70 (2d Cir. 2002) ....................................8

*Katzir's Floor & Home Design v. M-MLS.com*,
394 F.3d 1143 (9th Cir. 2004) ....................................7

*In re Kempthorne*,
449 F.3d 1265 (D.C. Cir. 2006)....................................33

*In re Kensington Int'l*,
368 F.3d 289 (3d Cir. 2004) ....................................passim

*Liljeberg v. Health Services Acquisition*,
486 U.S. 847 (1988)....................................32, 34, 35

*Mackey v. Lanier Collection Agency & Service*,
486 U.S. 825 (1988)....................................4, 5, 6, 7

*Mobil Oil Corp. v. Higginbotham*,
436 U.S. 618 (1978)....................................10

*Nichols v. Alley*,
71 F.3d 347 (10th Cir. 1995) ....................................21

**TABLE OF AUTHORITIES**
**(Continued)**

**Page(s)**

*OIEG v. Bolivarian Republic of Venezuela*,
73 F.4th 157 (3d Cir. 2023) ....................18, 19

*Perfect 10, Inc. v. Giganews*,
847 F.3d 657 (9th Cir. 2017) ....................8

*In re Placid Oil*,
802 F.2d 783 (5th Cir. 1986) ....................26

*Potashnick v. Port City Const.*,
609 F.2d 1101 (5th Cir. 1980) ....................31

*Process & Indus. Devs. Ltd. v. Fed. Republic of Nigeria*,
962 F.3d 576 (D.C. Cir. 2020)....................19

*Republic of Argentina v. NML Cap., Ltd.*,
573 U.S. 134 (2014)....................11, 13, 14

*Rubin v. Islamic Republic of Iran*,
583 U.S. 202 (2018)....................13

*Selkridge v. United of Omaha Life Insurance*,
360 F.3d 155 (3d Cir. 2004) ....................34, 35

*Sys. Div. v. Teknek Elecs.*,
253 F. App'x 31 (Fed. Cir. 2007) ....................8

*Trust v. Kummerfeld*,
153 F. App'x 761 (2d Cir. 2005) ....................8

*United States v. Chem. Found.*,
5 F.2d 191 (3d Cir. 1925) ....................38

*United States v. Stevens*,
559 U.S. 460 (2010)....................25

*United States v. Will*,
449 U.S. 200 (1980)....................23

# TABLE OF AUTHORITIES
**(Continued)**

**Page(s)**

*Wolverine World Wide v. Am. Ins.*,
2019 WL 11680205 (W.D. Mich. May 9, 2019) ....26

**STATE CASES**

*Buechner v. Farbenfabriken Bayer Aktiengesellschaft*,
154 A.2d 684 (Del. 1959) ....5

*Burge v. Fid. Bond & Mortg. Co.*,
648 A.2d 414 (Del. 1994) ....36, 37

*Carauna v. Saligman*,
1990 WL 212304 (Del. Ch. Dec. 21, 1990) ....38

*Kingsland Holdings, v. Bracco*,
1996 WL 104257 (Del. Ch. Mar. 5, 1996) ....5, 6

*M.P.M. Enters. v. Gilbert*,
731 A.2d 790 (Del. 1999) ....36

*Martin v. D.B. Martin Co.*,
88 A. 612 (Del. Ch. 1913) ....5

*Offredi v. Huhla*,
60 A.2d 779 (Conn. 1948) ....37

*Shields v. Bobby Murray Chevrolet*,
261 S.E.2d 238 (N.C. Ct. App. 1980) ....37

**FEDERAL STATUTES**

28 U.S.C. § 455 ....22, 31

28 U.S.C. § 455(a) ....21, 22, 28, 34

28 U.S.C. § 455(b) ....21, 25, 27, 28

28 U.S.C. § 455(b)(2) ....22

# TABLE OF AUTHORITIES
## (Continued)

**Page(s)**

28 U.S.C. § 455(b)(3)....................24

28 U.S.C. § 455(b)(4)....................24, 25, 26, 27

28 U.S.C. § 455(d)(4)....................24, 25, 26

28 U.S.C. § 455(e) ....................23, 28, 29, 30, 31

**STATE STATUTES**

8 Del. C. § 324 ....................37, 38

8 Del. C. § 324(a)....................38

**FEDERAL RULES**

Fed.R.Civ.P.53 ....................23

Fed.R.Civ.P.53(b)(3)....................28

Fed.R.Civ.P.69 ....................passim

Fed.R.Civ.P.69(a)....................3, 4, 7

**LEGISLATIVE MATERIALS**

H.R. Rep. No. 94-1487 (1976)....................6, 11

**OTHER AUTHORITIES**

Adviser, Black's Law Dictionary (12th ed. 2024)....................25

## INTRODUCTION

Appellees cannot refute the Venezuela Parties' (VPs') showing that the forced sale of CITGO was marred by fundamental legal errors and disqualifying conflicts of interest. Instead, Appellees urge this Court to overlook all that in order to ensure that creditors' judgments are satisfied without further delay. But the rule of law and basic fairness require that this Court assure itself that this forced sale complies with the law—and that it is free of impropriety—before approving the momentous step of selling off a thriving multibillion-dollar company that is the preeminent U.S. asset of a foreign sovereign, and undermining Venezuela's pro-democracy forces in the process. Appellees offer no sound basis for doing so.

First, Appellees do not dispute that if, as the VPs argue, Rule 69 required the creditors to satisfy Delaware law in obtaining their writs of attachment, the writs held by the Republic's creditors are invalid for failure to demonstrate fraud. Rule 69 unquestionably required application of Delaware alter-ego principles: as Crystallex conceded and Delaware law provides, those principles serve as a judgment-enforcement mechanism enabling courts to deem third-party property attachable. They are therefore part and parcel of Delaware's "procedure on execution" under Rule 69. Appellees try to surmount that hurdle by contending that the Supreme Court's *Bancec* decision overrides Rule 69 and preempts Delaware law. *First Nat'l City Bank v. Banco Para El Comercio Exterio de Cuba*, 462 U.S. 611

(1983). But they cannot identify any legal principle permitting *Bancec*'s federal-common-law rule to supersede a preexisting federal enactment—Rule 69. Appellees are thus left to contend that amorphous foreign-relations concerns displace Rule 69's unambiguous command, but the Supreme Court has rejected similar arguments. With the invalid writs—representing 90% of the judgment amount—excluded, PDVSA may well have been able to satisfy the judgments directly without selling any shares, let alone 100%.

Second, Appellees cannot paper over the severe conflicts of interest that afflicted the Special Master and his advisors—all of whom were *officers of the court* obligated to uphold the same standards of neutrality and integrity that govern judges. Most astonishingly, Weil—the Special Master's lead transaction counsel—prioritized its *own* interests in generating additional business from Elliott over the integrity of the judicial sale process. Weil's restructuring co-chair even personally interceded on Elliott's behalf, instructing the Special Master's Weil team to address Elliott's concerns about the "conditions and timing" of the sale process, because he would "hate for" Elliott "to not want to work with us." JA12760 (Email). Such blatant self-dealing is simply unacceptable for judicial officers, and no amount of post hoc rationalization can establish otherwise. Doubtless for this reason, Appellees raise one meritless procedural argument after another in the hope of avoiding the need to ask this Court to bless the advisors' nakedly conflicted conduct.

But the bottom line is that the VPs had no way of anticipating the advisors' conflicts (which the Special Master and his advisors had an obligation as judicial officers to avoid and disclose in any event), and the VPs raised the issue at the earliest opportunity. And because the sale process was at every step designed, implemented, and brokered by the Special Master and his advisors, the district court's later approval of the Special Master's recommendation cannot cleanse the taint of the advisors' conflicts.

Finally, the Special Master's conflicted process resulted in a sale price that is billions of dollars below any fair valuation, and that reflects several prejudicial errors. This Court should vacate the final sale order and remand to permit a lawful and impartial resolution.

## ARGUMENT

### I. UNDER RULE 69, DELAWARE LAW DETERMINES THE VALIDITY OF THE REPUBLIC'S CREDITORS' WRITS OF ATTACHMENT.

Appellees implicitly concede that if Rule 69 requires application of Delaware alter-ego principles, the writs held by Republic creditors are invalid for failure to show fraud. Rule 69 does require that Delaware alter-ego principles control, as they are unquestionably part of Delaware's "procedure on execution." Fed.R.Civ.P.69(a). Appellees' contrary contentions are refuted by both Supreme Court precedent and Delaware law. And their argument that *Bancec* supersedes Rule

69's normal operation boils down to special pleading for an ad hoc foreign-relations exception to Rule 69—but the Supreme Court has already rejected analogous unprincipled pleas. This Court should do the same.

### A. Rule 69 Requires The Creditors To Satisfy Delaware's Alter-Ego Prerequisite To Execution Against Third-Party Property.

Appellees concede that Rule 69(a) requires them to identify the Delaware "procedure on execution" authorizing attachment of PDVSA's assets to satisfy the Republic's judgment debts. Crystallex.Br.41. Appellees further concede that under Rule 69 the line between "procedure" and substance is that described in *Mackey v. Lanier Collection Agency & Service* and in the VPs' opening brief: Rule 69 encompasses "state procedural device[s] for collecting judgments," as opposed to substantive law that "create[s] the rule of decision in any case affixing liability." 486 U.S. 825, 834 & n.10 (1988); Crystallex.Br.46. Those concessions dispose of Appellees' contention that the alter-ego inquiry is not procedural under Rule 69 (and the Rules Enabling Act): under *Mackey*, Delaware's alter-ego principles are unquestionably a component of the state's "procedure on execution."

1. As Crystallex successfully argued to the district court in establishing jurisdiction over PDVSA, whether the alter-ego inquiry is procedural turns on the purpose for which it is used, and the creditors here invoke alter-ego principles for an unquestionably procedural purpose. JA1750-1755. Crystallex itself stated the point clearly. Disavowing any attempt to use alter-ego principles to "impose personal

liability on PDVSA"—which would be substantive under *Mackey*—they invoke alter-ego principles only "to attach assets" as to which they allege the Republic has an attachable equitable interest. Crystallex.No.18-2797.Br.19. That use constitutes "procedure on execution," because the creditors are employing the alter-ego determination as a mechanism for collecting "judgments otherwise obtained." *Mackey*, 486 U.S. at 834 & n.10.

Moreover, Crystallex has already acknowledged that Rule 69 requires the court to use Delaware's procedure for attaching third-party property, and that the relevant procedure is described in *Kingsland Holdings, v. Bracco*, 1996 WL 104257 (Del. Ch. Mar. 5, 1996); JA1564; Crystallex.No.18-2797.Br.31 (*Kingsland* applies under Rule 69). *Kingsland* invokes alter-ego principles for procedural purposes. "Incident to its power to enforce [a] judgment through seizure and sale of property located in Delaware," a Delaware court has "discretion" to "disregard the existence of a subsidiary corporation and look directly to the specific assets of a subsidiary for the satisfaction of [his] claim against the parent." *Kingsland*, 1996 WL 104257, at *7. That procedure is unavailable "in the absence of fraud." *Buechner v. Farbenfabriken Bayer Aktiengesellschaft*, 154 A.2d 684, 687 (Del. 1959). Delaware's "procedure on execution" thus uses alter-ego principles to implement the court's enforcement jurisdiction: those principles determine when a court has "discretion" to "look directly" to the subsidiary's property and to deem that property

available to satisfy a judgment against the parent. *See Martin v. D.B. Martin Co.*, 88 A. 612, 614 (Del. Ch. 1913) ("The courts have *power* to ignore the corporate existence" upon a showing of "fraud") (emphasis added). As prerequisites that determine when Delaware courts may deem third-party property attachable to satisfy "judgments otherwise obtained," *Mackey*, 486 U.S. at 834 & n.10, alter-ego principles are clearly part of Delaware's "procedure on execution."

Appellees' contrary arguments are unpersuasive. First, Elliott asserts (Br.29) that any "matter affecting … foreign relations" is necessarily substantive under Rule 69. That ignores *Mackey*'s line—as well as the Supreme Court's refusal to depart from generally-applicable Rule 69 principles based on foreign-relations concerns. *See* pp. 13-14, *infra*. And it proves far too much: many concededly procedural rules will have foreign-relations implications when applied to foreign-sovereign judgment debtors. If Elliott's position were accepted, Rule 69 would play no meaningful role in sovereign judgment-enforcement proceedings, despite Congress's contrary intent. H.R.Rep.No.94-1487, at 28 (1976). Second, Crystallex's suggestion that alter-ego principles are used here to determine *ownership* is refuted by Delaware law. *Kingsland* recognizes that the assets to be executed against are "assets *of* a subsidiary," 1996 WL 104257, at *7 (citation omitted)—that is, owned by the third-party subsidiary—but nonetheless permits the court to "equitably" deem them attachable to satisfy the parent's judgment. No question of actual ownership is at

stake (and that use of alter-ego principles would not be substantive anyway, VP.Opening.Br.31). Third, although Elliott contends (Br.30-31) that the alter-ego inquiry is substantive because it determines "whether Crystallex is … paid," the same could be said of numerous concededly procedural judgment-enforcement rules—which is why *Mackey* defines substantive rules as those *affixing liability*.[1] VP.Opening.Br.28-29.

Unsurprisingly, Appellees cannot muster a *single* decision holding that alter-ego principles are categorically substantive and therefore fall outside Rule 69's direction to use forum-state "procedure on execution." Crystallex identifies one district-court decision that used choice-of-law principles (not Rule 69) to determine what alter-ego law to apply—but only because the court proceeded under *diversity* jurisdiction rather than Rule 69 ancillary-enforcement jurisdiction. *Citibank, N.A. v. Aralpa Holdings*, 714 F. Supp. 3d 416, 433 (S.D.N.Y. 2024) ("a federal court sitting in diversity borrows the forum State's choice-of-law rule").[2] In fact, every appellate Rule 69 decision of which the VPs are aware applied forum-state alter-ego

[1] Rule 69(a) "follows in substance" its predecessor statutes, Fed.R.Civ.P.69 (committee note), which courts uniformly understood to establish that "attachment is wholly the creature of, and controlled by, the law of the state," *Huron Holding v. Lincoln Mine Operating*, 312 U.S. 183, 193 (1941).

[2] Crystallex also cites a 1968 decision that cites both Rule 69 and *Erie R.R. v. Tompkins* without explanation. *Christiansen v. Mech. Contractors Bid Depository*, 404 F.2d 324, 325 & n.3 (10th Cir. 1968).

principles to determine whether the state's third-party execution procedures could be invoked—including where choice-of-law principles might have dictated a different result. *See, e.g.*, *Katzir's Floor & Home Design v. M-MLS.com*, 394 F.3d 1143, 1149 (9th Cir. 2004) (applying California alter-ego principles to Canadian corporations); *Perfect 10, Inc. v. Giganews*, 847 F.3d 657, 677 (9th Cir. 2017); *Sys. Div. v. Teknek Elecs.*, 253 F. App'x 31, 34-35 (Fed. Cir. 2007) (applying California alter-ego standard to Scottish corporations as part of California's "enforcement method[]"); *Trust v. Kummerfeld*, 153 F. App'x 761, 762-63 (2d Cir. 2005). Crystallex protests (Br.47) that these decisions do not "grapple with" what law applied. But they did not need to, because they applied forum-state law under Rule 69.

The remaining decisions Crystallex cites are irrelevant because they involved *substantive* issues of liability. *IFC Interconsult v. Safeguard International Partners, LLC*, 438 F.3d 298 (3d Cir. 2006), applied an indemnification agreement's choice-of-law clause (rather than forum-state law) to determine the existence of a third party's indemnification duty. The existence of that duty did not fall within "procedure on execution" under Rule 69 because it concerned the putative indemnitor's *liability* to the judgment debtor. *Id.* at 314. And in *Karaha Bodas v. Perusahaan Pertambangan Minyak Dan Gas Bumi Negara*, 313 F.3d 70, 88 (2d Cir. 2002), the court applied Indonesian law to determine whether the judgment debtor

*owned* the property—a question best understood as concerning the creation of rights in the first instance. *See* pp. 6-7, *supra*.

Finally, Appellees contend that even if Delaware law governs under Rule 69, Delaware courts might apply *Bancec*; or might do so under choice-of-law principles. Elliott.Br.31-32; Crystallex.Br.48-49; OIEG.Br.40. But there is no reason to think that in the context of foreign sovereigns, Delaware would abandon the fraud requirement that provides the sole equitable justification for reaching third-party assets, especially since doing so would treat foreign sovereigns less favorably than private corporations. Although Elliott asserts Delaware would apply *Bancec* under the Supremacy Clause, *Bancec* does not by its terms govern the validity of writs of attachment. *See* pp. 12-13, *infra*. Contrary to Appellees' argument, the VPs preserved this argument below. Dkt.206_at_3; 21-mc-18 Dkt.27_at_17.

**B. *Bancec* Does Not Displace Rule 69 Or Delaware Law.**

Appellees contend that even if Rule 69 would require applying Delaware alter-ego principles in a proceeding involving private parties, *Bancec* should control the alter-ego determination here because PDVSA and the Republic are foreign-sovereign entities. But Appellees cannot identify any legal principle that would permit *Bancec* to supersede Rule 69's normal operation. They are therefore left asserting that generalized foreign-relations and uniformity concerns oust the legal

principles that otherwise apply—an unprincipled plea that the Supreme Court has already rejected.

1. *Bancec* cannot supersede Rule 69 and therefore cannot preempt Delaware's alter-ego principles. Rule 69, which has the force of a federal statute, directs federal courts to use state "procedure on execution," thereby preserving that state law from preemption. *Bancec*, as federal common law, cannot overcome Rule 69 or its preservation of state law. VP.Opening.Br.31-32. Crystallex briefly suggests otherwise (Br.49), citing *Am. Elec. Power Co. v. Connecticut*, 564 U.S. 410, 424 (2011). But that decision concerned *congressional* displacement of federal common law. Rule 69 predates *Bancec*, and federal courts have no power to displace Rule 69 with federal common law—and therefore no authority to conclude that *Bancec* supersedes state law. *See Mobil Oil Corp. v. Higginbotham*, 436 U.S. 618, 625 (1978) (where federal law addresses an issue, courts may not "rewrit[e] [the] rules" with federal common law); *cf. Cassirer v. Thyssen-Bornemisza Collection Found.*, 596 U.S. 107, 114 (2022) (statute "dictat[ing] selection of a choice-of-law rule" precludes using federal-common-law rule); *contra* Elliott.Br.25-26.[3]

Crystallex next points (Br.48-49) to Rule 69's statement that "a federal *statute* governs to the extent it applies," arguing that the FSIA "appl[ies]" because it

[3] OIEG's assertion (Br.41) that *Bancec* field-preempts state law is meritless, as it ignores the existence of federal law—Rule 69.

"implicitly" "authorizes attachment" using *Bancec*'s alter-ego inquiry. But the FSIA authorizes no such thing, "implicitly" or otherwise. Section 1610 governs only execution *immunity*—not the mechanisms by which property held to be non-immune can later be attached to satisfy a particular judgment. Those are different questions. *See FG Hemisphere Assocs. v. Republique du Congo*, 455 F.3d 575, 595 (5th Cir. 2006) ("[a] finding that an exception to executional immunity applies is … not the same as concluding that execution is appropriate or that writs of garnishment should issue"). Because the FSIA is silent on attachability, that question is left to state procedures under Rule 69. H.R.Rep.No.94-1487, at 28 (1976). *NML* confirmed that conclusion, declining to read the FSIA's execution-immunity provisions as "implicitly" addressing matters left to Rule 69. *Republic of Argentina v. NML Cap., Ltd.*, 573 U.S. 134, 143 n.3 (2014).[4]

2. Unable to rebut that established law, Appellees ask the Court to disregard it. They contend that *Bancec* established a universal federal-common-law rule governing the alter-ego inquiry for foreign-state instrumentalities in *all* contexts, regardless of Rule 69, and that foreign-relations and uniformity interests require that *Bancec* supersede Rule 69. Elliott.Br.24-26; Crystallex.Br.43-44. Those

[4] The reference to the "supremacy of federal law" in *Arnold v. Blast Intermediate Unit 17* is inapposite. Crystallex.Br.49. As its citations demonstrate, *Arnold* was explaining that, as Rule 69 provides, an applicable federal *statute* prevails over state law. 843 F.2d 122, 125 (3d Cir. 1988).

arguments—which distort *Bancec* beyond recognition—are nothing more than an unprincipled plea that this Court supplant Rule 69's clear rule with a bespoke common-law standard tailored to excuse the district court's error.

*Bancec* did not announce any universal alter-ego rule governing attachability, and the Court would have had no power to do so in any event. *Bancec* held that "attribution of liability" among foreign-state entities should be governed by a federal-common-law alter-ego rule. *Bancec*, 462 U.S. at 620. It did not, as Elliott suggests, choose federal common law over state law based on any conclusion that questions implicating sovereign entities' relationship are *always* governed by federal law. Instead, the Court chose federal common law because the *purpose and effect* of the determination—attribution of one sovereign entity's liability to another—was so closely comparable to "amenability … to suit" under the FSIA that a uniform federal-law rule should likewise govern attribution. *Id.* at 622 n.11. That makes sense: both inquiries determine when a sovereign entity can be haled into court, and therefore implicate the foreign-relations concerns raised whenever a sovereign is subjected to suit.

*Bancec* said nothing, however, about what law should apply to the distinct question whether non-immune sovereign property is attachable—nor could it have. 462 U.S. at 622 n.11. Appellees misleadingly quote *Bancec* as providing "the rule for when 'property held by one agency is really property of another,'"

Crystallex.Br.44 (quoting *Bancec*, 462 U.S. at 628), but that discussion pertained only to FSIA execution *immunity*. The *Bancec* Court was free to adopt federal common law to govern attribution of liability because federal law was silent on the subject—both as to what the rule should be and what law should govern. But federal law is *not* silent on what law governs attachability: Rule 69 dictates that state procedures apply. The Court therefore had no common-lawmaking authority to establish a rule that would supersede Rule 69 and the state alter-ego principles to which it points.[5]

The Supreme Court's *NML* decision—which Elliott and Crystallex ignore—confirms that courts lack authority to set aside Rule 69 based on the generalized foreign-relations and uniformity concerns Elliott highlights (Br.25). In *NML*, the petitioner similarly sought a foreign-sovereign-specific exception to Rule 69 (there,

[5] Although Elliott asserts that courts have applied *Bancec* in other contexts, its cases concern only FSIA immunity and personal jurisdiction under the FSIA—situations involving "amenability … to suit," *Bancec*, 462 U.S. at 622 n.11, in which federal law does not require resort to state law. Elliott.Br.26 (citing cases).

Appellees similarly mischaracterize *Crystallex II* as holding that *Bancec* applied to attachability questions under Rule 69. Elliott.Br.26-27; Crystallex.Br.48. The Court held only that "*Bancec* controls the [FSIA] jurisdictional inquiry here." 932 F.3d at 136. *Rubin v. Islamic Republic of Iran*, 583 U.S. 202, 213 (2018), also concerned only FSIA immunity: Section 1610(g) permits holders of terrorism judgments against a state to treat an instrumentality's property as the state's for purposes of Section 1610's *execution-immunity exceptions* without satisfying *Bancec*. *Rubin* U.S.Br.14. Appellees cannot identify any case applying *Bancec* in other situations, much less any involving overriding a federal-law direction to apply state law.

its execution-related discovery provisions), noting the "worrisome international-relations consequences" of permitting broad discovery under Rule 69 and state law. 573 U.S. at 146. The Court declined, holding that such concerns do not justify creating a special Rule 69 carve-out for sovereigns. And the Court has similarly rejected federal-common-lawmaking in other FSIA-adjacent contexts. *Accord Cassirer*, 596 U.S. at 116 (even if there was no statute on point, federal-common-lawmaking not justified by foreign-relations or uniformity concerns in contexts where sovereign is not immune).

In all events, the uniformity and foreign-relations concerns that *Bancec* viewed as critical in the liability-attribution context have little salience here, where the alter-ego analysis merely determines whether one sovereign entity's property is attachable to satisfy another's debts. The attachability of sovereign property *always* turns on the rules of the jurisdiction in which the property is located, because Congress left execution procedure in foreign-sovereign cases to state law under Rule 69. Congress evidently determined that doing so poses no threat to foreign-relations interests, even though the same type of foreign-state property could be subject to attachment in one state but not another. *FG Hemisphere*, 455 F.3d at 595. In other words, Congress determined that it was more important to treat foreign sovereigns like private parties with respect to execution. *Cf.* 28 U.S.C. § 1606. Non-uniformity and state-law primacy are thus *features* of execution proceedings—not defects that

courts have freewheeling authority to correct based on their own sense of what would advance the nation's foreign relations.

Elliott protests (Br.26) that enforcing Rule 69's command would make the *Bancec* inquiry a "waste of time" because it would simply be a prelude to applying a state alter-ego rule to determine attachability. Elliott misunderstands the statutory framework. Where, as here, a creditor seeks to attach an *instrumentality's* property to satisfy the foreign *state's* judgment debts, the *Bancec* alter-ego inquiry enables the creditor to treat the instrumentality's property as the state's for purposes of Section 1610's exceptions to execution immunity. But the court must then make the additional "finding that the property is garnishable under [state] law." *FG Hemisphere*, 455 F.3d at 596. That property may be non-immune under the FSIA but also not subject to attachment under state law hardly renders the antecedent immunity inquiry a "waste of time," whether or not alter-ego principles are involved.

Finally, Appellees attempt to make something of the absence of Rule 69 decisions applying forum-state alter-ego principles to foreign sovereigns. But exactly the same thing can be said about their position: no decisions apply *Bancec* to deem property attachable under Rule 69. The dearth of decisions on either side simply means the issue does not often arise—it hardly justifies Appellees' demand for a bespoke carve-out from Rule 69.

### C. The VPs' Rule 69 Argument Is Not Precluded.

Telegraphing a lack of confidence in their Rule 69 carve-out, Appellees seek to keep this Court from considering Rule 69 at all. But their lengthy preclusion argument runs headlong into two fundamental obstacles: they cannot identify a shred of evidence that the writs' validity under Rule 69 was actually adjudicated in *Crystallex I* and *II*, and they cannot establish that the immunity and validity issues are identical. To prevail on the latter point—as they must to justify preclusion—Appellees must establish that *Bancec* governs the writs' *validity* as well as immunity. *B&B Hardware v. Hargis Indus.*, 575 U.S. 138, 154 (2015). But that is the very question presented in this appeal. So this Court cannot find preclusion without first deciding the *Bancec* question. In all events, Appellees cannot establish preclusion or untimeliness.

1. Appellees must show that the district court adjudicated the writ's validity in *Crystallex I*. If the court did not decide the issue, then the VPs could not have appealed it in *Crystallex II* and this Court could not have decided it—meaning that the VPs have never had an opportunity for an appellate adjudication. But Appellees cannot identify a *single* statement in *Crystallex I* addressing the writ's validity—either what law should apply to that question or whether the writ was valid.

Crystallex does not even try, doing its best to ignore *Crystallex I*. Elliott implausibly asserts that the court addressed this case-dispositive issue in a lone

footnote stating that *Bancec* rather than Delaware law applied, JA1759 n.13, but the court's point was that *Bancec* applied to *FSIA immunity*: the footnote appeared in a section titled "Foreign Sovereign Immunity," JA1745, in a paragraph stating that the court would apply "federal common law" because the "FSIA does not address" when an instrumentality should be treated as the state "for purposes of either jurisdiction or attachment and execution," JA1759, and shortly after the court's explanation that the "alter ego finding" would allow PDVSA's property to be treated as the Republic's for purposes of "execution immunity," JA1757. The court could not have been clearer throughout: it decided only immunity. JA1792 (Crystallex has shown the "applicability of an exception to PDVSA's sovereign immunity"); JA1755; JA1765. Indeed, the district court said so at the time: upon PDVSA's appeal of *Crystallex I*, the court asserted it retained jurisdiction over issues other than those on appeal, which it said were limited to "PDVSA's sovereign immunities under the Foreign Sovereign Immunities Act." JA1816.[6]

[6] Though the district court's failure to decide the issue is conclusive, Appellees are *also* unable to identify any place where the parties argued the writs' validity. Elliott.Br.22 (citing JA224, which described PDVSA's discussion of "*immun[ity]*" *see* Dkt.26_at_37); JA1529-1530 (Delaware law is relevant to *immunity*). The writ's validity simply was not at issue. Consistent with that conclusion, and contrary to Crystallex's assertion (Br.35), PDVSA appealed only the denial of immunity. JA1736, JA1872 (Notices of Appeal).

2. This Court did not—and could not—decide the writ's validity in *Crystallex II*. The issue was not before this Court because the decision under review did not decide it. Nor would this Court have had pendent appellate jurisdiction to decide the writ's validity in the context of PDVSA's collateral-order appeal of immunity. *OIEG v. Bolivarian Republic of Venezuela*, 73 F.4th 157, 175-76 (3d Cir. 2023). Although, as Appellees observe, the *Crystallex II* Court stated that it had both collateral-order jurisdiction and Section 1291 final-order jurisdiction over the grant of the writ of attachment, that statement was unconsidered dicta, a "drive-by jurisdictional ruling" entitled to no precedential weight. *Goldman v. Citigroup Glob. Markets*, 834 F.3d 242, 251 (3d Cir. 2016). It was also wrong. *Crystallex I* itself plainly stated that it was not a final order, as it identified numerous legal issues that remained to be resolved and asked the parties to propose a sale procedure. JA1812. And this Court later held that a subsequent order upholding Crystallex's writ was *not* final because the district court had not yet "rule[d] on objections to the special master's proposed judicial sale procedures," 24 F.4th 242, 255—a conclusion that would have applied a fortiori to the earlier *Crystallex I* order, which predated any contemplated sale procedure. The *Crystallex II* court thus had only collateral-order jurisdiction—and under *OIEG*, which concerned other creditors' identical writs, it had no pendent jurisdiction to adjudicate the writs' validity, 73 F.4th at 175-76.

In all events, *Crystallex II* did *not* adjudicate the writs' validity. Once again, Appellees conspicuously fail to identify a single word in *Crystallex II* addressing the writ's validity under Rule 69. They point to the Court's statement that the district court "had *the power* to issue a writ of attachment on that entity's non-immune assets." 932 F.3d at 139 (emphasis added). But that statement addressed subject-matter jurisdiction, as it concluded a section titled, "The District Court properly used *Bancec* to extend its jurisdiction to assets held nominally by PDVSA." *Id.* at 138; *accord id.* at 152 (summarizing holding: "[t]he District Court acted within its jurisdiction when it issued a writ of attachment").

3. Appellees also cannot establish that the writs' validity and FSIA immunity are *identical* issues. They are self-evidently distinct: this Court *in this case* distinguished between FSIA execution immunity and attachability under Rule 69. *OIEG*, 73 F.4th at 175-76 ("[r]esolution of the immunity issue does not dictate the outcome of the attachment issue"); *accord Agudas Chasidei Chabad v. Russian Fed'n*, 110 F.4th 242, 249 (D.C. Cir. 2024). For the issues nonetheless to be identical for preclusion purposes, they would have to be governed by the same legal standard, *B&B Hardware*, 575 U.S. at 154—that is, the *Bancec* alter-ego test would have to govern both immunity and validity. But that is the question presented here. Appellees' assertion that the issues are identical thus assumes the conclusion needed

to justify preclusion—and, as demonstrated, Appellees are wrong that *Bancec* governs both.

4. Appellees' timeliness argument borders on frivolous. PDVSA had no obligation to challenge the writ's validity when the district court was adjudicating immunity in *Crystallex I*. VP.Opening.Br.43. Because FSIA immunity is immunity from *suit*, PDVSA was entitled to obtain an appellate ruling on immunity before being required to address the merits. *Process & Indus. Devs. Ltd. v. Fed. Republic of Nigeria*, 962 F.3d 576, 586 (D.C. Cir. 2020) (courts "must resolve colorable assertions of immunity before" requiring sovereign "to address the merits"). And the court acknowledged that Crystallex agreed PDVSA could subsequently "seek to challenge the writ on non-jurisdictional grounds." JA1813.

Appellees rest their argument entirely on the district court's inquiry, in its order finding PDVSA and its property non-immune, as to whether PDVSA would subsequently move to quash the writ on other grounds. JA1812; Crystallex.Br.37. PDVSA responded by asserting that the district court could not require PDVSA to proceed to the merits while its immunity appeal was pending; this Court subsequently agreed, staying all proceedings. Dkt.86_at_6-7_&_n.9; Dkt.129_at_2. Holding that PDVSA's justified insistence on its entitlement to an immunity adjudication forfeited its right to argue the merits would turn immunity on its head, depriving PDVSA of the fundamental protections guaranteed by the FSIA.

## II. THE SALE CANNOT STAND IN LIGHT OF DISQUALIFYING CONFLICTS OF INTEREST.

The judicial officers tasked with implementing and negotiating the sale process violated the bedrock standards of neutrality and integrity required of officers of the court. Their conduct would be reason for concern in any context—but with all that is at stake here it is especially important that the process be free of any suggestion of impropriety. Appellees' efforts to minimize the gravity of that misconduct founder on Weil's own statements expressing that the firm's economic interests would be advanced by enhancing Elliott's position in the sale process. And Appellees' procedural arguments should be seen for what they are: a last-ditch effort to shield the advisors' indefensible conduct from judicial scrutiny. The VPs' Section 455(b) argument cannot be waived, and the Section 455(a) may be waived only upon full disclosure—a requirement certainly not satisfied by the advisors' falsehoods and obfuscation. And Appellees' timeliness argument is frivolous.

### A. There Was A Disqualifying Appearance Of Partiality Under Section 455(a).

Appellees characterize the conflicts here as too remote and insulated from the sale process to raise concerns under Section 455(a). Those arguments lack merit. And even if the question were "close" (which it is not), the "balance" must "tip[] in favor of" disqualification. *Nichols v. Alley*, 71 F.3d 347, 352 (10th Cir. 1995).

Strikingly, Appellees do not meaningfully dispute the damning facts raising an appearance of impropriety. Weil and Evercore collected *millions* in fees from

clients who were sale parties while making critical decisions bearing on those same entities' interests in the sale process, ultimately pulling off a strategy that benefited their clients. VP.Opening.Br.19-20; JA12820-12832 (Tables). Elliott's Weil team included attorneys who simultaneously worked for the Special Master, including Ray Schrock, who ran the sale process until he left Weil in late 2024. JA12834-12845 (Table). Unconstrained by any ethics screens, Weil's restructuring department co-chair, Jeffrey Saferstein, intervened to get Elliott favorable treatment, including a phone call with the Special Master's team just before a bidding deadline, by conveying that he would "hate" it if Elliott withdrew its business from Weil. JA12760 (Email). That incident alone provides far more than "a reasonable factual basis" for "doubting" the Special Master's "impartiality." *Alexander v. Primerica Holdings*, 10 F.3d 155, 162 (3d Cir. 1993).

Unable to deny Weil and Evercore's obvious conflicts, Appellees instead characterize them as "unrelated" to the sale. Elliott.Br.39; Crystallex.Br.75-76. But Saferstein forged an indissoluble link between the two when he sought to foster Weil's relationship with Elliott by insisting that the Special Master's lawyers tend to Elliott. Moreover, unlike other subsections of Section 455, Section 455(a)'s prohibition does not turn on formal relatedness or any particular form of conflict. *See, e.g.*, 28 U.S.C. § 455(b)(2); *cf. IBM v. Levin*, 579 F.2d 271, 280 (3d Cir. 1978); *Cinema 5 v. Cinerama*, 528 F.2d 1384, 1386 (2d Cir. 1976). Under Section 455(a),

a conflict is impermissible *whenever* a reasonable person could perceive it as tainting judicial officers' actions.

Such a perception is inescapable here. The advisors had powerful financial incentives, not to mention fiduciary obligations, to advance their clients' interests. Elliott and the Bondholders represented by Weil expected "undivided loyalty and allegiance," *Cinema 5*, 528 F.2d at 1386—especially from the Weil attorneys on the Special Master's team who also worked on those entities' other matters. Saferstein's intervention to promote Elliott's interests starkly illustrates the resulting dangers. VP.Opening.Br.21, 48-50. Doubtless because there is no justification for Saferstein's conduct, Appellees dismiss it as "routine[]." Crystallex.Br.80. But their assertion that solely "innocuous" information was shared on the resulting hour-long call is not only pure speculation but also irrelevant to the pertinent legal question: whether Saferstein's actions and Weil's competing loyalties cast a "shroud[]" of "suspicion" over the proceedings, regardless of whether any impropriety actually took place. *Alexander*, 10 F.3d at 163. They do.

Appellees finally insist that "any firms qualified to advise the Special Master" would have conflicting engagements. Elliott.Br.39; Crystallex.Br.78. Even if true, that would not justify hiding conflicts or failing to establish screens. And it is not true. It borders on ridiculous to suggest that every qualified law firm and investment bank in the country was representing Elliott or the Bondholders during the relevant

time—and that, for those that did, none had interests that could have been waived on full disclosure and addressed through normal procedures like screens. *See* 28 U.S.C. § 455(e) (allowing waiver after "full disclosure"); Fed.R.Civ.P.53 (committee note) (noting "[s]pecial care" required to avoid any "conflict of interest involving a master" and discussing situations when waiver is permissible); *United States v. Will*, 449 U.S. 200, 215 (1980).

### B. There Was An Unwaivable Disqualifying Interest Under Section 455(b)(4).

The advisors' conflicts separately require disqualification under Section 455(b)(4), which states that a judicial officer must be disqualified where he has "a financial interest … in a party to the proceeding," including by serving as an "adviser" to a party, or some "other interest that could be substantially affected by the outcome of the proceeding." 28 U.S.C. § 455(b)(3), (4).

1. The advisors' representations gave them a prohibited "financial interest" in Elliott and the Bondholders, who are "part[ies] to the proceeding," and that prohibited interest is attributed to the Special Master. 28 U.S.C. § 455(b)(4); *see In re Kensington Int'l*, 368 F.3d 289, 308 (3d Cir. 2004). Appellees do not even try to defend the district court's conclusion that "[n]either Elliott nor the [Bondholders] is a party," JA10457, which is a legal error and therefore an abuse of discretion. VP.Opening.Br.58-59. Instead, they raise a grab-bag of misconceived arguments, including statutory-interpretation arguments never presented below.

First, Crystallex incorrectly argues that Weil and Evercore are not "advisers" under Section 455(d)(4), which defines "financial interest" as "ownership of a legal or equitable interest, however small, or a relationship as director, adviser, or other active participant in the affairs of a party." Crystallex never acknowledges the dictionary definition of "adviser," which fits Weil and Evercore to a tee: "[s]omeone whose job is to counsel on matters within an area of expertise, such as business, economics, law, or politics." Black's Law Dictionary (12th ed. 2024). Instead, Crystallex rewrites the provision, claiming that "Congress limited the set of qualifying 'adviser' relationships to formal, internal roles in a party's affairs." Crystallex.Br.84. But the provision says no such thing—and that is the end of the matter. Congress surely knew that outside lawyers and investment bankers frequently act as company "advisers" and thereby gain a financial interest in fees. 28 U.S.C. § 455(d)(4). Crystallex invokes (Br.84) *noscitur a sociis*, but that canon applies only to ambiguous terms, *United States v. Stevens*, 559 U.S. 460, 474 (2010), and "adviser" is not ambiguous. Moreover, the word "adviser" in Section 455(d)(4) is surrounded not only by the word "director," which connotes a type of internal role, but by the phrase "active participant in the [party's] affairs," which naturally encompasses outsiders.

Second, Crystallex argues without any basis that Section 455(b) cannot reach interests held by anyone outside the Special Master's immediate household.

Crystallex.Br.83. But the Special Master's advisors were judicial officers with judicial immunity, JA2445, and were agents of—effectively an extension of—the Special Master's, so their actions tainted him as well. *See Kensington*, 368 F.3d at 308. Although a Special Master is not tainted by the financial interests of distant family members, *see* 28 U.S.C. § 455(b)(4), entities that act as his direct staff and both shape and execute his work are in a far different position. Any other rule would allow a Special Master to knowingly select close advisors who have a financial bias, and it would incentivize interested parties to try to corrupt the process by hiring a Special Master's advisors to carry out other activities and promising them a quid pro quo.

Third, Appellees suggest that the financial interest here was too speculative to matter. Crystallex Br.85; Elliott.Br.42-43. But Section 455(d)(4) provides that an "adviser" relationship *is* a "financial interest" for purposes of Section 455(b)(4), period. Moreover, no speculation is required to understand that the financial interest is very real. Appellees cannot deny that Weil and Evercore had an interest in large and growing fees from parties to the proceeding, and that the head of Weil's restructuring group—anxious to continue receiving that money—intervened in the sale process, thereby creating a relationship between this matter and his other matters for Elliott.

Appellees' cases about speculative interests are readily distinguishable. None involves an activity statutorily *defined* as a financial interest, as "advis[ing]" is. And all involve attenuated interests that do not resemble those here—for instance, a judge's interest in a company in the same *general industry* as the one in which a party engaged. *See In re Placid Oil*, 802 F.2d 783, 787 (5th Cir. 1986); *see also In re Cap. One*, 2024 WL 3463952, at *3 (E.D. Va. July 18, 2024) (case involving interest in different corporate entity than a party and screening procedures); *Wolverine World Wide v. Am. Ins.*, 2019 WL 11680205, at *2 (W.D. Mich. May 9, 2019) (requiring affidavit confirming "fire walls" and explaining why special master, a non-equity law-firm employee, had no financial interest in separate representation by equity partner).

Finally, Appellees argue that unless this Court lets the Special Master off the hook it will be impossible to hire qualified advisors. That is wrong for the reasons discussed above. *See* pp. 23-24, *supra*. And in any event, Section 455(b)'s strictures, which are critical to public confidence in the judicial system, cannot yield to such self-interested arguments.

2. Appellees' arguments that there is no interest that "could be substantially affected by the outcome of the proceeding," 28 U.S.C § 455(b)(4), echo their "financial interest" arguments and fail for the same reasons. Weil and Evercore's engagements with Elliott and the Bondholders generated millions of dollars in fees

and held the promise of much more. And Saferstein's intervention makes clear that Weil's leadership understood that Elliott's unhappiness with the sale proceeding could affect the company's client relationship with Weil. Section 455(b)(4) requires only that an interest "could be substantially affected," not that it certainly will be—and rarely is there such direct evidence as here of possible effect. The district court therefore abused its discretion in concluding that the interest at issue was too speculative. *See* JA10456-10458 (relying on *Hook v. McDade*, 89 F.3d 350, 356 (7th Cir. 1996), in which the asserted interest in a criminal case was the judge's wife's firm's representation of an insurance company in a civil case involving an absent co-defendant).

### C. There Was No Waiver Or Untimeliness.

Appellees go to great lengths to bury the disqualification issue beneath an avalanche of waiver and timeliness objections. But there is an acute need for public confidence in the integrity of the sale process—which would force a foreign-sovereign instrumentality to sell a thriving multi-billion dollar asset. It should take an exceptionally substantial argument for this Court to decline to consider the grave conflict-of-interest issues presented on appeal. And Appellees' arguments are insubstantial.

Under 28 U.S.C. § 455(e), a Section 455(b) violation *cannot be waived*, and a Section 455(a) violation can be waived only with "full disclosure on the record of

the basis for disqualification." 28 U.S.C. § 455(e); *see* Fed.R.Civ.P.53(b)(3). But Weil and Evercore did not disclose their conflicts; they hid them. As late as September 2025, the advisors told the VPs and the court that they had no "engagements with any of the bidders." JA9526. That was false. VP.Opening.Br.17-21, 61. Splitting hairs, Crystallex suggests (Br.73) this statement was technically true because the term "bidder" did not include "Elliott's *affiliates*." But Elliott *itself* had identified its affiliates as bidders. JA10293.

Appellees also try to blame the VPs for not divining the advisors' conflicts earlier from two vague statements—but neither comes close to constituting "full disclosure on the record." 28 U.S.C. § 455(e). First, Appellees assert that the VPs had "constructive notice" of all conflicts based on Evercore's retention letter. Crystallex.Br.73; Elliott.Br.33. But constructive notice suffices only if it is the "undeniable equivalent" of "actual knowledge," and here it plainly was not. *Kensington*, 368 F.3d at 313-15 (rejecting as insufficient that conflicting representations were public). Evercore's letter did not disclose specific engagements with Elliott or the Bondholders, much less those relationships' expansion during the sale process. JA3261. The letter stated that Evercore's engagement would not limit its ability to deal with third parties *if* "customary information barriers" were "maintained," *id.*, a precondition that neither Evercore nor Weil ever bothered to implement, JA9708; JA12912. And Evercore's

boilerplate about "financial advisory" relationships, JA3261, did not provide notice that *Weil* would concurrently represent sales participants and the Special Master *three years later*.

Second, Appellees claim that all VPs were on notice of the engagements by August 6, 2025, when a list of engagements was introduced at a deposition.[7] But that purportedly "complete list," JA12789, was anything but, and therefore cannot qualify as "full disclosure." 28 U.S.C. § 455(e); *see Kensington*, 368 F.3d at 313. Weil disclosed only one concluded Elliott engagement that had lasted less than a month and a few concluded Bondholder engagements. JA12784-12785 (Tables). Evercore disclosed no Elliott engagements at all. *Id.* And in response to an email from CITGO, Weil falsely stated on September 4 that neither Weil nor Evercore currently had "any engagements" with bidders. JA9526. It was only through the objectors' investigation and the September 9 Turkel deposition that the advisors' ongoing engagements with sales-process parties, the high dollar value of those engagements, and the advisors' campaign to cultivate even more of Elliott's business first came to light. VP.Opening.Br.17-21.

---

[7] Other parties received that list in March 2025, but—as Appellees do not dispute—Venezuela, PDVSA, and their counsel were barred from receiving the disclosures until *months* later. Elliott.Br.34-35; Crystallex.Br.70.

Appellees also contend that the VPs were required to move for disqualification "within a day, two days maybe, three days at most" of learning *any* potentially relevant information regarding the conflicts. Elliott.Br.33. But the district court made that statement in 2023 with respect to a January 9 VP motion, based on knowledge the VPs acquired on January 3, to prevent a meeting scheduled for January 12. JA3528-3529 (3/30/23 Hr'g Tr.). The situation here involved no comparable emergency, and the VPs were entitled to gather evidence—especially because the advisors had affirmatively misled them and the court had previously discouraged insufficiently supported disqualification motions. JA4538. A requirement to move "within a day" would mean that the VPs could *always* be tasked with acting either too early (without sufficient support for disqualification) or too late (forfeiting their rights). That Catch-22 cannot be reconciled with Section 455(e) or with Section 455's overarching purpose to protect the public's "unwavering confidence" in "an unimpeachable judicial system." *Potashnick v. Port City Const.*, 609 F.2d 1101, 1111 (5th Cir. 1980), *cited in Kensington*, 368 F.3d at 303.

Regardless, the VPs acted quickly once they had the necessary information. Having previously received only a misleading, incomplete list of the advisors' engagements, and having received a false statement on September 4 in response to their inquiries, the VPs learned at Turkel's September 9 deposition that Elliott was "kicking off" new representations with the Special Master's advisors. JA12679.

Gold Reserve raised that issue with the district court the next day, JA8529 (Letter); *see* JA12755 (9/10/25 Conf. Tr.), and the VPs moved for disqualification five days later—the first business day after the advisors produced revised disclosures under court order. JA13049 (9/15/25 Hr'g Tr.); JA12304. The VPs then renewed their motion based on new information uncovered through additional discovery concluding on October 3, JA8968-8969 (Joint Status Report), which revealed that several Weil attorneys concurrently represented Elliott and the Special Master, JA12834-12845 (Table); that ethics screens were not in place at Weil or Evercore, JA9708 (Letter); JA12912 (Letter); and that Saferstein had intervened in the sales process to make sure Elliott's other business stayed with Weil, JA12760 (Email).

At the close of that discovery, the VPs took less than a week to review the previously concealed materials and to complete their brief, filing on October 9. JA12718. Those facts do not indicate any dilatoriness or gamesmanship, except on the part of Weil and Evercore for failing to fulfill their obligation to make truthful disclosures in the first place.

### D. The Sale Order Must Be Vacated.

Appellees' efforts to excuse those serious errors as harmless are meritless. As the Supreme Court emphasized in *Liljeberg v. Health Services Acquisition*, 486 U.S. 847 (1988), in assessing harmless error courts must "continuously bear in mind" that "justice must satisfy the appearance of justice." *Id.* at 864, 870. Here, the

appearance of impropriety is overwhelming, and the district court's review of the tainted recommendations cannot cure that problem.

To avoid that conclusion, Appellees must distort both the facts and the law. On the facts, the sale order was fundamentally shaped by the actions of the conflicted advisors and the Special Master who was "tainted" through his association with them. *Kensington*, 368 F.3d at 308. The district court relied on Weil and Evercore to give the Special Master "substantial assistance." JA10464 (Opinion). They produced the bids, identifying potential bidders and conducting "back-and-forth negotiations" on "proposed transaction structures" directly with bidders, often without the Special Master's participation. JA6531-6535 (Declaration); JA315 (Opinion); VP.Opening.Br.17-18. And bid proposals went directly to Weil and Evercore for evaluation in the first instance. JA12780 (Email). All of that left plenty of room for bias that "leave[s] no trace in the record." *In re Kempthorne*, 449 F.3d 1265, 1271 (D.C. Cir. 2006).

The district court of course had some freedom to say no to the Special Master—although, notably, it never rejected any bid that the Special Master recommended.[8] But the court did not have the ability to round up bidders on its own

---

[8] Elliott's earlier bids, recommended by the conflicted Special Master and his advisors over universal creditor and VP opposition, were withdrawn by Elliott, not rejected by the court. VP.Opening.Br.12-13.

or shape the substance of their proposals. And the court deferred to the advisors and the Special Master at crucial junctures. For instance, the advisors directed the selection of the stalking horse by "convinc[ing]" the Special Master to change his mind about paying the Bondholders. JA13190-13191 (9/16/25 Hr'g Tr.). The district court then accepted the Special Master's selection, explaining that it was "persuaded by the Special Master and his expert advisors" to set up the topping period with a stalking horse bidder who satisfied the Bondholders over one who offered a higher price. JA5874 (Order). The court ultimately approved Elliott's bid because Elliott committed to paying the Bondholders. JA413-415 (Opinion); JA8304 (Declaration); VP.Opening.Br.54, 71-74.

Given those facts, the cases on which Appellees rely (Crystallex.Br.85-87, Elliott.Br.43-45) do not aid them. *Liljeberg* involved a district-court judge's failure to disqualify himself due to a "temporary lapse of memory," which meant that he did not know a conflict existed when "the case was … being tried." 486 U.S. at 861, 864. Although the Court refused to "adopt an absolute prohibition against any relief in cases involving forgetful judges," it nevertheless concluded that the judgment should be vacated because the "facts create precisely the kind of appearance of impropriety that § 455(a) was intended to prevent," vacatur would "encourag[e] … prompt[] disclos[ure]" of conflicts, and there was "a greater risk of unfairness in upholding the judgment" than in "tak[ing] a fresh look" in a new trial. *Id.* at 862,

867-69. The improprieties here are far worse than those in *Liljeberg*, and the reasons the Court gave for vacatur there apply here even more strongly.

*Selkridge v. United of Omaha Life Insurance*, 360 F.3d 155 (3d Cir. 2004), is inapposite. There, an individual filed an ERISA suit barred by res judicata, and the district court granted summary judgment on that basis. *See id.* at 159. That issue was a "pure issue of law" subject to de novo review—and this Court concluded that "*any* trial judge … would be required as a matter of law" to apply res judicata exactly as the district court had. *Id.* at 171-72 (emphasis added). Under those circumstances, this Court perceived no risk of "unfairness." *Id*. at 171. This case is completely different. The proceedings below involved complex facts and judgment calls, including in the selection of a winning bidder, and they were inevitably shaped along the way by the input of the conflicted advisors and the tainted Special Master.

The seriousness of what occurred here should not be swept under the rug. The "risk of injustice" to the VPs and Gold Reserve is high. *Liljeberg*, 486 U.S. at 864. So is "the risk that the denial of relief will produce injustice in other cases," in which advisors and others will understand that they can profitably engage in conflicted activities, and even conceal those activities from the parties and the court, so long as there will be some later judicial review to wash the slate clean. *Id.* And the "risk of undermining the public's confidence in the judicial process," *id.* at 864, by allowing the order below to stand is patent, as any reasonable observer would have substantial

"doubt[]" about whether the outcome here was meaningfully shaped by the private financial interests of entities charged with acting on behalf of the court, *Kensington*, 368 F.3d at 301-02. This Court should vacate the sale order, which would allow fair sale proceedings to go forward.

## III. DEFECTS IN THE SALE PROCESS REQUIRE VACATUR.

Appellees' briefs confirm that the Special Master's conflicted process was marred by grave errors and resulted in an improperly depressed sale price.

### A. The Sale Price Is Grossly Inadequate.

1. Appellees do not dispute that Delaware courts hold that "a sale for less than 50% of an asset's fair market value" shocks the judicial conscience. Crystallex.Br.61; Elliott.Br.54. Although the "50% test" may not be the "sole touchstone of acceptability," it is an important benchmark. *Burge v. Fid. Bond & Mortg. Co.*, 648 A.2d 414, 419 (Del. 1994).

2. Elliott's $5.892 billion sale price is just 44% of the $13.2 billion valuation prepared by Evercore and is therefore "grossly inadequate." JA295-296, 372; *Burge*, 648 A.2d at 419.

Appellees attack Evercore's valuation as "'outdated,'" and 'contain[ing] errors.'" Elliott.Br.55 (quoting JA372); Crystallex.Br.63-64. But the court identified no such errors, other than CITGO's purported underperformance of Evercore's earnings projections—which Evercore's own analyses showed was

common in the industry and unrelated to value. JA10591-10648; VP.Opening.Br.68. Crystallex (Br.64) argues that the submitted bids were lower than Evercore's valuation, showing the valuation was higher than market value—but bids in a forced sale are no measure of fair market value. *See M.P.M. Enters. v. Gilbert*, 731 A.2d 790, 791 (Del. 1999).

Appellees assert that the $5.892 billion price should be treated as $8.8 billion based on the purported value of Elliott's Bondholders settlement. Elliott.Br.55-56. But a Section 324 sale must satisfy "attached judgments," and the 50% standard must be applied to that statutory directive. *Accord* JA5559, 5623. As the Special Master recognized, Elliott's bid "satisfies $5.892 billion of Attached Judgments"—and that is its purchase price, well below 50% of the $13.2 billion valuation. JA7426, 7433.

3. Even if the court were correct that the shares' value "is under $10 billion," JA390, the sale price's multibillion-dollar shortfall shocks the conscience. *Burge*, 648 A.2d at 419. The fact that CITGO is far higher-value than typical properties, Elliott.Br.54-55, requires vacating the sale, not confirming it. VP.Opening.Br.68-69. No court has ever approved a forced sale for billions of dollars below any measure of fair market value.

### B. The Grossly Inadequate Sale Price Is The Inevitable Consequence Of Errors In The Sale Process.

1. The court and Special Master did not run a "public sale" as required by Section 324. "The key element … in a public sale is the opportunity for competitive bidding," *Shields v. Bobby Murray Chevrolet*, 261 S.E.2d 238, 240 (N.C. Ct. App. 1980), where "the bidder has full opportunity to know what the competition is and to increase his bid," *Offredi v. Huhla*, 60 A.2d 779, 781 (Conn. 1948).

Appellees contend that even though bid prices were secret, the sale was "public" because the Special Master disclosed prices of his recommended bids. Crystallex.Br.66-67. But the secrecy still depressed the bids from which the Special Master chose. Although bidders could subsequently submit "unsolicited" bids, their "price to beat"—the recommended bid—was lower because of the secrecy. Moreover, unsolicited post-auction bids could not remedy the secrecy during the main bidding process unless unsolicited bidders competed knowing each other's bids. That never happened.

2. The sale also violated Section 324's mandate that the shares be "sold … to the highest bidder." Gold Reserve was the "highest bidder" among qualified bidders. 8 Del. C. § 324(a); JA353. Appellees assert that Gold Reserve's bid was no longer qualified after the court terminated it, Elliott.Br.48-49; Crystallex.Br.51-58, but the court cannot evade Section 324 by itself terminating the highest bid and then declaring it unqualified. VP.Opening.Br.71-72; Gold.Reserve.Br.33-37.

Appellees argue that "the 'highest' bid is the one with the best combination of" price and closing certainty. Elliott.Br.47-48; Crystallex.Br.58-60. But Section 324 requires the "highest bidder," not the "highest and best" bidder. *See Carauna v. Saligman*, 1990 WL 212304, at *5 (Del. Ch. 1990) (distinguishing "highest bid" from "best bid"); *United States v. Chem. Found.*, 5 F.2d 191, 206 (3d Cir. 1925) ("highest bidder" focuses on "money" absent contrary textual indication). Even if the court permissibly considered closing certainty relative to price, its "eyeball it" analysis was no substitute for reasoned consideration of the actual likelihood of closing. VP.Opening.Br.74.

3. Appellees do not meaningfully respond to the conflicted Special Master's improper insistence throughout the sale process on prioritizing the Bondholders' contested claims, thereby depressing the sale price, or to the risk that Elliott will pay over $2 billion to the Bondholders, when their claims may be invalidated by the Second Circuit on expedited de novo review. VP.Opening.Br.73-74; Elliott.Br.56. That money could instead satisfy more attached debt. A ruling against the Bondholders therefore would warrant vacating the sale order as "a fundamental injustice." JA5878-5879.

## CONCLUSION

The sale order should be vacated and the case remanded.

Dated: March 2, 2026

Respectfully submitted,

/s/ *Donald B. Verrilli, Jr.*
Donald B. Verrilli, Jr.
Elaine J. Goldenberg
Ginger D. Anders
Xiaonan April Hu
Kyle A. Schneider
Nicole R. Allicock
Andrew J. Slottje
MUNGER, TOLLES & OLSON LLP
601 Massachusetts Avenue NW
Suite 500E
Washington, DC 20001
(202) 220-1100
Donald.Verrilli@mto.com

George M. Garvey
MUNGER, TOLLES & OLSON LLP
350 South Grand Avenue
50th Floor
Los Angeles, CA 90071
(213) 683-9100

*Counsel for the Bolivarian Republic of Venezuela*

Joseph D. Pizzurro
Kevin A. Meehan
Juan O. Perla
CURTIS, MALLET-PREVOST,
COLT & MOSLE LLP
101 Park Avenue
New York, NY 10178
(212) 696-6000
jpizzurro@curtis.com

*Counsel for Petróleos de Venezuela, S.A.*

Nathan P. Eimer
Daniel D. Birk
EIMER STAHL LLP
224 South Michigan Avenue
Suite 1100
Chicago, IL 60604
(312) 660-7600
NEimer@eimerstahl.com

*Counsel for PDV Holding, Inc., and CITGO Petroleum Corporation*

## CERTIFICATE OF BAR MEMBERSHIP

I hereby certify that at least one attorney whose name appears on this Brief is a member in good standing of the bar of the United States Court of Appeals for the Third Circuit.

Dated: March 2, 2026

Respectfully submitted,

*/s/ Donald B. Verrilli, Jr.*
Donald B. Verrilli, Jr.
Counsel for the Bolivarian Republic of Venezuela

## CERTIFICATE OF COMPLIANCE

1. This document complies with the word limit of Fed. R. App. P. 32(a)(7)(B) as modified by this Court's December 19, 2025 Order (25-3347 Dkt.136), because, excluding the parts of the document exempted by Fed. R. App. P. 32(f), this document contains 9,000 words.

2. This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word 2010 in 14 point, Times New Roman.

3. The electronic copy of the Brief has been scanned for viruses and none were detected.

4. The text of the electronic copy of the Brief is identical to the text in the paper copies.

Dated: March 2, 2026

Respectfully submitted,

*/s/ Donald B. Verrilli, Jr.*
Donald B. Verrilli, Jr.
Counsel for the Bolivarian Republic of Venezuela

## CERTIFICATE OF SERVICE

I hereby certify that on March 2, 2026, the foregoing document was served on all parties or their counsel of record through the CM/ECF system.

Dated: March 2, 2026

Respectfully submitted,

*/s/ Donald B. Verrilli, Jr.*
Donald B. Verrilli, Jr.
Counsel for the Bolivarian Republic of Venezuela

## CERTIFICATE OF ELECTRONIC FILING

I hereby certify that the text of the electronic Brief filed through the CM/ECF system is identical to the text in the paper copies dispatched on March 2, 2026, by Federal Express Overnight delivery to the Clerk of the Court of the United States Court of Appeals for the Third Circuit.

Dated: March 2, 2026

Respectfully submitted,

*/s/ Donald B. Verrilli, Jr.*
Donald B. Verrilli, Jr.
Counsel for the Bolivarian Republic of Venezuela