# United States Court of Appeals
*for the*
# Third Circuit

Case Nos. 25-3347, 25-3348, 25-3349, 25-3350, 25-3363, 25-3453 to 25-3494, 25-3563, and 25-3564

CRYSTALLEX INTERNATIONAL CORPORATION

– v. –

BOLIVARIAN REPUBLIC OF VENEZUELA

Bolivarian Republic of Venezuela, Appellant in No. 25-3347

PDV Holding, Inc., Appellant in No. 25-3348

CITGO Petroleum Corporation, Appellant in No. 25-3349

Petróleos de Venezuela, S.A., Appellant in No. 25-3350

Gold Reserve Ltd., Appellant in No. 25-3363

XYQ US, LLC, Appellant in No. 25-3563 and 25-3564

ON APPEALS OF AN ORDER OF THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF DELAWARE NO. 17-MC-151-LPS AND 22-MC-347-LPS (HON. LEONARD P. STARK)

## REPLY BRIEF FOR APPELLANT XYQ US, LLC

DAVID ELSBERG
MICHAEL DUKE
SEAN FOLEY
MOLLY O'KEEFE
DARIA BALAESKOUL
ELSBERG BAKER & MARURI PLLC
350 Fifth Avenue, 38th Floor
New York, New York 10118
(212) 597-2600

*Counsel for Appellant XYQ US, LLC*

March 2, 2026

CP COUNSEL PRESS (800) 4-APPEAL • (390905)

## TABLE OF CONTENTS

INTRODUCTION ........................................................................................1

ARGUMENT ...........................................................................................3

I. The District Court's Order Was Reversible Error .....................................3

A. The District Court's Order Violated The Statutory Mandate That The Shares Be Sold To The "Highest Bidder" .......................................4

B. The District Court's Order Was Impermissible Even Under the Court's Own Procedures .......................................................................12

II. The Expected Value Analysis Was Not Only Legally Impermissible But Also Factually Flawed ..........................................................................14

A. The District Court Impermissibly—And Without Support—Assumed Gold Reserve's Bid Had Less Chance Of Closing Than Elliott's ......16

B. The District Court Improperly Assigned 100% Closing Certainty To Elliott's Bid ......................................................................21

CONCLUSION ........................................................................................26

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Acumed LLC v. Advanced Surgical Servs., Inc.*,
561 F.3d 199 (3d Cir. 2009)....................21

*Arnold v. Socy. for Sav. Bancorp, Inc.*,
650 A.2d 1270 (Del. 1994)....................9

*Caruana v. Saligman*,
1990 WL 212304 (Del. Ch. Dec. 21, 1990)....................4

*Edwards v. Wyatt*,
330 F. App'x 342 (3d Cir. 2009)....................15

*Frank's GMC Truck Ctr., Inc. v. Gen. Motors Corp.*,
847 F.2d 100 (3d Cir. 1988)....................18

*FTC v. Lane Labs-USA, Inc.*,
624 F.3d 575 (3d Cir. 2010)....................16

*Huff Fund Inv. Pr'ship v. CKx, Inc.*,
2013 WL 5878807 (Del. Ch. Nov. 1, 2013)....................9

*In re Adoption of Swanson,*
623 A.2d 1095 (Del. 1993)....................4, 5

*In re Appraisal of Regal Entm't Grp.*,
2021 WL 1916364 (Del. Ch. May 13, 2021)....................9

*In re APW Enclosure Sys., Inc.*,
2007 WL 3112414 (Bankr. D. Del. Oct. 23, 2007)....................13

*In re Bakalis*,
220 B.R. 525 (Bankr. E.D.N.Y. 1998)....................10

*In re Cap. Cities/ABC, Inc.'s Application for Access to Sealed Transcripts*,
913 F.2d 89 (3d Cir. 1990)....................................................................................21

*Ingram v. Experian Info. Sols., Inc.*,
83 F.4th 231 (3d Cir. 2023) ......................................................................................6

*InspiRx, Inc. v. Lupin Atlantis Holdings SA*,
554 F. Supp. 3d 542 (S.D.N.Y. 2021) ......................................................................22

*IRS v. Hairopoulos*,
118 F.3d 1240 (8th Cir. 1997) ...................................................................................13

*Laborers' Int'l Union of N. Am., AFL-CIO v. Foster Wheeler Corp.*,
26 F.3d 375 (3d Cir. 1994)........................................................................................16

*Lawsky v. Condor Cap. Corp.*,
2015 WL 4470332 (S.D.N.Y. July 21, 2015)...............................................................9

*Lawyers' Fund for Client Prot. of State of N.Y. v. Bank Leumi Tr. Co. of New York*,
94 N.Y.2d 398 (2000) ...............................................................................................25

*Leatherbury v. Greenspun*,
939 A.2d 1284 (Del. 2007) ......................................................................................4, 5

*Marblegate Asset Mgmt., LLC v. Educ. Mgmt. Corp.*,
846 F.3d 1 (2d Cir. 2017).........................................................................................26

*Mars Steel Corp. v. Continental Illinois National Bank & Trust Co.*,
834 F.2d 677 (7th Cir. 1987) ...................................................................................15

*Monzon v. De La Roca*,
910 F.3d 92 (3d Cir. 2018)........................................................................................16

*Sullivan v. DB Investments, Inc.*,
667 F.3d 273 (3d Cir. 2011).......................................................................................14

*Truskoski v. ESPN, Inc.*,
60 F.3d 74 (2d Cir. 1995)..........................................................................................12

*United States v. McBroom*,
124 F.3d 533 (3d Cir. 1997)....................................................................6

*United Steelworkers of Am., AFL-CIO v. N.J. Zinc Co.*,
828 F.2d 1001 (3d Cir. 1987)..................................................................15

*Versa Prods. Co. v. Bifold Co. (Mfg.),*
50 F.3d 189 (3d Cir. 1995)......................................................................16

*Vornado PS, L.L.C. v. Primestone Inv. Pr's, L.P.*,
821 A.2d 296 (Del. Ch. 2002)..................................................................10

**Statutes**

8 *Del. C.* § 324 ............................................................................ passim

9 *Del. C.* § 4535 ..............................................................................1, 4

9 *Del. C.* § 8753 ..............................................................................1, 4

22 *Del. C.* § 504 ..............................................................................1, 4

25 *Del. C.* § 6309 ............................................................................1, 4

**Rules**

F.R.A.P. 28(i).............................................................................................17

**Other Authorities**

9C Charles Alan Wright & Arthur R. Miller,
*Fed. Prac. & Proc.* § 2577 (3d ed.) .......................................................16

U.S. Dep't of Treasury, OFAC FAQ No. 74,
available at https://perma.cc/V3EZ-CFEC ...............................................19

Executive Order 13835, (May 21, 2018),
available at https://perma.cc/EUV6-RDCY...............................................19

Andrew J. Rossman, et al., *"Hell Or High Water" Clauses in Merger & Acquisition Agreements* (Aug. 18, 2022), available at https://perma.cc/KJB9-F8KA........................................................................................................21

What does Venezuela-related General License 5U authorize?, U.S. Dep't of Treasury, available at https://perma.cc/6XHF-C3NX .......................................19

## INTRODUCTION

Delaware law requires that attached shares be sold "at public sale to the highest bidder." 8 *Del. C.* § 324(a). The district court received three qualified bids. One—Gold Reserve's[1]—was approximately $7.9 billion, which was $2 billion higher than the next highest bid from Elliott. The district court chose Elliott's bid. That choice violated Delaware law.

Delaware's legislature knows how to authorize courts to subjectively determine the "best bid." It has done so numerous times. *See, e.g.*, 9 *Del. C.* §§ 4535, 8753; 22 *Del. C.* § 504(a); 25 *Del. C.* § 6309. Courts have long recognized that the "highest bid" is not always what the court may view as the "best bid." When the legislature wrote Section 324, it chose "highest bidder," full stop.

Remarkably, Appellees never address the fact that when the Delaware legislature wants to include a "best" bid requirement, it does so expressly. Nor do

---

[1] Entities and capitalized terms have the same definitions as in XYQ's Opening Brief. "Appellees" refers to Crystallex International Corporation, Amber Energy Inc., ConocoPhillips Petrozuata B.V., ConocoPhillips Hamaca B.V., Phillips Petroleum Company Venezuela Limited, ConocoPhillips Gulf of Paria B.V., OI European Group B.V., ACL1 Investments Ltd., ACL2 Investments Ltd., LDO (Cayman) XVIII Ltd., Northrop Grumman Ship Systems, Inc., Rusoro Mining Limited, Koch Minerals Sàrl, Koch Nitrogen International Sàrl, Red Tree Investments, LLC, Tidewater Investment SRL, and Tidewater Caribe, S.A.

they address the uniform refrain from courts in Delaware and across the country that the "highest bid" and the "best bid" are not necessarily the same. Instead, they resort to misdirection, trying to paper over the district court's erroneous decision to choose a lower bid when the statute required it to choose the highest bid. Every argument Appellees make in defense of the sale order is an argument for a judicial rewrite of Section 324 to include a standard Delaware's legislature declined to enact. The district court's failure to follow Section 324's mandate requires reversal.

But that is not all. The district court committed another independently dispositive error by deciding at the last minute to ignore procedures upon which bidders had relied for years. While Appellees try to defend the use of certainty of settlement with the 2020 Bondholders as a legitimate selection criterion, the district court's own prior order explicitly prohibited it: "[t]he [Sale Purchase Agreement] and [e]valuation [c]riteria shall NOT include any requirement or condition with respect to the 2020 Bond[holders]." JA5529-30 (emphasis in original). The Special Master and district court chose Elliott's bid anyway because that bid "virtually eliminates any closing risks associated with the [2020 Bondholders]." JA7435; JA0416. Courts may not abandon their procedures at the eleventh hour when the parties' reliance interests had long ago crystallized.

The district court's decision to choose a lower bid, and to reverse course at the last minute to weigh the closing risk that the 2020 Bondholders allegedly

presented, was fatally flawed. It violated Delaware law and the district court's own sales process. But even setting aside those clear defects, the district court's improper analysis was arbitrary. The district court irrationally "assumed" Elliott's bid had a 100% likelihood of closing and Gold Reserve's bid had less than a 75% likelihood of closing. It based those conclusions on nothing and ignored numerous risks to Elliott's bid that made clear it was not 100% likely to close (which even the district court acknowledged before proceeding with this assumption anyway).

Appellees have no defense of the district court's decision to set aside the legislative mandate to choose the highest bid, its own procedures, and the facts to arrive at the value destructive result of wiping out $2 billion in recovery to the attached judgment creditors ("AJCs") by choosing Elliott's lower bid. This Court should reverse.

## ARGUMENT

### I. The District Court's Order Was Reversible Error

Under Delaware law, attached shares must be sold to the "highest bidder." 8 *Del. C.* § 324(a).[2] By approving a sale to Elliott at $2 billion below Gold Reserve's bid, the district court disregarded this unambiguous requirement. Moreover, even if

[2] XYQ's judgment is directly against PDVSA, not the Bolivarian Republic of Venezuela, so the writ of attachment that secures XYQ's judgement is not subject to Venezuela's appeal with respect to Rule 69(a). *See* Venezuela Br. at 26-43.

the selection of Elliott's bid over Gold Reserve's did not violate Delaware law (it did), it violated the district court's own procedures. Either way, reversal is required.

### A. The District Court's Order Violated The Statutory Mandate That The Shares Be Sold To The "Highest Bidder"

Delaware law requires that attached shares be sold "at public sale to the ***highest*** bidder." *Id.* (emphasis added). To comply with that mandate, the district court should have accepted the highest bid, maximizing the proceeds to benefit the most AJCs. It did not. Rather, it selected what it viewed as "the best bid," *e.g.*, JA0413, based on the "combination of price and certainty" of closing, JA0415, which was $2 billion ***lower*** than Gold Reserve's bid.

As detailed in Gold Reserve's opening brief, the Delaware legislature could have authorized courts to choose what they view as the "best" bid. GR Br. at 28-32. The Delaware legislature has enacted many other statutes authorizing courts to do so. *See, e.g.*, 9 *Del. C.* §§ 4535 ("highest and best bidder"), 8753 (same); 22 *Del C.* § 504(a) (same); 25 *Del. C.* § 6309 (same). Delaware courts have also "long recognized that the highest bid is not necessarily the best bid." *Caruana v. Saligman*, 1990 WL 212304, at *5 (Del. Ch. Dec. 21, 1990). Numerous other courts, both federal and state, have as well. *See* GR Br. at 30-31 (collecting cases).

"It is well established that 'a court ***may not*** engraft upon a statute language which has clearly been excluded therefrom.'" *Leatherbury v. Greenspun*, 939 A.2d 1284, 1291 (Del. 2007) (emphasis added) (quoting *In re Adoption*

*of Swanson*, 623 A.2d 1095, 1097 (Del. 1993)). This is true "[r]egardless of one's views as to the wisdom of the statute." *Swanson*, 623 A.2d at 1097. "Where, as here, when provisions are expressly included in one statute but omitted from another, [the court] ***must*** conclude that the General Assembly intended to make those omissions." *Leatherbury*, 939 A.2d at 1291 (emphasis added).

Appellees ignore all of this. None of the eight Appellees address that when the Delaware legislature wants a court to determine what bid is "best," it says so expressly. None reference the numerous Delaware statutes that include their desired "best bid" standard. Nor do they mention the long recognition of Delaware courts that highest bid and best bid are not synonymous, or the numerous other courts that have concluded the same. Appellees' silence speaks volumes.

Rather than addressing the actual issue, Appellees try to skirt around it. They attempt to hide behind an abuse of discretion standard. *See, e.g.*, Amber Br. (referencing "discretion" at least fifty-five times). But as some of the Appellees concede, this Court reviews legal questions de novo. Four Creditors Br. at 21. The district court's construction of Section 324(a)—specifically, whether choosing Elliott's lower bid over Gold Reserve's higher bid violated Delaware law's "highest bidder" requirement—is a legal question. *See* XYQ Br. at 3-4. It is one of statutory

interpretation, and this Court reviews such questions de novo. *Ingram v. Experian Info. Sols., Inc.*, 83 F.4th 231, 236 (3d Cir. 2023).[3]

Elliott's feeble attempts to justify its misguided interpretation of Section 324 fall flat. Elliott contends that the inclusion of the language "to satisfy the debt" after the words "highest bidder" in Section 324 is somehow a license for courts to consider closing certainty alongside price. *See* Amber Br. at 47-48. Nonsense. The statute provides that after shares are attached, "[s]o many of the shares … may be sold at public sale to the highest bidder, ***as shall be sufficient to satisfy the debt***." 8 *Del. C.* § 324(a) (emphasis added). "[A]s shall be sufficient to satisfy the debt" explains how "many of the shares" should be sold—enough to "satisfy the debt." *Id.*[4] It is not a backdoor way to do what the legislature proscribed: selecting a bid based on factors other than price.

---

[3] Even if abuse of discretion were the proper standard of review (it is not), Appellants would still prevail. A district court "abuses its discretion when it makes an error of law," which is precisely what happened here. *United States v. McBroom*, 124 F.3d 533, 541 (3d Cir. 1997) (quotation omitted).

[4] Consistent with this interpretation, the Sale Procedures Order provided that potential bidders could acquire fewer than all of the attached shares if the number of shares sold satisfied all of the attached judgments. *See* JA3230 ("Interested parties may submit bids for the purchase and sale of some or all of the shares of PDVH … To avoid any ambiguity, ***parties may submit bids for less than 100% of the shares of PDVH so long as such bid satisfies the Attached Judgments***.") (emphases added).

With no answer to the statutory text or caselaw, Appellees try to play "gotcha." They argue that Appellants "add[ed] a "gloss" to Section 324 by "insisting that the court must choose the highest among the 'qualified' bids." Amber Br. at 47; *see* ConocoPhillips Br. at 15-18. But the "qualified bid" framework was not a "gloss," nor was it anything that Appellants imposed. Those were the rules of the road set by the district court. *See* JA3276-314 (Sale Procedures Order); JA3140-59 (Bidding Procedures).

At the outset, the district court and the Special Master agreed that the sales process needed to be "designed to … generate the greatest level of interest in the PDVH Shares and result in the highest offer in connection with any Sale Transaction at least sufficient to satisfy the Attached Judgments." JA3281. The district court also concluded that Section 324's "highest bidder" mandate did not prevent it from setting eligibility and bid-content criteria to screen out non-serious bidders. JA3140. So, the Bidding Procedures included "form and content" requirements for an offer to constitute an actual bid. JA3147-52. Once the Special Master and district court determined an offer met the bid requirements, the only remaining inquiry should have been determining which bid was the "highest."

Appellees argue there is no difference between the court disqualifying an offer on qualitative grounds before an auction and discounting a bid during the auction. *See* ConocoPhillips Br. at 17. Elliott and Crystallex point to Blue Water's and Black

Lion's higher-priced offers—which were rejected for failing to comply with the form and content requirements—as proof that higher-priced bids are properly disregarded for deficiencies other than price. Amber Br. at 47; Crystallex Br. at 57.

That argument misses the point. The purpose of qualitative screening is to serve as a gating mechanism—to determine bidder eligibility and ensure that only compliant offers enter the bidding process. Blue Water's and Black Lion's offers never made it past that gate.[5] Gold Reserve's did. The Special Master determined Gold Reserve's offer complied with the bid requirements, confirmed Gold Reserve's bid was "the highest bid for the PDVH Shares that meets the [b]id [r]equirements," JA5923 (¶ 78) (emphasis added), recommended Gold Reserve as the leading bidder, and executed a purchase agreement with Gold Reserve. Once Gold Reserve crossed that threshold, Delaware law permitted only one comparison: price.

The cases Appellees cite do not help them. ConocoPhillips (at 17-18) invokes *Arnold*, *DFC Global*, and *Regal* for the proposition that Delaware law requires discounting for risk and contingency when valuing transactions. But none of those cases involved a forced judicial sale under a "highest bidder" statute—let alone under Section 324.

---

[5] Both Blue Water's and Black Lion's offers lacked committed financing, JA0319, JA0393, and Black Lion's offer was subject to outstanding due diligence, JA0319.

*Arnold* addressed whether a contingency-laden valuation needed to be disclosed to stockholders in a merger proxy statement. *Arnold v. Socy. for Sav. Bancorp, Inc.*, 650 A.2d 1270, 1274 (Del. 1994). That situation, including the governing disclosure obligations, bears no resemblance to the facts here. *DFC Global* and *Regal* both arose in the appraisal context. *See In re Appraisal of Regal Entm't Grp.*, 2021 WL 1916364 (Del. Ch. May 13, 2021) (explaining "[a]n appraisal proceeding is … intended to provide shareholders dissenting from a merger … with a judicial determination of the intrinsic worth … of their shareholdings."). That is markedly different from Section 324's forced sale context, where courts choose the "highest bid" rather than value a company's shares.

Crystallex's effort to misdirect from its failure to address the statutory language fares no better. Crystallex cites two cases to claim certainty of financing and favorable deal terms are legitimate selection criteria when bidders "compet[e] along more dimensions than just price." Crystallex Br. at 58-59 (citing *Huff Fund Inv. Pr'ship v. CKx, Inc.*, 2013 WL 5878807, at *14 & n.135 (Del. Ch. Nov. 1, 2013); *Lawsky v. Condor Cap. Corp.*, 2015 WL 4470332, at *9 (S.D.N.Y. July 21, 2015)). But *Huff Fund* is an appraisal case—*i.e.*, a case having nothing to do with the statutory mandate to select the "highest bidder"—that can be discounted on the same grounds as the appraisal cases that ConocoPhillips cites. *See Huff Fund*, 2013 WL 5878807. And *Lawsky*—a New York case—involved a receiver empowered to

choose whatever bid he "deem[ed] to be advisable or necessary." 2015 WL 4470332, at *6 (S.D.N.Y. July 21, 2015). There was no "highest bidder" requirement.

Crystallex also relies (at 52) on *Vornado* to argue that "***[u]nder Delaware law***, a party that does 'not produce a valid financing commitment' is properly disqualified from bidding' and cannot be considered 'the highest bidder.'" That is wrong at every turn. *Vornado* applied ***New York*** law—not Delaware law. *See Vornado PS, L.L.C. v. Primestone Inv. Pr's, L.P.*, 821 A.2d 296, 314-16 (Del. Ch. 2002). It also concerned determining whether an offer was a valid bid—not whether the court, when selecting among valid bids, could choose a lower bid because the court subjectively determined that bid was best. *Id*. at 309-10. It does not help them.

Finally, Crystallex argues that *Bakalis* supports its position. Crystallex Br. at 58. But *Bakalis* proves XYQ's point. That case involved a "highest and best" standard, not a "highest bidder" standard. *In re Bakalis*, 220 B.R. 525, 533 (Bankr. E.D.N.Y. 1998). The non-price discretion *Bakalis* endorses flows from the word "best." *Id.* Section 324 omits any reference to the "best" bid, which means the considerations in *Bakalis* are precluded.

Appellees ignore that Section 324 leaves no room for bidders to "compete along more dimensions than just price." Crystallex Br. at 58-59. To the contrary, Section 324 requires that qualified bidders compete only on price. That ***other***

situations not governed by a "highest bid" requirement might have a different result is irrelevant. Appellees have not identified a single case that has done what the district court did here when tasked with selecting the highest bid. That is telling.

As a last resort, Appellees contend that Gold Reserve's bid was "no longer viable" at the time of the sale order because it lacked committed financing. Amber Br. at 48; Crystallex Br. at 51-52, 57-58. Appellees have it backwards: the district court's (improper) authorization of the Special Master's termination of the Gold Reserve's SPA led to the unraveling of Gold Reserve's financing, not the other way around. Gold Reserve had fully committed financing until the district court pulled the rug out from under it at the last minute. *E.g.*, JA11392-96 (Gold Reserve Commitment Letter). The Special Master and the district court knew that terminating the SPA would cause the termination of Gold Reserve's financing commitments. *See* JA13389 (1407:13-22) (statement from the Special Master's counsel). So, contrary to Appellees' attempt to brush aside the district court's error, the termination of Gold Reserve's SPA was anything but a "ministerial action." Amber Br. at 49. Rather, it took Gold Reserve's bid out of the running—causing Gold Reserve to lose its financing (as there was no bid left to finance)—and displaced Gold Reserve's higher bid in favor of Elliott's lower bid. *See* GR Reply at 4-5. Appellees' brazen suggestion that the inevitable result of the district court's

improper termination of Gold Reserve's SPA can retroactively justify that very error should be swiftly rejected. *See id.*

### B. The District Court's Order Was Impermissible Even Under the Court's Own Procedures

Even if Appellees were right (they are not) that the Special Master and the district court could select a lower bid based on some qualitative metric, the actual metric used to select Elliott's bid over Gold Reserve's bid was still improper. The Special Master chose Elliott's bid, although it was billions of dollars below Gold Reserve's, because he viewed the Transaction Support Agreement ("TSA") executed by certain 2020 Bondholders in connection with Elliott's bid as providing 100% "certainty of closing" by purportedly "eliminat[ing] any closing risks associated with the SDNY Litigation, by delivering a settlement with the … 2020 Bondholders." JA7435.

The district court had already rejected that criterion.[6] Even when the district court—contrary to Delaware law—permitted the Special Master to consider "closing certainty" in choosing between bids that met the form and content requirements, it did not include the alleged threat posed by the 2020 Bondholders as part of the

[6] Crystallex relies (at 55) on *Truskoski v. ESPN, Inc.*, 60 F.3d 74 (2d Cir. 1995), to argue that courts defer to a district court's interpretation of its own order. But, as Gold Reserve explains, a district court abuses its discretion by failing to adhere to the clear terms of its prior order. GR Reply at 12-13.

"closing certainty" assessment. *See* JA5559-60 (Evaluation Criteria). To the contrary, the district court explicitly ordered that there would be no "requirement or condition with respect to the 2020 Bond[holders] other than that bidders acknowledge that the 2020 Bond[holders] purport to have a pledge of 50.1% of the equity of CITGO Holding, Inc." JA5529-30.

On the last day of the sale hearing, Judge Failla issued a decision upholding the 2020 Bondholders' collateral interest. JA13432. The same day, the district court granted the Special Master's request to terminate Gold Reserve's SPA and sign Elliott's SPA—effectively endorsing a requirement that the winning bid address the risk posed by the 2020 Bondholders. *See* JA13421-24. The district court then expressly justified this shift based on Judge Failla's decision, asserting that Gold Reserve had made a losing "be[t] on a finding of [the bonds'] invalidity." JA0416. But Gold Reserve placed no such "bet"—the district court had instructed it not to do so. After explicitly not requiring that bids address the alleged risk posed by the 2020 Bondholders, the district court could not reverse course at the eleventh hour once bids had already been submitted in reliance on the district court's guidance or impose a new requirement after bidding had already closed. *Cf. In re APW Enclosure Sys., Inc.*, 2007 WL 3112414, at *6 (Bankr. D. Del. Oct. 23, 2007) (describing the fact that "other parties in interest did not have an opportunity to know what the sale procedures were" as "disturb[ing] and "concern[ing]"); *IRS v. Hairopoulos*, 118

F.3d 1240, 1244 (8th Cir. 1997) (explaining that creditors "have a right to adequate notice and the opportunity to participate in a meaningful way"). *See also* GR Reply at 14-15 (explaining that courts often reopen sales process based on similar procedural errors).

Here, after an almost decade-long process, expectations were crystallized; the district court had formally adopted sale criteria that expressly disclaimed any condition with respect to the alleged risk posed by the 2020 Bondholders. The district court erred by reversing course without notice at the last minute.[7]

## II. The Expected Value Analysis Was Not Only Legally Impermissible But Also Factually Flawed

As explained above, Delaware law requires courts to select the highest bid. It does not authorize the court to conduct an "expected value" analysis that determines which bid is "best." The district court engaged in an expected value analysis anyway, discounting Gold Reserve's bid based on alleged closing risks, assigning Elliott's bid a 100% certainty of closing, and selecting Elliott's bid after concluding it offered a superior "expected value." *See* JA0341-51.

Appellees argue that the analysis was permissible because courts regularly use expected value to assess litigation uncertainty, citing *Sullivan v. DB Investments,*

---

[7] The district court's decision to ignore the overbid requirement is also an independent ground for reversal. *See* GR Reply at 12-15.

*Inc.*, 667 F.3d 273 (3d Cir. 2011), *Mars Steel Corp. v. Continental Illinois National Bank & Trust Co.*, 834 F.2d 677 (7th Cir. 1987), and expert testimony that expected value is the "standard way" to quantify such uncertainty. Four Creditors Br. at 42-43. That confirms XYQ's point: rather than selecting the highest bid, the district court assessed the litigation uncertainty associated with the 2020 Bondholders' claims and chose the bid that, in its view, best resolved that uncertainty. As explained above, Section 324 does not authorize that decision.

Even if expected value analysis were permitted under Section 324 (it is not), the district court's analysis was doubly flawed. The expected values assigned to both Gold Reserve's and Elliott's bids were impermissible, arbitrary, unsupported by the record, and, therefore, not entitled to deference. *See Edwards v. Wyatt*, 330 F. App'x 342, 347 (3d Cir. 2009) ("Where a court's subordinate factual findings are insufficient, [this Court] 'review[s] the district court's ultimate factual findings under a standard more stringent than the clearly erroneous standard ordinarily applicable to such findings.'" (quoting *United Steelworkers of Am., AFL-CIO v. N.J.*

*Zinc Co.*, 828 F.2d 1001, 1009 (3d Cir. 1987))).[8] The district court's expected value "analysis" (or lack thereof) provides an independent basis for reversal.[9]

### A. The District Court Impermissibly—And Without Support—Assumed Gold Reserve's Bid Had Less Chance Of Closing Than Elliott's

The district court set 74.58% as the minimum closing probability Gold Reserve needed for its bid to exceed Elliott's expected value, based on the inexplicable and erroneous assumption that Elliott's bid had a 100% likelihood of closing. Appellees cannot defend the district court's conclusion that Gold Reserve's

---

[8] This fact mandates remand. *See* 9C Charles Alan Wright & Arthur R. Miller, *Fed. Prac. & Proc.* § 2577 (3d ed.) ("If the district court makes only general, conclusory, or inexact findings, the appellate court must vacate the judgment and remand for proper findings."). In any event, the district court's factual findings with respect to expected value were clearly erroneous. *See FTC v. Lane Labs-USA, Inc.*, 624 F.3d 575, 587 (3d Cir. 2010) (district court finding "unsupported by competent" evidence was clearly erroneous); *Versa Prods. Co. v. Bifold Co. (Mfg.)*, 50 F.3d 189, 210 (3d Cir. 1995) (reversing district court's order where "the district court's ultimate conclusion was clearly erroneous, not supported by record evidence, let alone evidence cited anywhere in the opinion").

[9] Appellees argue that XYQ's legal challenge to the expected value methodology was too underdeveloped to preserve. Four Creditors Br. at 42. That is wrong. XYQ's opening brief argued over numerous pages that Section 324 forecloses expected value analysis in a forced judicial sale, that the district court cited no authority for the methodology, and that the analysis was factually flawed in multiple independent respects. XYQ Br. at 10-19. That is not a "passing reference" or just "two sentences" in the brief. Four Creditors Br. at 42 (quoting *Laborers' Int'l Union of N. Am., AFL-CIO v. Foster Wheeler Corp.*, 26 F.3d 375, 389 (3d Cir. 1994); *Monzon v. De La Roca*, 910 F.3d 92, 106 n.90 (3d Cir. 2018)). Moreover, pursuant to F.R.A.P. 28(i), XYQ adopted Gold Reserve's arguments that the district court's expected value analysis violated 8 *Del. C.* § 324. *See* XYQ Br. at 5.

closing probability fell below that threshold because the court never calculated what that probability actually was. Rather, the district court identified three scenarios under which Gold Reserve could close—the 2020 Bondholders would lose on appeal, Gold Reserve would "come up with the financing to reach a settlement" with them, or OFAC would not provide the required approval for the bondholders to exercise their rights—and declared without any support or analysis that none cleared 75%. JA0351 & n.9. The district court made no factual finding, and Appellees identify no evidence to support the court's conclusory determination—no assessment of the probability of appeal, no assessment whether Gold Reserve could finance a settlement with the 2020 Bondholders, and, as described below, functionally no analysis of whether OFAC would provide the required approval for the 2020 Bondholders to exercise their rights.

Appellees' argument that litigation risk associated with the 2020 Bondholders justified the discount of Gold Reserve's bid fails because it addresses the wrong question.[10] Appellees justify the discount by arguing that the 2020 Bondholders

---

[10] Moreover, as explained above, Elliott's argument (at 20-21) that Gold Reserve's bid "failed to address" the 2020 Bondholders mischaracterizes Gold Reserve's compliance with the court's orders as a failure. Gold Reserve followed the district court's express instruction that the procedures "shall NOT include any requirement or condition with respect to the 2020 Bond Entities." JA5529-30. A bidder cannot be penalized for following the court's own rules. *See supra* § I.A.

posed a threat to Gold Reserve's ability to close. Specifically, they contend that Gold Reserve's bid could not close without completing a merger and that the 2020 Bondholders would challenge it. Four Creditors Br. at 44-46.

Whether the 2020 Bondholders had a viable legal claim against that financing structure is beside the point. The relevant question is whether the 2020 Bondholders could obtain an ***injunction*** stopping the transaction. To do so, they would need to demonstrate irreparable harm. *Frank's GMC Truck Ctr., Inc. v. Gen. Motors Corp.*, 847 F.2d 100, 102 (3d Cir. 1988). A claim that Gold Reserve's financing structure impairs the value of their collateral is a claim about diminution of economic value—precisely the kind of injury compensable with money damages, which cannot support irreparable harm. *Id*. Appellees do not engage with this argument anywhere in their briefs. That failure is dispositive.[11]

Even setting aside the irreparable harm problem, the 2020 Bondholder threat was overstated for a second reason: OFAC has repeatedly delayed the authorization date of General License 5, the license necessary for the 2020 Bondholders to attempt

---

[11] Moreover, on July 10, 2025—***after the Special Master recommended the Gold Reserve bid***—the 2020 Bondholders represented that they were "not seeking an injunction of Judge Stark, … the special master, … the process in Delaware … [or] the [G]old [R]eserve bid." JA8509.

to exercise any supposed Pledge rights to block the Gold Reserve transaction.[12] JA8511. Appellees argue that OFAC's past delays of the authorization date do not guarantee future delays, and that "at least one reasonable reading" of OFAC's guidance would permit action by the 2020 Bondholders even before General License 5 takes effect. Four Creditors Br. at 46; JA0399-400. But no one endorsed that reading—and it is directly contradicted by the Special Master's own advisor, who conceded the 2020 Bondholder threat to Gold Reserve's bid currently "does not exist." JA13200 (12:19-13:6). The argument that OFAC could have acted differently is irreconcilable with Appellees' insistence that the district court's decision be evaluated on the record at the time of the sale order. *See* Crystallex Br. at 57; Amber Br. at 48. At that time, as now, General License 5 was not effective

[12] Elliott confusingly states that "XYQ relies on OFAC's suspension of General License No. 5, which provides a limited exception to a prohibition imposed by an entirely different Executive Order." Amber Br. at 50-51. An OFAC license "is an authorization from OFAC to engage in a transaction that otherwise would be prohibited." U.S. Dep't of Treasury, OFAC FAQ No. 74, https://perma.cc/V3EZ-CFEC. Executive Order 13835 prohibits "[a]ll transactions related to … the sale, transfer, assignment, or pledging as collateral by the Government of Venezuela of any equity interest in any entity in which the Government of Venezuela has a 50 percent or greater ownership interest." Executive Order 13835, (May 21, 2018), https://perma.cc/EUV6-RDCY. Accordingly, Executive Order 13835 prohibits the 2020 Bondholders from exercising their rights under the Pledge. Although General License 5 provides an exception to the Executive Order that would allow the 2020 Bondholders to exercise their rights under the pledge, OFAC has repeatedly delayed the authorization date—most recently until March 20, 2026. *See* Office of Foreign Assets Control, *595. What does Venezuela-related General License 5U authorize?*, U.S. Dep't of Treasury, https://perma.cc/6XHF-C3NX.

and so the 2020 Bondholder "threat" to Gold Reserve's bid did not exist. Yet the district court erroneously acted as though General License 5 becoming effective before closing was a 100% certainty.

The district court also assumed erroneously that a failed Gold Reserve closing meant zero value.[13] Rather, the result would be an unsold asset that already demonstrated that it could fetch billions of dollars. Appellees do not dispute this point and argue only that redoing the sale process would have destroyed additional value through fees and delay and that changed geopolitical circumstances could reduce future proceeds. Four Creditors Br. at 47-48. The opposite is more likely to be true: changed geopolitical circumstances, especially considering recent developments in Venezuela, may well ***increase*** future proceeds. And the $19 million in Special Master fees Appellees cite as evidence of delay costs is a fraction of the $2 billion in value for AJCs permanently eliminated (absent reversal by this Court) by accepting Elliott's lower bid. *Id.* In any event, there is no explanation, and Appellees provide none, for a potential ***reduction*** in value to be treated as an ***elimination*** of all value.

---

[13] Elliott (at 53) also contends that XYQ forfeited any argument that the district court should not have assigned a failed Gold Reserve bid zero value by not raising that argument below. But Gold Reserve argued below that its bid does not have zero value, *e.g.*, JA0350 (¶ 343), and disputed Dr. Heaton's expected value analysis and its applications to Gold Reserve's and Elliott's bids. *See* D.I. 2426. XYQ joined Gold Reserve's arguments below. *E.g.,* D.I. 2503; 2378.

The district court's conclusion that Gold Reserve's bid had less than a 75% chance of closing was unsupported by the record, arbitrary, and without analysis. It warrants reversal.

### B. The District Court Improperly Assigned 100% Closing Certainty To Elliott's Bid

The district court's unexplained decision to assign Elliott's bid a 100% certainty of closing was irreconcilable with the record. The court acknowledged its assumption was counterfactual yet applied it anyway. JA0351. That was erroneous.

Elliott attempts to defend the 100% assumption by pointing to post-sale-order regulatory approvals.[14] Amber Br. at 52-53. Those regulatory approvals are not in the appellate record, so they cannot be considered on appeal. *See In re Cap. Cities/ABC, Inc.'s Application for Access to Sealed Transcripts*, 913 F.2d 89, 96 (3d Cir. 1990) (collecting cases); *Acumed LLC v. Advanced Surgical Servs., Inc.*, 561 F.3d 199, 226 (3d Cir. 2009) (same). Appellees also concede the point by arguing that the district court's expected value determination must be based on the likelihood of closing at the time of the sale order. Crystallex Br. at 60; Amber Br.

---

[14] Elliott (at 52) also points to the "hell or high water" provision contained in its SPA to try to justify the 100% closing certainty that the district court assigned Elliott's bid. But the provision, like all such provisions, only requires "[Elliott] to make all efforts to obtain the necessary approvals." JA0407. However, "***effort*** does not guarantee a desired ***outcome***—either regulatory approval or a closing." Andrew J. Rossman, et al., *"Hell Or High Water" Clauses in Merger & Acquisition Agreements* (Aug. 18, 2022), https://perma.cc/KJB9-F8KA (emphasis in original).

at 48. Approvals received after the sale order, *see* D.I. 2585, 2594, 2611, 2619, cannot retroactively validate an assumption that was unsupported when made.

Moreover, as explained in XYQ's opening brief, the TSA from the 2020 Bondholders, upon which the district court based its 100% closing assumption, was anything but a sure thing. XYQ Br. at 13-16. Instead, it is a contingency-laden agreement that has numerous paths to failure—which the district court brushed aside—including the following: the TSA required the court to execute a sale order on or before December 1, 2025, JA0407 n.29, JA13445 (1624:5-9) (describing December 1, 2025, as the Elliott bid's "drop dead date"); the so-called "Required Consenting 2020 Noteholders" retained discretion to withhold consent to any definitive TSA document or amendment, which is required for closing, JA8245; and the parties are required to engage in only "commercially reasonable efforts" to satisfy the conditions necessary to consummate the transaction, which is a low bar,[15] JA8250-54. If any of these contingencies do not materialize by June 30, 2026, the TSA dissolves, and the Required Consenting 2020 Noteholders can terminate the TSA. XYQ Br. at 13-14.

---

[15] *See InspiRx, Inc. v. Lupin Atlantis Holdings SA*, 554 F. Supp. 3d 542, 556 (S.D.N.Y. 2021) ("[T]he standard for satisfying commercial reasonability under New York law is a fairly lenient one." (citation omitted)).

Appellees do not—and cannot—contest that the TSA's embedded contingencies threaten to undermine a bid that the district court erroneously concluded is certain to close. Elliott, for its part, states (at 51 n.11) only that these contingent provisions are "standard." Even assuming that all these provisions are "standard" in this context, that does not make them any less contingent; nor does it relieve the district court of its obligation to consider whether and to what extent each provision could sink Elliott's bid when conducting an expected value analysis.

In addition to the risk that it could collapse under its own contingencies, the TSA also faced at least two other significant threats: the risk of failing to satisfy the issuer consent requirement in Section 9.02 of the 2020 Bond Indenture, and the risk that nonconsenting 2020 Bondholders would pursue legal challenges against the TSA. XYQ Br. at 14. Appellees' efforts to explain away these risks fall short.

*First*, Elliott and ConocoPhillips argue that Section 7.03 of the Pledge, not Section 9.02 of the Indenture, governs the release of collateral. Specifically, Elliott contends that Section 9.02 is inapplicable to the TSA because the TSA contemplates a direction to the Collateral Agent under Section 7.03 of the Pledge, not an "amendment or supplement" under Section 9.02 of the Indenture. Amber Br. at 51-52. ConocoPhillips advances a substantially similar argument, insisting that the Pledge's two-thirds requirement governs when, as here, the release of collateral follows a default, and that "[t]he provision governing amendments to the terms of

the indenture is not the governing provision for the reasons stated by the district court." ConocoPhillips Br. at 25-26.[16]

But as XYQ explained in its opening brief—and Appellees did not address in their opposition briefs—Section 7.03 is ***additive***, not substitutive. XYQ Br. at 14. Section 7.03 states that "the consent of the Holders of at least 66 2/3% aggregate in principal amount of the outstanding Notes shall be required." JA5458. That is true: a supermajority is necessary. But it is not sufficient.

Under Section 9.02, any "supplement" or "amendment" of the Indenture or Security Documents that "modif[ies] in any manner the rights of the Holders in respect thereof" requires the consent of the "Required Holders"—*i.e.*, a majority of Holders. JA5393-94. When the supplement or amendment involves the release of collateral, Section 9.02(b) increases the "Required Holders" threshold from a bare majority to a supermajority, which is the same threshold as specified in Section 7.03 of the Pledge. *Compare* JA5393-94 (Section 9.02) *with* JA5458 (Section 7.03).

Section 9.02 ***also*** requires the consent of "the Issuer." JA5393; XYQ Br. at 14. If PDVSA refuses to agree to supplement or amend the Indenture to release the collateral, no such supplement or amendment can occur under Section 9.02.

[16] ConocoPhillips's characterization (at 25) of Section 7.03 of the Pledge as a post-default remedy is contrary to the plain language of that provision. Section 7.03 is not a post-default remedy—in fact, the word "default" is not mentioned once in the provision. *See* JA5457-58.

Appellees believe they can release the collateral anyway without PDVSA's consent by labeling the same action as a direction to the Collateral Agent, rather than a supplement or amendment, and invoking Section 7.03 of the Pledge. New York law, which governs the Indenture (JA5397), does not permit such results. *See, e.g.*, *Lawyers' Fund for Client Prot. of State of N.Y. v. Bank Leumi Tr. Co. of New York*, 94 N.Y.2d 398, 404 (2000) (An "interpretation [that] would render [a contractual provision] superfluous … [is] unsupportable under standard principles of contract interpretation.").

*Second*, ConocoPhillips argues (at 25-26) that it is "nonsensical" to read Section 9.02 to permit a debtor to block the release of collateral. Not so. The property of the issuer, PDVSA, does not secure the bonds; rather, the property of its subsidiary, PDVH, serves as the collateral. JA5440. Once the collateral is released, the 2020 Bondholders would no longer have recourse to PDVH's shares of CITGO Holding and would look to PDVSA to satisfy the debt. So, it is entirely sensical, as the drafters of the Indenture recognized, to require PDVSA's consent to the elimination of valuable credit support for debt on which it is the primary obligor.

*Third*, Appellees also miss the point. The point is not whether XYQ has the correct interpretation of the Indenture, though it does. Rather, the issue is that the district court refused to even consider the litigation risk posed by these arguments. When that risk is taken into account, the expected value of Elliott's bid goes down.

The district court, though, turned a blind eye to these risks and assumed a 100% chance of Elliott's bid closing. That is unsupported and irrational.

*Finally*, ConocoPhillips builds a strawman (at 25) out of *Marblegate Asset Mgmt., LLC v. Educ. Mgmt. Corp.*, 846 F.3d 1 (2d Cir. 2017), arguing that "*Marblegate* stands for precisely the opposite position to the one XYQ argues here." That is wrong. The point XYQ made in its opening brief is a simple one: the non-consenting creditors "retain the right to 'pursue available State and federal law remedies' to enforce their payment rights," and may act to protect their investments, including by challenging the TSA. XYQ Br. at 15 (quoting *Marblegate*, 846 F.3d at 16). Tellingly, ConocoPhillips neither disputes that point nor offers any defense of the district court's failure to consider litigation risk with respect to Elliott's bid.

There is no defense to the district court's arbitrary and unsupported assumption that Elliott's bid had a 100% chance of closing. Its decision to assume a 100% chance of closing anyway was erroneous and warrants reversal.

## CONCLUSION

This Court should vacate the sale order, and remand with instructions to conform to Section 324 and the governing procedures.

Respectfully submitted,

*/s/David Elsberg*
DAVID ELSBERG
MICHAEL DUKE
SEAN FOLEY
MOLLY O'KEEFE
DARIA BALAESKOUL
ELSBERG BAKER & MARURI PLLC
350 Fifth Avenue, 38th Floor
New York, New York 10118
(212) 597-2600
delsberg@elsberglaw.com
mduke@elsberglaw.com
sfoley@elsberglaw.com
mokeefe@elsberglaw.com
dbalaeskoul@elsberglaw.com

*Counsel for Appellant XYQ US, LLC*

March 2, 2026

**CERTIFICATE OF COMPLIANCE**

1. This document complies with the type-volume limit of F.R.A.P. 32(a)(7)(B) because, excluding the parts of the document exempted by F.R.A.P. 32(f), this document contains 6,445 words, as certified by the word-count function of the word-processing system (Microsoft Office Word 365) used to prepare the document.

2. This document complies with the typeface requirements of F.R.A.P. 32(a)(5), the type-style requirements of F.R.A.P. 32(a)(6), and 3d Circuit L.A.R. 32.1(c), because this document has been prepared in a proportionally spaced typeface using Microsoft Office Word 365 in 14-point Times New Roman font.

3. In addition, pursuant to 3d Circuit L.A.R. 31.1(c), the undersigned hereby certifies that the text of the electronic brief filed with the Court is identical to the paper copies, that a virus detection program has been run on the electronic file, and that no virus was detected.

Dated: March 2, 2026

*/s/David Elsberg*
David Elsberg
Counsel for Appellant
XYQ US, LLC

## CERTIFICATE OF BAR MEMBERSHIP

Pursuant to 3d Circuit L.A.R. 28.3(d) and 46.1, I, David Elsberg, hereby certify that I am a member in good standing of the bar of the United States Court of Appeals for the Third Circuit.

Dated: March 2, 2026

*/s/David Elsberg*
David Elsberg
Counsel for Appellant
XYQ US, LLC

## CERTIFICATE OF FILING AND SERVICE

I certify that, on March 2, 2026, the foregoing Reply Brief of Appellant XYQ US, LLC was filed electronically with the Clerk of Court and served on counsel of record through CM/ECF.

*/s/David Elsberg*
David Elsberg
Counsel for Appellant
XYQ US, LLC